KIEVE LAW OFFICES
  Loren Kieve (Bar No. 56280)
2655 Steiner Street
San Francisco, California 94115
Telephone:      (415) 364-0060
Facsimile:      (435) 304-0060
lk@kievelaw.com

Counsel for plaintiff PHH Mortgage Corporation

UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PHH MORTGAGE CORPORATION,<br><br>                    Plaintiff,<br><br>          vs.<br><br>BARRETT, DAFFIN, FRAPPIER, TREDER & WEISS, LLP,<br><br>                    Defendant. | Civil Action No. 2:16-cv-00832-KJM-EFB<br><br>SUPPLEMENTAL REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PHH MORTGAGE CORPORATION'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT<br><br>Date:  October 20, 2017<br><br>Time:  10:00 a.m. |

Plaintiff PHH Mortgage Corporation requests that the Court take judicial notice pursuant to Fed. R. Evid. 201(b) of the court record and status of court proceedings set forth below. *Archer v. Gipson,* No. 1:12-CV-00261-JLT, 2017 WL 1398854, at *1 (E.D. Cal. Apr. 19, 2017) ("The record of a court proceeding is a source whose accuracy cannot reasonably be questioned, and judicial notice may be taken of court records").

On October 23, 2017, the Third District Court of Appeal issued its opinion and order in the appeal styled *Linza v. PHH Mortgage Corp.,* No. C078067, (a) reversing the judgment below of some $16 million, including $15.7 million in punitive damages, as well as the award of attorneys' fees to Mr. Linza, and (b) remanding for a limited trial on the issue of contract damages. A copy of that document is attached as **Exhibit 24.**

Dated: October 25, 2017

Loren Kieve

Counsel for plaintiff
PHH Mortgage Corporation

Exhibit 24

Court of Appeal, Third Appellate District
Andrea K. Wallin-Rohmann, Clerk/Administrator
Electronically FILED on 10/23/2017 by A. Kenner, Deputy Clerk

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yuba)

----

| | |
|---|---|
| PHILLIP LINZA, | C078067 |
| Plaintiff and Appellant, | |
| | (Super. Ct. No. YCSCCVCV 12-0000714) |
| v. | |
| PHH MORTGAGE CORPORATION, | |
| Defendant and Appellant. | |

Plaintiff Phillip Linza entered into a loan modification agreement with defendant PHH Mortgage Corporation (PHH) that reduced his monthly payments on his home loan. Soon after, PHH incorrectly notified him that his payments were substantially higher than the amount actually due and sent two notices of intention to foreclose; each contained incorrect information.  Linza stopped making any payments.  He first contacted PHH and then filed a claim with the Department of Corporations.  The matter was not resolved to Linza's satisfaction and he sued PHH for breach of contract and various torts.  The jury

returned a verdict in his favor of over $16 million, including $15.7 million in punitive damages.  The trial court granted PHH's motion for a judgment notwithstanding the verdict (JNOV) as to the tort causes of action, but denied its motion for a new trial on the contract causes of action.

Both sides appeal.  Linza contends substantial evidence supports the jury verdict on intentional infliction of emotional distress, negligence, misrepresentation, intentional interference with contract, and punitive damages.  PHH contends the JNOV should be affirmed, but complains that the trial court abused its discretion in denying the motion for a new trial.  PHH contends a new trial must be granted on the contract claims because the jury was prejudiced by evidence in support of the invalid tort claims and because the damage award was excessive, speculative, and not supported by the evidence.

We affirm the JNOV, but reverse the order denying the motion for a new trial.  All of the tort claims are either factually deficient or legally barred, and there is insufficient evidence to support the award of damages.  Accordingly, we reverse the judgment and remand for a new trial, limited to the issue of contract damages.

## FACTUAL AND PROCEDURAL BACKGROUND

*The Loan Modification*

Linza purchased a home in Olivehurst in 2006.  He financed the purchase with a 30-year loan of $278,437 at 7.5 percent interest from Century 21 Mortgage.  PHH does business as Century 21.  Linza's monthly payment was $1,946.88; he put in a pool and backyard landscaping at a cost of $55,000.  With the subsequent economic downturn, Linza suffered financial difficulties.  He worked in the jewelry business and his income had declined from $40,000-$45,000 a year to $10,000.  He filed for bankruptcy in October 2009, and was discharged therefrom in March 2010.

In June 2010 Linza wrote to PHH for help in keeping his house by means of a loan modification.  PHH and Linza entered into a loan modification later that year.  Under its terms, the loan balance was increased to $298,051.51; $28,972.45 was added to the loan

for accrued interest, advances (including escrow advances), and fees.  The interest rate was two percent for the first two years, then three and one half percent for the next five years, then five percent for 30 years.  The initial monthly payment, beginning January 1, 2011, was $1,234.96 for principal and interest plus $308.31 to escrow for property taxes.

Linza made payments for January, February, March, and April 2011.  The March payment was returned for insufficient funds and the April payment was applied to March.

*Incorrect Statements from PHH and Attempts to Resolve the Problem*

In April PHH sent Linza an annual escrow statement indicating his monthly payment was increased to $2,352.80 because his escrow account had a shortage of over $9,000.  This statement was in error; although the prior escrow shortage had been added to the loan amount as part of the modification, the paperwork had not zeroed out the escrow balance.  According to Linza, he called PHH and spoke with Henry Thomas, the head of the loss mitigation department.  Thomas told Linza that his payments had not been accepted but had been put in a separate escrow account.  When Linza asked why he should pay if his payments were not credited to his account, Thomas responded that he would just as soon Linza did not pay.  Thomas said he would make more money that way, because Linza's earlier payments would stay in his department.  Thomas did not testify at trial.

In early May PHH sent out a notice of intention to foreclose, claiming Linza owed $7,056.90 to stop the foreclosure proceedings.  This notice was generated by an automated system and was a mistake.  Linza called PHH, but it took him several days to make contact.  Then someone at PHH told him it looked like PHH had made several mistakes, but never got back to him.  Linza was scared, hurt, upset, and confused.  A second notice of intent to foreclose was sent in mid-May; this notice claimed the amount due was $4,704.60.  This notice was also a mistake.

3

Linza did not make any further payments as he believed, based on his conversation with Thomas, that PHH would keep the payments and not apply them to the loan. Linza's experience was "[t]otal absolute frustration."

PHH sent Linza an annual escrow statement on July 29, 2011.  This statement correctly showed a zero escrow balance at the beginning of the loan modification.  It showed a current escrow shortage of $616.62.  Due to the shortage, the new monthly payment was increased by $34.26 to $1,577.53.  PHH believed this escrow statement cured the early errors by providing the correct monthly payment.

Linza agreed to this payment, but wanted the back payments added to the principal of the loan and any further agreements or changes to be in writing.  He warned that if there was any further attempt to foreclose, he would sue.  Linza also wanted PHH to send him a confirmation letter.  PHH refused; Thomas said such a letter was not required. When Linza threatened legal action, Thomas replied, "stand in line."  Thomas said PHH was a multi-billion dollar company with deep pockets and a "bus load" of attorneys on retainer.  He told Linza that if Linza thought he could find an attorney to take on PHH to go ahead.

Linza filed a complaint with the Department of Corporations.  Thomas, on behalf of PHH, responded to the complaint in both December 2011 and January 2012.  Both letters by Thomas stated the monthly payment of principal, interest, and escrow of $1,543.27 had been increased by $34.26 due to an escrow shortage for a monthly payment of $1,577.53, the same amount as that stated in the July 2011 annual escrow statement.

Linza continued to refrain from paying anything toward the loan, including the agreed-upon monthly payments.  In January 2012, PHH wrote Linza that his loan was 10 months past due.  Linza did not respond.  PHH recorded a notice of default in April and a notice of trustee's sale in early July.  The trustee's sale was set for July 30, 2012.

4

*Linza's Lawsuit*

Linza filed suit against PHH for breach of contract and various torts and applied for a temporary restraining order (TRO) to stop the trustee's sale. The trial court granted the TRO until an order to show cause could be heard. In opposition to the TRO, PHH submitted the declaration of Marjari Ganti, a litigation specialist in the foreclosure/bankruptcy department (who astoundingly *repeated* the earlier mistake of the $9,708.32 escrow shortage). The court granted a preliminary injunction against foreclosure, and ordered Linza to post a bond of $25,000 and make monthly payments of $1,234.96 for principal and interest plus $308.31 for escrow. These sums were the amount of the mortgage under the modification agreement and the amount that Linza did not dispute was payable into escrow. In December, the parties stipulated to dissolve the injunction as Linza had neither posted a bond nor made any payments.

PHH demurred to Linza's complaint. The demurrer was dropped from the court's calendar after Linza filed an amended complaint.

As relevant here, the amended complaint set forth causes of action for breach of contract and breach of the implied covenant of good faith and fair dealing (the contract claims) and intentional and negligent misrepresentation, intentional interference with contract, and negligence (the tort claims).[1] The amended complaint sought compensatory, special, statutory, and punitive damages; expungement of the foreclosure instruments; and removal of derogatory information from Linza's credit report.

*Linza's Case at Trial*

On July 9, 2014, the morning that the evidence portion of the trial was to begin, Linza raised an issue of a discovery dispute and sought a continuance. The trial court questioned why the case had been set for trial before discovery was complete, remarking

---

[1] Other causes of action were later dismissed after the grant of nonsuit or dismissed by Linza.

5

that the sequence of events was "bizarre."  The court denied the motion to continue and reserved the issue of sanctions, which it later denied.

At trial, Linza testified to his efforts to resolve the problems with PHH.  He claimed he spent days on the phone with the Department of Corporations, sometimes for three or four hours a day.  He explained he could afford the loan payments but he could not pay the loan payments as well as his attorneys.  He paid his attorneys about $300 more per month than the loan payment amount.

On the issue of damages, Linza testified people came by and took pictures of his house and asked to see the backyard.  A man came by once a month with an envelope; he said the house was in foreclosure and to call PHH.  Linza was uncertain if he could keep the house, so when his children and his grandson wanted to visit from out-of-state, he had to tell them they should not come because he did not know if he would still be there.  He could no longer use the home as he used to before foreclosure was threatened; for example, he did not plant flowers in front or put water in the fountain.

Linza's health was affected.  He could not sleep at night and had diarrhea or nausea, although he claimed that during the day he was "absolutely fine."  He went to a doctor who prescribed Paxil for stress; his medical expenses were a $20 co-pay and around $200 for the medication.  He clarified:  "I'm hurt and wounded but more than anything I'm just pissed."  When PHH asked him about proof of damages, Linza responded, "I would think common sense, reason, logic, any analytical person with a pulse that would put themselves in my position could understand the type of damage that it would do to them."

Linza claimed there was damage to his credit but he had not pulled a credit report because that would cause further damage.  At first he testified his failure to make payments did "absolutely not" affect his credit, but later admitted his credit was "drastically affected by not making payments."  He wanted PHH to have to pay a lot of money or be "nailed" with a fine.

Linza retained Anthony Tarter, who had 40 years experience in the finance industry, as an expert.  Tarter testified there was an opportunity for a lender to make increased fees if a loan was in default.  It was a good business practice to modify a loan. The period from the original mistake in the amount owed to Ganti's declaration repeating the mistake was 494 days, a time period that Tarter testified was not "on the planet" as to the standard of care.  In Tarter's opinion, it was reasonable for Linza to request a letter correcting the errors, and Linza was treated very poorly and unfairly.  There was no doubt that Linza's credit had been damaged, but Tarter could not put a number on the damage because it was too speculative.

Ronald Casperite from PHH admitted that PHH had made several mistakes.  He explained the turmoil in the housing market in 2010 contributed to the mistakes.  He could not answer why Linza was never told in writing that the May 2011 foreclosure notices were in error.

*Motion for Nonsuit and Amendment of the Complaint*

At the close of Linza's case, PHH orally moved for a nonsuit.  PHH argued there was no breach of contract because Linza had failed to perform and suffered no damage. Linza argued in response that his performance was made impossible.  The court asked about Linza's damages and if the fees were speculative because it was unknown if they would be charged.  Linza argued his damages included the time he spent trying to straighten out the problems and the damage to his credit.  As the discussion continued, the court expressed frustration at the parties' lack of briefing, and then denied nonsuit on the contract claims.

The court also denied the nonsuit motion as to the causes of action for negligence, fraud or misrepresentation, and interference with contract.

Linza sought to amend his complaint to add a claim for intentional infliction of emotional distress; his motion to amend was granted without objection.

*PHH's Case*

PHH called an expert who testified PHH acted reasonably and could have corrected any damage to Linza's credit report.  PHH's Casperite testified he was not aware that PHH would make money when a loan was in default.  He claimed if there *were* a foreclosure on Linza's home, there was the potential for a large write-off.  The home's value was $235,000 in May 2014, while the outstanding balance on the loan was $295,000 and the amount for a pay-off was in the range of $350,000.  The investor holding the loan would lose $100,000.

Casperite claimed the July 2011 escrow statement and PHH's letters to the Department of Corporations confirmed the corrected amount of Linza's monthly payment.  He explained that PHH could not send a letter confirming a set payment amount because the amount added for *escrow* fluctuated.  While Linza's request for a confirmation letter appeared reasonable at first blush, PHH had to take potential fluctuations into account.

Casperite testified about calls reflected by the customer service log.  The log showed that by early May 2011, Linza was threatening to sue.  Linza hung up on calls with PHH several times and PHH was unable to contact him after July 2011.

*Linza's Closing Argument*

During closing argument, Linza asked the jury to "send a message," claiming companies hear only "through their pocket books."  He claimed PHH made a business decision to force Linza into foreclosure rather than send him a new contract.

Much of the argument was devoted to damages.  Linza argued that he should be able to recover fees, but he could not specify the amount--a problem for which he blamed PHH, accusing PHH of withholding evidence.  He requested fees of $56,149, based on the difference between his loan balance and the payoff amount.  For loss of use and enjoyment of the house--as demonstrated by his reluctance to plant flowers or fill his fountain, as well as strangers' inquiries as to his move-out date--he suggested one half the

8

amount of his monthly loan payment for 39 months for a total of $30,000.  He calculated his time spent making calls and sending letters to be 200 hours at $19.23 an hour or $3,846.  He sought medical expenses of $220.  The expert, after speaking with colleagues, had come up with a figure of $25,000 for damage to Linza's credit, and Linza asked for $225,000 for emotional distress.

*Jury Verdicts*

The jury found for Linza on all causes of action.  It awarded damages of $513,902.40 as to each cause of action, a far greater amount than Linza had requested. The verdict form designated the damages as $250 for medical expenses, $158,652.40 in other past economic expenses, $55,000 in future economic expenses, and $300,000 for past noneconomic loss, including physical pain and mental suffering.  The jury further found PHH acted with malice, oppression, or fraud.  In a separate trial on punitive damages, the jury awarded Linza $15.7 million.

*Motions for JNOV and a New Trial*

After the initial verdict, PHH (orally) moved for a JNOV.  Again, the trial court expressed frustration at the lack of briefing, taking the motion under submission and proceeding with the trial on punitive damages.  PHH subsequently filed a written motion, as well as a motion for a new trial, through new counsel.

The court granted PHH's motion for JNOV as to the tort claims, the causes of action for negligence, misrepresentation, intentional interference with contract, and intentional infliction of emotional distress.  The court also granted JNOV as to future economic damage, and denied it with respect to damages on the contract claims.  The court cited expert testimony of credit damage, evidence that Linza made hundreds of calls, evidence that $50,000 was added to his mortgage due to nonpayment, and evidence that Linza had made a down payment of $80,000, spent $55,000 on improvements, and paid a $1,200 loan modification fee.

The trial court denied the motion for a new trial.  It was not convinced the jury should have reached a different verdict.  The amended judgment awarded Linza $158,902.40 in past economic damages.  The court awarded $178,731 in attorney fees.

Both Linza and PHH appealed.

## DISCUSSION

### I

*Linza's Appeal*

A.  *Standard of Review*

Linza contends the trial court erred in granting JNOV as to the tort claims because substantial evidence supports each.  The standard of review is well settled.  "An appellate court reviews the grant or denial of a motion for JNOV de novo using the same standard as the trial court.  [Citation.]  A JNOV must be granted where, viewing the evidence in the light most favorable to the party securing the verdict, the evidence compels a verdict for the moving party as a matter of law.  [Citations.]  In general, ' "[t]he purpose of a motion for judgment notwithstanding the verdict is not to afford a review of the jury's deliberation but to prevent a miscarriage of justice in those cases where the verdict rendered is without foundation." ' [Citation.]"  (*Oakland Raiders v. Oakland-Alameda County Coliseum, Inc.* (2006) 144 Cal.App.4th 1175, 1194.)

"The trial court's power to grant a motion for JNOV is the same as its power to grant a directed verdict.  (Code Civ. Proc., § 629.)  The court must accept as true the evidence supporting the jury's verdict, disregarding all conflicting evidence and indulging in every legitimate inference that may be drawn in support of the judgment.  The court may grant the motion only if there is no substantial evidence to support the verdict."  (*Tognazzini v. Coastal Unified School Dist.* (2001) 86 Cal.App.4th 1053, 1057-1058.)

B.  *Intentional Infliction of Emotional Distress*

"The elements of a cause of action for intentional infliction of emotional distress are (1) the defendant engages in extreme and outrageous conduct with the intent to cause, or with reckless disregard for the probability of causing, emotional distress; (2) the plaintiff suffers extreme or severe emotional distress; and (3) the defendant's extreme and outrageous conduct was the actual and proximate cause of the plaintiff's extreme or severe emotional distress.  [Citation.]  Outrageous conduct is conduct that is intentional or reckless and so extreme as to exceed all bounds of decency in a civilized community. [Citation.]  The defendant's conduct must be directed to the plaintiff, but malicious or evil purpose is not essential to liability. [Citation.]  Whether conduct is outrageous is usually a question of fact.  [Citation.]"  (*Ragland v. U.S. Bank National Assn*. (2012) 209 Cal.App.4th 182, 204 (*Ragland*).)

"In evaluating whether the defendant's conduct was outrageous, it is 'not . . . enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.  Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'  (Rest.2d Torts, § 46, com. d, p. 73.)

"Further, the tort does not extend to 'mere insults, indignities, *threats*, annoyances, petty oppressions, or other trivialities.  The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind.  There is no occasion for the law to intervene in every case where some one's feelings are hurt.  There must still be freedom to express an unflattering opinion, and *some safety valve must be left through which irascible*

*tempers may blow off relatively harmless steam . . . .'* (Rest.2d Torts, § 46, com. d, p. 73; [citations].)" (*Cochran v. Cochran* (1998) 65 Cal.App.4th 488, 496.)

Although whether conduct qualifies as outrageous is generally a question of *fact*, many cases analyzing conduct labeled as outrageous have concluded that the conduct at issue was not outrageous *as a matter of law*. (*Barker v. Fox & Associates* (2015) 240 Cal.App.4th 333, 356.) Linza protests that cases finding no outrageous conduct as a matter of law are those in which the claim was resolved by demurrer or summary judgment, so the question did not go to the jury. He offers no principled reason to distinguish between *facts alleged* (in a complaint) and *facts proven* (to a jury) for purposes of determining whether such facts are sufficient to constitute outrageous conduct. Linza appears to take the view that once a jury has found a fact to be true, reviewing courts are powerless to find the evidence insufficient to support that fact. Such a view of the law is untenable as it would eliminate the procedural vehicle of a JNOV, as well as the substantial evidence standard of review.

We look to case law to define conduct which is sufficiently outrageous to satisfy that particular element of the tort of intentional infliction of emotional distress. For example, a bank's conduct was sufficiently outrageous where it failed to advise small business operators (the plaintiffs) that it would give no further loans and misrepresented that further loans would be made if the plaintiffs assigned all past, present and future accounts receivable to the bank. It then refused further loans despite the plaintiffs' compliance and forced the plaintiffs to execute excessive guarantees and security agreements. Further, bank employees publicly ridiculed plaintiffs, including the use of profanities. (*Sanchez-Corea v. Bank of America* (1985) 38 Cal.3d 892, 909.) As another example, a plaintiff adequately alleged extreme and outrageous conduct by an anesthesiologist who brought a container of blood and tissue to her bedside while she was recovering from a surgical procedure after a miscarriage. (*So v. Shin* (2013) 212 Cal.App.4th 652, 672-673.) Finally, a jury could find a reporter's conduct in

12

interviewing three young children on camera without another adult present and telling them of their neighbor's suicide and murder of two playmates was extreme and outrageous. (*KOVR-TV, Inc. v. Superior Court* (1995) 31 Cal.App.4th 1023, 1030-1031.)

On the other hand, the plaintiffs *failed* to allege the requisite outrageous conduct by an insurance adjuster who allegedly ignored evidence supporting coverage for damage from a heavy tree limb that fell on their home, altered the scene, conspired with an unlicensed contractor to create a false report to deny coverage, and made disparaging remarks. (*Bock v. Hansen* (2014) 225 Cal.App.4th 215, 235-236.)  As another example, a court properly sustained a demurrer to an emotional distress claim that foreclosing lenders breached an oral agreement to foreclose on a vacant property first where there were no allegations that lenders "threatened, insulted, abused or humiliated" the plaintiffs. (*Wilson v. Hynek* (2012) 207 Cal.App.4th 999, 1009.)

Linza contends the evidence, viewed in the light most favorable to him, shows extreme and outrageous conduct.  He argues the heart of his emotional distress claim is PHH's inadequate response to its own mistakes.  He emphasizes that PHH took much too long to acknowledge and correct its errors, demanded large and incorrect sums to prevent foreclosure, and refused to confirm the proper payment amount in writing.  PHH's Thomas dared Linza to sue and bragged of PHH's financial strength and legal resources. While Linza recognizes that some might view Thomas's response as merely insensitive (or unprofessional), he argues the jury *could have* found it extreme and outrageous.[2]

We are not persuaded.  The conduct at issue here does not rise to the level of that conduct which the courts have deemed sufficiently outrageous.

---

[2]  At oral argument, counsel for PHH admitted Thomas's conduct was "rude, arrogant, and insensitive."

In *Little v. Stuyvesant Life Ins. Co.* (1977) 67 Cal.App.3d 451, the jury found the insurer's conduct in denying disability insurance benefits was outrageous. On appeal, the defendant contended it had simply declined to pay a disputed claim. The appellate court found other inferences were possible. "That is one possible view of the evidence. Viewing the evidence most favorably to plaintiff who prevailed below, however, reasonable inferences may be drawn that defendant purposely ignored the great bulk of the medical information it had and withheld that information from the physicians it selected to examine plaintiff and that it sought only to justify its predetermined course of discontinuing disability benefit payments justly due plaintiff under the policy." (*Id*. at p. 462.)

PHH's conduct did not evidence the same deliberate refusal to meet its obligations. PHH corrected the error as to the escrow balance in the July 2011 escrow statement and in its various responses to the Department of Corporations. It was Linza who cut off contact with PHH after July 2011 and failed to make *any* further payments. Although the evidence shows PHH made a significant billing error, by May 2011 it had recognized its mistake. What followed was a prolonged attempt to correct the error to Linza's satisfaction, compounded by incorrect automated notices (and an incorrect declaration) and poor customer service. Despite these difficulties, PHH never foreclosed on Linza's home. A notice of trustee's sale was not filed until July 2012, after Linza had failed to make *any* payments for *over a year*. (Compare *Ragland, supra,* 209 Cal.App.4th at pp. 204-205 [triable issue of fact as to outrageous conduct where lender induced borrower to default and sold house at foreclosure sale].)

Difficulties in resolving billing problems and other issues with customer service in large corporations and the accompanying delay, annoyance, frustration, and anger are unfortunate but common occurrences in modern life, experienced by nearly all. Such common annoyances are hardly "so extreme in degree, as to go beyond all possible

14

bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." (Rest.2d Torts, § 46, com. d, p. 73.)

Because Linza failed to produce substantial evidence of extreme and outrageous conduct, the trial court did not err in granting JNOV on his claim for intentional infliction of emotional distress.

C.  *Negligence*

"The existence of a duty of care owed by a defendant to a plaintiff is a prerequisite to establishing a claim for negligence. [Citation.] 'Whether a legal duty exists in a given case is primarily a question of law.' [Citation.]" (*Nymark v. Heart Fed. Savings & Loan Assn.* (1991) 231 Cal.App.3d 1089, 1095 (*Nymark*).)

Linza contends there was sufficient evidence of negligence because his expert testified PHH breached the standard of care by not correcting its errors within 30 days and PHH lacked the proper policies to address issues such as those Linza experienced in dealing with the company.

In granting JNOV on the negligence claim, the trial court found PHH owed no duty to Linza because its involvement was only as a lender.  At most, the court found, PHH acted as "an arguably 'bad' party to the loan modification contract."  "[A]s a general rule, a financial institution owes no duty of care to a borrower when the institution's involvement in the loan transaction does not exceed the scope of its conventional role as a mere lender of money." (*Nymark, supra,* 231 Cal.App.3d at p. 1096.)  In *Nymark,* we found the lender owed no duty of care to the borrower in preparation of a loan appraisal.  (*Id.* at p. 1097.)

Linza contends first that *Nymark* applies only to lenders and here PHH was acting as a loan servicer, not a lender.  But PHH *was* acting as a lender, as it originated the loan. Further, courts have included loan servicers within the general rule of *Nymark*.  (*Lanini v. JPMorgan Chase Bank* (E.D.Cal., Apr. 4, 2014, No. 2:13-CV-00027 KJM) 2014 U.S. Dist. Lexis 47348, at p. *7 (*Lanini*); *Somera v. Indymac Federal Bank, FSB* (E.D.Cal.,

15

Mar. 3, 2010, No. 2:09-CV01947 FCD DAD) 2010 U.S. Dist. Lexis 19256, at p. *5;

*Lingad v. Indymac Federal Bank* (E.D.Cal. 2010) 682 F.Supp.2d 1142, 1149.)  After all,

once a residential loan is funded, the borrower's only remaining relationship with the

lender is servicing.  (See *Jolley v. Chase Home Finance, LLC* (2013) 213 Cal.App.4th

872, 901 [distinguishing construction loan from residential loan].)

 Linza next argues that the *Nymark* rule is only a "general" rule and the question of

duty in a specific case must be determined by applying the factors set forth in *Biakanja v.*

*Irving* (1958) 49 Cal.2d 647, as the court did in *Nymark*.  (*Nymark, supra,*

231 Cal.App.3d at pp. 1098-1100.)  We agree that *Nymark* does not stand for the

proposition that a lender or loan servicer can *never* owe a duty of care to the borrower.

Currently, courts are split over whether a lender owes a duty of care in negotiating or

processing a loan modification.  (See, e.g., *Alvarez v. BAC Home Loans Servicing, L.P.*

(2014) 228 Cal.App.4th 941, 951 [duty to use reasonable care in the processing of a loan

modification]; *Lueras v. BAC Home Loans Servicing, LP* (2013) 221 Cal.App.4th 49, 67

[lender does not owe a borrower a common law duty "to offer, consider or approve" a

loan modification].)  But here the loan modification was complete.  Outside the area of

negotiation and implementation of a loan modification, Linza fails to cite to a case where

a court found the lender or loan servicer owed a duty to the borrower that would support

a negligence cause of action.

 Cases have found no duty in circumstances similar to those here.  In *Lanini,* the

plaintiffs alleged the defendant had a duty of care to apply their loan payments accurately

and properly and to maintain accurate records, the same allegations as here.  The court

found these activities "sufficiently entwined with money lending" so as not to give rise to

a duty of care.  (*Lanini, supra,* U.S. Dist. Lexis 47348, at p. *8.)  In *Ragland, supra,*

209 Cal.App.4th at page 205, a borrower alleged the lender misadvised her to fail to pay

a loan payment in order to be considered for a loan modification, then negligently caused

her severe emotional distress by failing to modify her loan and selling her home in a

foreclosure sale.  The reviewing court affirmed summary adjudication of a cause of action for negligent infliction of emotional distress, concluding, "[t]he undisputed facts established there was no relationship between [the borrower] and [the lender] giving rise to a duty the breach of which would permit [the borrower] to recover emotional distress damages based on negligence."  (*Id.* at p. 208.)

Further, there is a separate basis on which to grant JNOV on the negligence claim; Linza cannot recover in tort for a negligent breach of contract.  Linza's amended complaint alleged:  "Defendants breached their duty to Plaintiff by failing to honor the terms of the Subject Agreement."  It further alleged PHH breached its duty by providing Linza with incorrect information about the amount of money he owed and proceeding with foreclosure.  Thus, Linza's negligence claim was based on PHH's failure to perform under the terms of the loan modification agreement.  Negligent breach of contract is insufficient for recovery of tort damages.  (*Erlich v. Menezes* (1999) 21 Cal.4th 543, 552 (*Erlich*).)

"Generally, outside the insurance context, 'a tortious breach of contract . . . may be found when (1) the breach is accompanied by a traditional common law tort, such as fraud or conversion; (2) the means used to breach the contract are tortious, involving deceit or undue coercion or; (3) one party intentionally breaches the contract intending or knowing that such a breach will cause severe, unmitigable harm in the form of mental anguish, personal hardship, or substantial consequential damages.' [Citation.]  Focusing on intentional conduct gives substance to the proposition that a breach of contract is tortious only when some independent duty arising from tort law is violated. [Citation.]  If every negligent breach of a contract gives rise to tort damages the limitation would be meaningless, as would the statutory distinction between tort and contract remedies."  (*Erlich, supra,* 21 Cal.4th at pp. 553-554.)

Because the negligence claim was not based on any intentional conduct or independent tort duty, the trial court did not err in granting JNOV on this count.

17

D. *Misrepresentation*

The jury found in favor of Linza on both negligent and intentional misrepresentation.  The trial court found no reliance and granted JNOV on both counts.

"The elements of negligent misrepresentation are (1) the misrepresentation of a past or existing material fact, (2) without reasonable ground for believing it to be true, (3) with intent to induce another's reliance on the fact misrepresented, (4) justifiable reliance on the misrepresentation, and (5) resulting damage."  (*Apollo Capital Fund LLC v. Roth Capital Partners, LLC* (2007) 158 Cal.App.4th 226, 243.)  In a claim for intentional misrepresentation, the elements are the same except the second element is replaced with knowledge of falsity.  (*Chapman v. Skype Inc*. (2013) 220 Cal.App.4th 217, 230.)

The element of justifiable reliance is not met where the plaintiff knows the alleged misrepresentation is not true.  (*Orient Handel v. United States Fid. & Guar. Co.* (1987) 192 Cal.App.3d 684, 696 [no justifiable reliance where insurer disbelieved any misrepresentations or concealment by insureds]; *Gold v. Los Angeles Democratic League* (1975) 49 Cal.App.3d 365, 374-375 [plaintiff could not reasonably rely on alleged misrepresentation he knew was false]; *Chavez v. Citizens for a Fair Farm Labor Law* (1978) 84 Cal.App.3d 77, 80 [same].)  To allege actual reliance sufficiently, the "plaintiff must plead that he believed the representations to be true (or that he was ignorant of their falsity which amounts to the same thing), and that in reliance thereon (or induced thereby) he entered into the transaction."  (*Younan v. Equifax Inc*. (1980) 111 Cal.App.3d 498, 513.)

Linza testified he knew the April 11, 2011 letter claiming his monthly payment was $2,352.30 was "not true" and not what he agreed to.  He did not pay the amounts claimed due in the notices of intention to foreclose because "I wasn't going to pay for something I didn't know and nobody can explain to me what it was."  Linza never paid any of the amounts demanded (or even the undisputed monthly payments).  On appeal, Linza "does not seriously contend that he believed he owed those amounts."

18

Despite Linza's undisputed knowledge that the alleged misrepresentations were false, he contends there was reliance because PHH actually *wanted* him to default on the loan to collect greater fees.  Linza argues the jury could conclude that PHH made fraudulent misrepresentations to induce Linza to breach the loan modification agreement and Linza relied on these misrepresentations by refusing to continue to make payments.  This convoluted theory does not support an action for misrepresentation.  For a valid claim of misrepresentation, the plaintiff must reasonably rely on the misrepresentation *believing it is true*.  (*Beckwith v. Dahl* (2012) 205 Cal.App.4th 1039, 1063.)  Because Linza failed to prove reasonable reliance on the alleged misrepresentations, the trial court did not err in granting JNOV on the claims for intentional and negligent misrepresentation.

E. *Intentional Interference with Contract*

Linza contends the trial court erred in granting JNOV on the claim for intentional interference with contract by finding that PHH could not interfere with its own contract. However, the trial court was correct.  The tort of intentional inference with contract can be committed only by a stranger to the contract.  "The tort of intentional interference with contractual relations is committed only by 'strangers—interlopers who have no legitimate interest in the scope or course of the contract's performance.' [Citation.]  Consequently, a contracting party is incapable of interfering with the performance of his or her own contract and cannot be held liable in tort for conspiracy to interfere with his or her own contract.  [Citations.]"  (*PM Group, Inc. v. Stewart* (2007) 154 Cal.App.4th 55, 65.)

The elements of intentional inference with contractual relations are:  "(1) a valid contract between plaintiff and *a third party*; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage."  (*Pacific Gas & Electric Co. v. Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1126, italics added.)

Here the only contract at issue is the loan modification agreement, entered into by Linza and PHH (dba Century 21). PHH was the originator of the loan, but it assigned the proceeds to an investor while continuing to service the loan. This relationship was explained to the jury by a stipulation: "The parties to this action stipulate to the following facts. That PHH Mortgage Corporation and Phillip Linza entered into a contract. The loan modification agreement dated November 9, 2010. PHH Mortgage Corporation transferred the right to receive payments on the loan modification agreement to a separate investor. Each party must still follow the terms of the loan modification agreement."

Linza contends PHH is not a party to the loan modification agreement as it is only the servicer of the loan. Linza relies on statements of counsel for PHH in response to the court's question about an earlier version of the stipulation. Counsel stated: "That was relating to the interference with the contract and it involves a third party, one of the elements, and so we stipulated because the loan modification agreement was originally entered into with Century 21 but then the contract was assigned to a third party to Bank of America. First U.S. Bank and then Bank of America. So we just stipulated that the contract was entered into by a third party."

Linza argues that there were two agreements: the loan modification with the owner of the loan (Bank of America) and a second agreement between Linza and PHH that required both to abide by the terms of the loan modification agreement.[3] Linza contends PHH interfered with the contract between him and Bank of America. He

---

[3] Linza contends this separate agreement to abide by the terms of the loan modification agreement allowed for Linza's cause of action for breach of contract. The amended complaint, however, identifies the loan modification agreement entered into on November 9, 2011, as the contract at issue in the breach of contract claim.

further contends he relied on counsel's statement and PHH is now judicially estopped from presenting a different meaning of the stipulation.

Linza's argument fails. Although there are two agreements, Linza misidentifies them. The first agreement is the loan modification agreement between Linza and PHH that is at issue in this case. The second is an assignment agreement between PHH and Bank of America that is *not* at issue in this case. Although PHH had assigned the proceeds of the loan modification agreement, it was not a stranger to that agreement. It was still bound by its terms, as explicitly recognized in the stipulation. (See also Civ. Code, § 1457 [burden of obligation cannot be transferred without consent of party to be benefitted].) The incorrect characterization of the stipulation by counsel for PHH does not change the analysis. Counsel's statement was not in evidence and was contradicted by the actual evidence, the stipulation that identified the contract and that both parties were bound by its terms.

Linza's attempt to invoke judicial estoppel also fails because he does not meet the requirements of the doctrine. "The elements of judicial estoppel are '(1) the same party has taken two positions; (2) the positions were taken in judicial or quasi-judicial administrative proceedings; (3) the party was successful in asserting the first position (i.e., the tribunal adopted the position or accepted it as true); (4) the two positions are totally inconsistent; and (5) the first position was not taken as a result of ignorance, fraud, or mistake.' [Citations.] Even if the necessary elements of judicial estoppel are satisfied, the trial court still has discretion to not apply the doctrine. [Citation.]" (*Owens v. County of Los Angeles* (2013) 220 Cal.App.4th 107, 121.)

PHH did not advance different positions. In the trial court it argued it was party to the only contract so there could be no interference with contract. Moreover, the trial court did not accept counsel's statement as to a third party contract. Rather, it found PHH could not interfere with its own contract.

The trial court did not err in granting JNOV on the claim for intentional interference with contract.

F.  *Punitive Damages*

"[P]unitive or exemplary damages, which are designed to punish and deter statutorily defined types of wrongful conduct, are available only in actions 'for breach of an obligation *not* arising from contract.'  (Civ. Code, § 3294, subd. (a), italics added.)  In the absence of an independent tort, punitive damages may not be awarded for breach of contract 'even where the defendant's conduct in breaching the contract was willful, fraudulent, or malicious.'  [Citation.]"  (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 516 (*Applied Equipment*).)

Since the trial court correctly ruled that Linza could not recover in tort, it was also correct in ruling he could not recover punitive damages.

II

*PHH's Cross-Appeal*

PHH contends the trial court abused its discretion in denying PHH's motion for a new trial on the contract claims for two reasons.  First, the jury was improperly tainted by inflammatory evidence on the invalid tort claims.  Second, the economic damages award was excessive and not supported by the record, suggesting the jury used the wrong standard or was swayed by passion and prejudice.

A.  *Motion for a New Trial and Standard of Review*

PHH moved for a new trial on the contract claims on the grounds that the jury was contaminated by the evidence of the tort claims, there was insufficient evidence to support the jury verdict, and the trial court committed instructional error.  The trial court denied the motion because PHH failed to file dispositive motions to narrow the issues, the instructional error caused no prejudice, PHH did not argue the damages were not proper contract damages, and the court was not convinced the jury should have reached another verdict.

"New trial motions, as creatures of statute, are solely granted on the grounds enumerated in Code of Civil Procedure section 657." (*Sargon Enterprises, Inc. v. University of Southern California* (2013) 215 Cal.App.4th 1495, 1506.)  These statutory grounds include "[i]rregularity in the proceedings," "[e]xcessive or inadequate damages," and [i]nsufficiency of the evidence" if the rights of the party aggrieved are materially affected.  (Code Civ. Proc., § 657, subds. 1, 5, & 6.)

"Although a trial court is not required to specify its reasons for denying a motion for a new trial, a reviewing court must not turn a blind eye to reasons or findings stated on the record.  The standard of review is abuse of discretion." (*David v. Hernandez* (2014) 226 Cal.App.4th 578, 590.)  An abuse of discretion is established where the trial court's decision rests on an error of law.  (*Ibid*.)

B.  The *"Taint" of Tort Evidence*

Relying on *Fidler v. Hollywood Park Operating Co.* (1990) 223 Cal.App.3d 483, PHH contends a new trial must be ordered on the contract claims because evidence of the invalid tort claims prejudiced the jury.  In *Fidler*, the plaintiff sued for wrongful discharge and, in addition to economic losses, sought damages for emotional distress and punitive damages.  (*Id.* at p. 487.)  The jury awarded him $898,101.  (*Id.* at p. 485.)  After the trial, the California Supreme Court clarified that neither compensatory damages for emotional distress nor punitive damages were available in a wrongful discharge action; the court also found that rule was fully retroactive.  (*Id.* at pp. 487-488.)  On appeal, the court reversed the damage award as to damages for emotional distress and punitive damages.  (*Id.* at p. 488.)  The court further found the evidence to support these non-contract damages denied the defendant a fair trial and ordered a new trial.  (*Id.* at p. 489.)  "Claims that either the employer's business decision was so unfair that it caused the employee emotional distress or that the employer's actions were so egregious as to find the predicates for punitive damages are particularly of the sort likely to inflame the jury and evoke passion." (*Ibid.*)  PHH contends the same result is required here.

23

In denying the motion for a new trial on this ground, the trial court faulted PHH's counsel for failing to file a single dispositive motion, such a demurrer, motion for summary adjudication, or motion for judgment on the pleadings, to narrow the issues at trial, or to request any limiting instructions.  The court also noted that PHH did not object to the amendment to the complaint adding a claim for intentional infliction of emotional distress.  Linza argues PHH's lack of diligence precludes a new trial.

"A party litigant is deemed to have waived matters constituting grounds for a new trial which come to his attention during the course of the trial, or of which he should by the exercise of reasonable diligence have acquired knowledge, where he fails to make objection at the time of the occurrence and seek to have the defect cured."  (*Olmos v. Southern Pacific Co*. (1948) 84 Cal.App.2d 765, 768.)

PHH contends *Fidler* does not require any objection to the invalid tort evidence.  We find *Fidler* distinguishable on this point.  The defendant in *Fidler* could not have objected to the tort evidence during trial because the decision barring such evidence came *after* the trial.  Here, the law on which PHH relies to defeat the tort claims--such as *Nymark, supra,* 231 Cal.App.3d 1089, *Erlich, supra*, 21 Cal.4th 543*,* and the law of interference with contract--was well established at the time of trial and could have been argued in a dispositive motion to eliminate one or more tort claims.

PHH further contends that it was not until trial that it became clear that the tort claims were unsupported by the evidence.  We reject this feeble claim.  The lack of any evidence to support a tort claim could have been determined before trial based on discovery.  "A motion for summary judgment is designed to test whether there is sufficient evidence upon which a claim or defense may be sustained."  (*Harman v. Mono General Hospital* (1982) 131 Cal.App.3d 607, 612.)  "A party may move for summary adjudication as to one or more causes of action . . . if the party contends that the cause of action has no merit."  (Code Civ. Proc., § 437c, subd. (f)(1).)  "A cause of action has no merit if . . .  [¶]  [o]ne or more of the elements of the cause of action cannot be separately

established." (*Id.,* subd. (o)(1).)  A "moving defendant may show by competent proofs (typically derived from discovery) that the *plaintiff lacks the evidence* to prove a necessary fact."  (*Browne v. Turner Const. Co*. (2005) 127 Cal.App.4th 1334, 1339-1340.)

We recognize that PHH filed an in limine motion to exclude evidence of emotional distress, which the trial court denied.  But in limine motions are not designed "to replace the dispositive motions prescribed by the Code of Civil Procedure." (*Amtower v. Photon Dynamics, Inc*. (2008) 158 Cal.App.4th 1582, 1593.)

We agree with the trial court that PHH could have--and, in the interests of preserving scarce judicial resources, should have--sought to narrow the scope of the trial by use of cogent dispositive motions.  Indeed, we find PHH's passive acquiescence in defending the action perplexing.  Because PHH failed to make sufficient efforts to keep the tort evidence out of the case, the trial court did not abuse its discretion in denying the motion for a new trial on this ground.

    C.  *Sufficiency of the Evidence of Contract Damages*

        1.  *Measure of Contract Damages and Jury Instructions*

"Contract damages seek to approximate the agreed-upon performance.  '[I]n the law of contracts the theory is that the party injured by breach should receive as nearly as possible the equivalent of the benefits of performance.'  [Citations.]"  (*Applied Equipment, supra,* 7 Cal.4th at p. 515)  "For the breach of an obligation arising from contract, the measure of damages . . . is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom."  (Civ. Code, § 3300.)  "No damages can be recovered for a breach of contract which are not clearly ascertainable in both their nature and origin."  (Civ. Code, § 3301.)

The trial court instructed the jury on contract damages.  "The purpose of such damages is to put Phillip Linza in as good a position as he would have been if PHH

Mortgage Corporation had performed as promised."  "Phillip Linza claims damages for loss of the use and enjoyment of his property due to the breach of the contract and threat of foreclosure.  Phillip Linza also claims damages for loss of time and other conveniences caused by the breach of contract . . . ."  "If you decide that PHH Mortgage Corporation breached a contract but also that Phillip Linza was not harmed by the breach, you may still award him nominal damages such as one dollar."

The court also distinguished between the damages available on all claims and those available only for the tort claims.  The court instructed the jury that damages for loss of time, loss of use and enjoyment of the residence, additional fees, costs, and interest on the loan, and damages to Linza's credit were recoverable only once under any of the legal theories presented, both contract and tort.  Damages for emotional distress and the purchase of medicine, on the other hand, were recoverable only under the tort theories and only once.

The jury did not follow these instructions.  Instead, the jury awarded identical damages on both the contract and tort claims.  In particular, the jury awarded $300,000 for noneconomic damages, including physical pain and mental suffering, for breach of contract and $250 for medical expenses where the evidence showed "a couple of hundred dollars" was for the cost of medicine.  The jury's disregard of the instructions, as well as the enormous punitive damage award, suggests the jury was swayed by passion and prejudice and did not decide the case solely on the evidence.[4]

The court granted PHH's motion for JNOV as to the noneconomic damages of $300,000, as such damages are not recoverable in contract, and the $55,000 for future

---

[4]  The punitive damage award of $15.7 million was over 30 times the amount of the actual damages ($513,902.40) that the jury originally found.  There is a presumption that a punitive damage award that exceeds a single-digit ratio between the punitive damages and compensatory damages is constitutionally invalid.  (*Simon v. San Paolo U.S. Holding Co., Inc.* (2005) 35 Cal.4th 1159, 1182.)

economic damages, as the parties agreed there was no evidence of future economic damages.  The amended judgment awarded Linza $158,902.40 in past economic damages.

PHH contends the evidence does not support this reduced damages award.  We agree.  The damage award is difficult to analyze because the jury did not specify precisely what the damages were.  However, neither the damages sought by Linza in closing argument nor the damages cited by the trial court in denying the motion for JNOV on contract claims support an award of $158,902.40.  No other evidence in the record supports the award.

### 2.  *Damages Requested in Closing Argument*

In closing argument, Linza requested economic damages of $115,215 for fees and costs, loss of use and enjoyment of his home, his time spent attempting to resolve the problem, medical expenses, and damage to his credit.  The jury awarded $158,902.40, almost 40 percent more than Linza sought.  The evidence does not support even the lesser amount.

Linza argued the damages for loss of use and enjoyment of his home should be calculated as one-half the amount of his mortgage payment (which was not made) for 39 months, totaling $30,000.  On appeal, Linza argues the jury could have used "a different decision calculus" and awarded twice that amount.[5]  But there was no evidence that PHH prevented Linza from full use of his home.  Linza's decision not to plant flowers, put water in his fountain, or welcome out-of-state guests was based on his emotional state-- his fear of foreclosure.  Such damages, if recoverable, are emotional distress damages, not contract damages.  Further, such minor inconveniences do not support an award of even $30,000.  Linza did not specify when he suffered these damages or for how long.

---

[5]  Linza provided this court with about 175 pages of briefing, but devotes fewer than two full pages to the issue of the sufficiency of the evidence of contract damages.

The only serious threat of foreclosure was in July 2012 when a trustee's sale was scheduled, but this threat was short-lived as Linza obtained a preliminary injunction. Tellingly, Linza then failed either to post the bond or pay the undisputed portion of the payment as required by the court, so the injunction was dissolved *by stipulation*.

Linza requested $56,149 in fees and costs, calculated as the difference between the pay-off amount of $355,000 and the loan balance of $298,851.  In discussing the motion for nonsuit, the court questioned whether these fees were speculative because it was unknown if they would be charged.  Further, this amount includes unpaid property taxes-- Linza's responsibility.  The evidence does not support the award.

The jury awarded $250 in medical expenses, despite being instructed that contract damages do not include the cost of medicine.  Linza testified he incurred a $20 co-pay for visiting the doctor once for stress and spent "a couple of hundred" dollars on medicine. There is no other evidence of any medical expenses.  This portion of the damage award cannot stand.

At trial, Linza's expert Tarter testified he did not obtain Linza's credit report, but there was no doubt his credit was damaged.  He could not put a number on it because giving a value "would be speculative."  Speculative damages cannot serve as the legal basis for recovery.  (*Piscitelli v. Friedenberg* (2001) 87 Cal.App.4th 953, 989.)  In closing argument, counsel argued the expert had consulted with colleagues and placed a value of $25,000 on the damaged credit.  "It is axiomatic that the unsworn statements of counsel are not evidence."  (*In re Zeth S*. (2003) 31 Cal.4th 396, 413, fn. 11.)  No evidence supported this amount; to the extent the jury found damages based on Linza's closing argument, the damage award is not supported by sufficient evidence.

3. *The Trial Court's Discussion of Damages*

In denying PHH's motion for JNOV on past economic damages, the trial court found evidence to support the medical damages, expert testimony that Linza's credit was damaged, that Linza made hundreds of calls to trying to straighten out the erroneous

billing, and that over $50,000 had been added to the mortgage due to nonpayment, penalties and interest. As we have explained, the evidence is insufficient to support the full damage award based on these elements of damages.

The court also cited evidence that Linza had made a down payment of $80,000, spent $55,000 on backyard improvements, and spent $1,200 for a loan modification fee. While these dollar amounts come closer to supporting the damage award, they are not proper elements of contract damages. Linza is still in possession of the property and the loan modification is still in effect. He has not lost these amounts due to PHH's breach in sending erroneous information about the amount he owes.

Because the evidence was insufficient to support the damage award, the trial court abused its discretion in denying PHH's motion for a new trial on the contract claims. It is difficult to determine exactly what damage Linza suffered due to the breach of contract. On appeal, PHH does not dispute that there was a breach and does not contend that Linza suffered no damage or nominal damage. As PHH challenges only the damage award on appeal, the new trial shall be limited to damages. (See *Capelouto v. Kaiser Foundation Hospitals* (1972) 7 Cal.3d 889, 898 [ordering limited new trial on issue of damages].) Because we reverse and remand for a new trial, at this point there is no prevailing party for an attorney fee award under Civil Code section 1717 and the fee award cannot stand. (See *Spinks v. Equity Residential Briarwood Apartments* (2009) 171 Cal.App.4th 1004, 1056 [reversing fee award where summary judgment is reversed].)

**DISPOSITION**

The judgment and the award of attorney fees are reversed and the cause remanded for a limited new trial on the issue of contract damages.  PHH shall recover its costs on appeal.  (Cal. Rules of Court, rule 8.278(a).)


                                                          Duarte, J.


We concur:


Nicholson, Acting P. J.


Robie, J.


30

IN THE

# Court of Appeal of the State of California

IN AND FOR THE

## THIRD APPELLATE DISTRICT

MAILING LIST

Re:   Linza v. PHH Mortgage Corporation
      C078067
      Yuba County
      No.    YCSCCVCV120000714

Copies of this document have been sent by mail to the parties checked below unless they were noticed electronically.   If a party does not appear on the TrueFiling Servicing Notification and is not checked below, service was not required.

John S. Sargetis
United Law Center
1390 Lead Hill Blvd.
Roseville, CA 95661

Forrest Arthur Hainline III
Goodwin Procter LLP
3 Embarcadero Center
San Francisco, CA 94111

Jonathan D. Fink
Wright, Finlay & Zak, LLP
4665 MacArthur Court, Suite 280
Newport Beach, CA 92660

Michael Ray Pfeifer
Pfeifer & de la Mora, LLP
765 The City Dr
Ste 380
Orange, CA 92868

 Honorable Stephen W. Berrier
Judge of the
Yuba County Superior Court
215 Fifth Street
Marysville, CA 95901