1 | KIEVE LAW OFFICES
   Loren Kieve (Bar No. 56280)
2 | 2655 Steiner Street
San Francisco, California 94115
3 | Telephone:   (415) 364-0060
Facsimile:   (435) 304-0060
4 | lk@kievelaw.com

5 | Counsel for plaintiff PHH Mortgage Corporation

UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PHH MORTGAGE CORPORATION,<br><br>        Plaintiff,<br><br>    vs.<br><br>BARRETT, DAFFIN, FRAPPIER, TREDER & WEISS, LLP,<br><br>        Defendant. | Civil Action No. 2:16-cv-00832-KJM-EFB<br><br>DECLARATION OF SHANNON TOMASSO IN SUPPORT OF PHH MORTGAGE CORPORATION'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT<br><br>Date:  October 20, 2017<br><br>Time:  10:00 a.m. |

Shannon Tomasso states:

1. I am Director of Default for PHH Mortgage Corporation ("PHH").

2. I have held that position since 2011.

3. As Director of Default, I am responsible for oversight of foreclosure property preservation and foreclosure bankruptcy attorney oversight for PHH.

4. I have personal knowledge of the facts set forth below and I could and would testify to the truth of these facts.

5. Attached as **Exhibit 23** is a true and correct copy of the July 31, 2011 Legal Services Agreement "between PHH Mortgage Corporation, a New Jersey corporation, and Barrett Daffin Frappier Treder & Weiss LLP ('Firm'), whose principal address is 15000 Surveyor Blvd, Addison, TX 75007."

6. Attached as **Exhibit 1** is a true and correct copy of the April 5, 2013 Legal Services Agreement between PHH and "Barrett, Daffin, Frappier, Turner & Engel, LLP (and its Affiliated Firms Barrett, Daffin, Frappier, Levine & Block, LLP and Barrett, Daffin, Frappier, Treder & Weiss, LLP (collectively the 'BDF Law Group' or 'Firm'), whose principal address is 15000 Surveyor Boulevard, Addison, Texas 75001."

7. The April 5, 2013 Legal Services Agreement superseded the prior July 31, 2011 Legal Services Agreement.

8. As reflected in the e-mail correspondence found at the pages following page 38 of the April 5, 2013 Legal Services Agreement, the Barrett Daffin firm made the changes that are reflected in underlining and strike-outs in **Exhibit 1**, and in particular the edits on page 21 to § 12.1 that replaced New Jersey with Texas as the governing law.

9. As reflected in the cover letters at the front of the July 31, 2011 Legal Services Agreement, PHH had a longstanding relationship with the Barrett Daffin firm, including its Texas and Georgia branches.

10. The July 31, 2011 Legal Services Agreement governed the relationship between PHH and the Barrett Dafffin firm, including the California affiliate, from July 31, 2011 until it was superseded by the April 5, 2013 Legal Services Agreement, which continued in force from April 5, 2013 until PHH notified the Barrett Daffin firm in writing on January 29, 2016 that PHH was terminating the Legal Services Agreement.

11. A true and correct copy of the January 29, 2016 termination letter is attached as **Exhibit 12.**

12. The two Legal Services Agreements dated July 31, 2011 and April 5, 2013 governed the relationship between PHH and the Barrett Daffin firm for the firm's representation of PHH in the *Linza* lawsuit and the retention by PHH of the firm to represent PHH in the *Linza* lawsuit until PHH terminated the relationship with PHH's January 29, 2016 letter.

Declaration of Shannon Tomasso in
Opposition to Barrett Daffin Motion for
Summary Judgment

2

Civil Action No. 2:16-cv-00832-KJM-EFB

1    I declare under penalty of perjury under the laws of the United States that the foregoing is

2  true and correct.

3  Executed this _25_ day of October, 2017.

4

5

6                                                Shannon Tomasso

7                                                Assistant Vice President
                                                 PHH Mortgage Corporation

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Declaration of Shannon Tomasso in              3          Civil Action No. 2:16-cv-00832-KJM-EFB
Opposition to Barrett Daffin Motion for
Summary Judgment

Exhibit 1

## LEGAL SERVICES AGREEMENT

This Legal Services Agreement (this "Agreement") is made and entered into this ——5th day of ——————,·April , 2013———, by and between PHH Mortgage Corporation, a New Jersey corporation ("Servicer") whose principal address is 1 Mortgage Way, Mount Laurel, New Jersey 08054 and —————————————·("Barrett Daffin Frappier Turner & Engel, LLP (and its Affiliated Firms Barrett Daffin Frappier Levine & Block, LLP and Barrett Daffin Frappier Treder & Weiss, LLP (collectively the "BDF Law Group" or "Firm") whose principal address is ————————————·——15000 Surveyor Boulevard, Addison, Texas 75001 . Servicer and Firm may be collectively referred to as "Parties" and each singularly as a "Party".

### RECITALS

Servicer is in the business of servicing residential first and second lien mortgage loans and lines (collectively, "loans"), some of which are currently in default, and Servicer requires residential mortgage loan default related legal services, including legal services relating to loss mitigation, foreclosure, eviction, bankruptcy and condominium and homeowner association dues delinquencies;

Firm and its employees, agents, members, shareholders or affiliates are practicing attorneys or otherwise active in the business of providing such residential mortgage loan default related legal services;

Servicer wishes to retain Firm to provide the legal services stated herein;.

**NOW, THEREFORE**, in consideration of the premises and the representations, warranties, covenants and agreements contained herein, the parties hereto, intending to be legally bound, agree as follows:

### ARTICLE I.  SERVICES

1.1 SERVICES GENERALLY.  Firm agrees to provide the legal services described in this Agreement, including Exhibit 1.1 hereto, together with the legal and other services described in Servicer's Best Practices Guide for Default Counsel, a copy of which is attached hereto as Exhibit 1.1-a (collectively, the "Services"). Firm shall utilize the Servicer's approved automated communications and invoicing systems, including, when applicable, the systems of Third Party Service Providers (as hereinafter defined) (collectively, "Systems"), in connection with the Services. Any licensing fees or other fees of Third Party Service Providers to utilize such Third Party Service Providers' systems required in connection with the Services shall be paid by the Firm directly to such Third Party Service Provider. Communications between Firm and Servicer or Third Party Service Provider's shall primarily occur thought the Systems. Relevant documents related to the Services shall be uploaded into the appropriate Systems by the Firm. Firm shall upload into the appropriate Systems any documents so requested to be uploaded by Servicer.

1.2 PERFORMANCE STANDARDS.  In addition to the other requirements relating to the Services set forth in this Agreement, the Firm shall provide all Services in conformance with,

1

2 - 1



and otherwise meet, the performance standards set forth on <u>Exhibit 1.2</u> hereto (the "Performance Standards").

(A) <u>Responsiveness</u>. Firm shall respond to Servicer inquiries presented via e-mail, through the Systems, or any other form of written inquiry from Servicer (including requests for indemnification by Servicer pursuant to Article V) within forty eight (48) hours of Firm's receipt of the inquiry.

1.3   INITIAL REFERRAL.   Servicer or Servicer's third party vendor, on Servicer's behalf (as applicable), shall provide Firm with an initial loan referral in form and substance to be agreed upon by Servicer and Firm (each an "Initial Referral").   The Initial Referral shall be provided to Firm at the same time Servicer or Servicer's vendor delivers the referred file to Firm. In the event Servicer subsequently obtains new or updated information necessary for the Firm to perform the Services ("Additional Information"), Servicer or Servicer's vendor shall provide Firm with a written supplement to the Initial Referral disclosing the Additional Information within a reasonable time.

1.4   MONTHLY STATUS REPORTS.   Firm agrees that it will provide, either electronically or in writing, a monthly status report (the "Monthly Status Report") of the matters being handled by Firm hereunder.   The Monthly Status Report shall be in the form of and contain the information set forth on <u>Exhibit 1.4</u> attached hereto.

Firm shall provide Servicer with a copy of the Monthly Status Report on or before the 15th day of every month.   Monthly Status Reports shall be transmitted to Servicer by way of email.   Unless otherwise directed by Servicer, Firm shall transmit the Monthly Status Reports to Servicer via email to:

<u>Tara.Olive@mortgagefamily.com</u>

<u>Shannon.Tomasso@mortgagefamily.com</u>

<u>Josh.Emmett@mortgagefamily.com</u>

The Monthly Status Report shall not limit Servicer's right under this Agreement to obtain any other report or examine any of the applicable records in Firm's possession.   In addition to the Monthly Status Report, Servicer may require additional reports, and Firm agrees to provide such additional reports when reasonably requested by Servicer.

1.5   LITIGATION.   If, in the course of representing the interest of Servicer, it becomes necessary for Firm to pursue or defend litigation (other than uncontested judicial foreclosures), Firm agrees that it will immediately notify Servicer in writing in the manner and at the address designated by Servicer seeking approval and indicating (i) the necessity of litigation, (ii) the proposed course of action, (iii) anticipated fees and costs, and (iv) any documentation needed from Servicer.   Upon receiving such notification from Firm, Servicer agrees to respond to Firm's request for litigation approval within five (5) business days, indicating approval or disapproval of the proposed course of action and anticipated fees and costs. For the avoidance of doubt, Firm agrees that it shall immediately notify Servicer as provided herein of any answer or affirmative defense, counterclaim, motion, deposition notice or other discovery demand, or any similar filing or request received by Firm in any matter where Firm is providing Services hereunder.   Firm

2

2-2

shall deliver to Servicer copies of all pleadings, motions or other documents filed by the Firm on behalf of Servicer hereunder, together with any pleading, motion or other document received by Firm in respect of Servicer or otherwise related to the Services within two (2) business days of Firm's filing or receipt of the same.

1.6 NO MINIMUM VOLUME, ETC. Servicer is not obligated to refer any minimum volume of matters to the Firm during the term of this Agreement or any portion thereof. Servicer may reduce the volume of matters being referred to the Firm, or cease referring any new matters to the Firm, at any time. Firm is not Servicer's exclusive provider of legal services in the jurisdictions where the Firm provides legal services, and Servicer may utilize other attorneys or providers in such jurisdictions in Servicer's sole discretion.

1.7 THIRD PARTY SERVICE PROVIDERS. Firm may outsource any of the Services or portion thereof to a third party service provider, subcontractor and/or law firm (each a "Third Party Service Provider"); provided, however, Firm's use of any Third Party Service Provider shall be subject to Servicer's ongoing right to (i) review the performance of such Third Party Service Provider and (ii) instruct Firm to terminate or otherwise cease the use of such Third Party Service Provider in connection with the Services.

Firm shall furnish Servicer with such information as may be reasonably requested by Servicer including the name and address of the Third Party Service Provider, a description of the Services to be performed by such Third Party Service Provider and a statement as to whether the Third Party Service Provider is affiliated with Firm or any of its attorneys, staff members, partners, shareholders, principals or members (collectively, "Firm Constituents"). In addition, with respect to any Third Party Service Provider that serves as Firm's local counsel, Firm will provide Servicer with evidence that such Third Party Service Provider is licensed to practice and in good standing in the jurisdiction in which it will be providing services to Firm.

Firm ~~and each Third Party Service Provider~~ will be ~~jointly and severally~~ liable for the acts and omissions of the Third Party Service Provider to the same extent as if Firm had performed, or failed to perform, such acts and/or omissions. Firm ~~and each Third Party Service Provider~~ shall each fully indemnify Servicer from and against any and all losses, liabilities, damages and expenses (including, without limitation, legal fees) incurred or awarded against Servicer as a result of any act or omission of the Third Party Service Provider or Firm. Firm will ensure that each Third Party Service Provider agrees in writing to be bound by all terms and conditions of this Agreement that are applicable to the portion of the Services to be performed by the Third Party Service Provider.

Firm will ensure that all contractual agreements between Firm and its Third Party Service Providers (each a "Third Party Provider Contract") contain provisions which allow Servicer to conduct audits and assessments of such Third Party Service Providers to the same extent that Servicer is permitted to perform audits and assessments of Firm hereunder. Firm will further ensure that Servicer is not (a) deemed a party to any Third Party Provider Contract, (b) responsible for the obligations of the Firm or the Third Party Service Provider under such Third Party Contract including, without limitation, the fees payable thereunder and (c) responsible for the acts or omissions or breaches of Firm or the Third Party Service Provider under Third Party Provider Contract.

3

2-3       PHH003825

If required by Servicer, as a result of, among other things, (i) litigation, (ii) a breach by a Third Party Service Provider under its Third Party Provider Contract with Firm, (iii) a Third Party Service Provider's failure to meet the requirements set forth in this Agreement which are applicable to the portion of the Services to be performed by such Third Party Service Provider, (iv) or other reputational risk to Servicer, Firm shall discontinue use of any Third Party Service Provider as promptly as is possible under the circumstances.

## ARTICLE II. REPRESENTATIONS, WARRANTIES AND COVENANTS OF FIRM

Firm represents and warrants to Servicer as of the Effective Date and throughout the term of this Agreement that:

2.1 ORGANIZATION.  Firm is a [ limited liability partnership————————], validly existing and in good standing under the laws of the state of its organization and has the requisite power and authority to carry on its business in every jurisdiction in which the Services contemplated under this Agreement will be performed.  Firm is qualified to do business and is in good standing in each jurisdiction required to perform the Services.

2.2 AUTHORITY.  Firm has full power and authority to enter into this Agreement and to consummate the performance contemplated hereby.  No other proceedings on the part of Firm are necessary to authorize the execution and delivery of this Agreement or the consummation of the performance contemplated hereunder.  The execution of this Agreement does not conflict with Firm's organizational documents or ethics rules applicable to the Firm.  This Agreement constitutes a valid and legally binding agreement of Firm, enforceable against Firm in accordance with its terms, except as enforcement may be limited by bankruptcy or similar insolvency laws, or general equitable principles.

2.3 INVESTOR, ETC. REQUIREMENTS.  If the Firm is approved as Freddie Mac designated counsel, or approved by Fannie Mae (as defined by, respectively, the Freddie Mac or Fannie Mae approved foreclosure and/or bankruptcy attorney list, which may change from time to time), Firm will comply with all Freddie Mac or Fannie Mae guidelines applicable to the Services. Firm will also comply with all requirements and guidelines, as applicable, of the U.S. Department of Housing and Urban Development ("HUD"), including the Federal Housing Administration ("FHA") and the U.S. Department of Veterans Affairs, or Veteran's Administration ("VA") in performing the Services. Firm shall also comply with all requirements and guidelines, as applicable, of private investors, and insurers (including private mortgage insurers).

2.4 NO LITIGATION.  There are no claims, suits, actions or proceedings pending or, to the Firm's knowledge, threatened against the Firm, before any court, or any judgment, decree, injunction, rule or order of any court, governmental department, commission, agency, instrumentality or authority, or any arbitrator that reasonably could have a material adverse effect on Firm's ability to perform its obligations under this Agreement.

2.5 LICENSES.  Firm has all licenses, permits or other approvals necessary to provide the Services.

4

2-4                    PHH003826

2.6 COMPLIANCE WITH LAW, ETC. In performing the Services the Firm will comply with, and all Services shall conform to, all applicable rules of professional conduct, as well as all applicable federal, state and local laws, regulations, ordinances, rules or orders, including but not limited to state foreclosure laws and regulations, the United States Bankruptcy Code, the federal Fair Debt Collection Practices Act, the Servicemembers Civil Relief Act and the MERS, Inc Rules of Membership.

2.7 NO CONFLICT OF INTEREST. Neither the Firm nor any of its officers, directors or employees has any business or financial arrangement with any other entity which would conflict with Firm's representation of Servicer in providing the Services.

2.8 NO CODES OR VIRUSES. Firm shall not introduce into any Servicer system, sub-system, software, hardware or any other component or element of Servicer's business or technology environment (collectively, the "Servicer Technology Environment") any code which is designed to have the effect of disabling or otherwise shutting down all or any portion of the Servicer Technology Environment. Firm shall use commercially reasonable efforts to (i) to ensure that no viruses, software traps, worms, trap doors, back doors, Trojan horses, or other similar malicious program code, programming instruction, or software, or similar items (collectively, a "Virus") are coded in, introduced in, allowed to be introduced in, or included in the Servicer's Technology Environment; and/or (ii) to assist the Servicer in reducing the effects of any Virus on the Servicer Technology Environment.

Firm acknowledges that it has read and will observe and be bound by Servicer's information handling requirements as set forth on Exhibit 2.8 attached hereto.

2.9 COMPETENT PERFORMANCE. All Services shall be performed in a competent and professional manner by qualified personnel. Firm and each of its officers, directors employees, agents, contractors and subcontractors performing the Services has the proper skill, training and background necessary to accomplish their assigned tasks.

2.10 FIRM AFFILIATES. Except as otherwise disclosed on Exhibit 2.10, Firm does not have any affiliates (defined as a person or entity which controls, is controlled by or under common control with, Firm or any Firm Constituent) which engage in mortgage related services. Firm shall submit to Servicer updates to Exhibit 2.10, within ten (10) days of any changes to the substance thereto.

2.11 BRIBERY AND CORRUPT PRACTICES. Firm represents and it will ensure that each of the Firm affiliates and any subcontractors or parties to whom Legal Services have been Outsourced represents to Servicer and Servicer's Affiliates, that they have not and agree that they shall not in connection with the transactions contemplates by this Agreement or in connection with any other business transactions involving Servicer or the Servicer's Affiliates, make any payment or transfer anything of value, offer, promise or give a financial or other advantage or request, agree to receive or accept a financial or other advantage either directly or indirectly:

> (a) to any government official or employee (including, without limitation, employees of a government corporation or public international organization) or to any political party or candidate for public office or

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

2-5

PHH003827

(b) to any other person or entity;

if to do so would violate or cause Servicer or any Servicer Affiliates to be in violation of the laws of the country in which it is done or the laws of the United States or the United Kingdom (or any part thereof).

Law Firm warrants and agrees that it is familiar with and it will ensure that each of the Law Firm Affiliates and any subcontractors or parties to whom Legal Services have been Outsourced warrants and agrees that they are familiar with the provisions of the U.S. Foreign Corrupt Practices Act, the UK Bribery Act and other analogous legislation in other jurisdictions (together "FCPA") and that each agrees that:

(a) it is not a government official (as the term is defined in the FCPA) or affiliated with any government official;

(b) it has not previously engaged in conduct that would have violated the FCPA had the Law Firm or any Law Firm Affiliates and any subcontractors or parties to whom Legal Services have been Outsourced been subject to its terms;

(c) it shall not violate or cause Servicer or any Servicer Affiliates to violate to violate the FCPA in connection with the software and/or Legal Services provided to Servicer or to any Servicer Affiliates;

(d) notwithstanding any other provisions to the contrary, Servicer or any Servicer Affiliates may suspend or terminate this Agreement and/or schedule an Adoption Agreement forthwith on learning information giving it a factual basis to conclude that the Law Firm or a Law Firm Affiliate or any subcontractors or parties to whom Legal Services have been Outsourced has violated or caused Servicer or any Servicer Affiliate to violate the FCPA; and

(e) in the event of termination for such cause, Servicer or any Servicer Affiliate may retain from, or charge to, the Law Firm or Law Firm Affiliate or parties to whom Legal Services have been Outsourced an amount equal to the amount earned or to be earned by the Law Firm or a Law Firm Affiliate or parties to whom Legal Services have been Outsourced in respect of the transaction or matter in which the Law Firm or a Law Firm Affiliate or parties to whom Legal Services have been Outsourced violated or caused to violate the FCPA as well as the amount of any costs, fines, or penalties which Servicer or any Servicer Affiliate is required to pay as a consequence of acts by the Law Firm or a Law Firm Affiliate or parties to whom Legal Services have been Outsourced.

## ARTICLE III.  REPRESENTATIONS AND WARRANTIES OF SERVICER

Servicer represents and warrants to Firm as of the Effective Date and throughout the term of this Agreement that:

3.1 ORGANIZATION.  Servicer is a New Jersey corporation, validly existing and in good standing under the laws of the state of its incorporation and has the requisite power and

6

authority to carry on its business and perform its obligations under this Agreement. Servicer is qualified to do business and is in good standing in each jurisdiction required to perform its obligations under this Agreement.

3.2 AUTHORITY. Servicer has full power and authority to enter into this Agreement and to consummate the performance contemplated hereby. No other proceedings on the part of Servicer are necessary to authorize the execution and delivery of this Agreement or the consummation of the performance contemplated hereunder. The execution of this Agreement does not conflict with Servicer's articles of incorporation or bylaws. This Agreement constitutes a valid and legally binding agreement of Servicer, enforceable against Servicer in accordance with its terms, except as enforcement may be limited by bankruptcy or similar insolvency laws, or general equitable principles.

3.3 NO LITIGATION. There are no claims, suits, actions or proceedings pending or, to the Servicer's knowledge, threatened against the Servicer, before any court, or any judgment, decree, injunction, rule or order of any court, governmental department, commission, agency, instrumentality or authority, or any arbitrator that reasonably could have a material adverse effect on Servicer's ability to perform its obligations under this Agreement.

## ARTICLE IV. INSURANCE REQUIREMENTS

4.1 INSURANCE TYPES/LIMITS. At all times during the performance of the Services hereunder, Firm shall keep in full force and effect and maintain, at no additional cost to Servicer, the following policies of insurance:

(a) Professional Liability and Errors and Omissions Liability Insurance/Legal Malpractice Insurance covering acts, errors, omissions, and equipment/machine malfunctions arising out of Firm's operations or provision of the Services in an amount not less than three million dollars ($3,000,000.00) per occurrence; and

(b) Commercial (Comprehensive) General Liability Insurance, including coverage for independent contractors, personal or bodily injury, products liability, premises/operations, completed operations, and broad form property damage, with combined single limits of not less than three million dollars ($3,000,000.00) per occurrence; and

(c) Crime Insurance (including fidelity bond, employee dishonesty, and computer fraud coverage) covering losses arising out of or in connection with any fraudulent or dishonest acts committed by Firm's (or its subcontractors') personnel, acting alone or with others, with a limit of not less than ~~two~~ one million dollars ($1~~2~~,000,000.00); and    *JF*

(d) Workers' Compensation Insurance (in compliance with State and Federal laws) covering all of Firm's (and/or its subcontractors') employees engaged in the performance of Services hereunder, and Employers' Liability Insurance with a limit of not less than one million dollars ($1,000,000.00); and

(e) Commercial Business Automobile Liability Insurance covering all owned,

7

non-owned, leased, and hired vehicles, and providing coverage for bodily injury and property damage liability with combined single limits of not less than two million dollars ($2,000,000.00) per occurrence.

Servicer may, in the exercise of its reasonable discretion or as otherwise required by its contractual or regulatory requirements, change the foregoing insurance requirements during the term of this Agreement. Firm shall comply with such new requirements within thirty (30) days of receiving notice of the same from Servicer.

4.2 OTHER INSURANCE REQUIREMENTS. All insurance policies required by this Agreement shall be written by insurance carriers rated at least "A-" or better by A.M. Best. Firm shall provide evidence of the insurance coverage required hereunder to Servicer on an annual basis as well as promptly upon request. Firm shall notify Servicer in writing at least twenty (20) days in advance if Firm intends to decrease the amount of or materially change any other terms of any required insurance policy. By requiring insurance as provided herein, Servicer does not represent that the coverage and limits required will be necessarily adequate to protect Firm or Servicer. Firm is responsible for providing, at Firm's expense, any additional insurance that Firm deems necessary to protect Firm's interests. The limits required by Servicer hereunder shall not be deemed a limitation of Firm's liability hereunder.

## ARTICLE V. INDEMNIFICATION

5.1 INDEMNIFICATION OF SERVICER BY FIRM. Firm does hereby agree to hold harmless, defend and indemnify Servicer, and each of Servicer's directors, officers, agents acting within the scope of their authority and employees (collectively, the "Servicer Indemnified Parties"), from and against any and all claims, demands, liabilities, losses, costs and damages (including without limitation court costs and reasonable attorney's fees) that the Servicer or the Servicer Indemnified Parties may incur or suffer, ~~arising out of~~caused by the ~~alleged~~following: (a) negligence, gross negligence, or willful misconduct by any of Firm Constituent, affiliate, Third Party Service Provider or other third party engaged or employed by Firm; (b) any and all actions relating to the Services taken by or on behalf of Firm that (i) are not permitted by this Agreement, or (ii) are not within the scope of Firm's duties under this Agreement, or (iii) are not within Firm's actual or implied authority under this Agreement; and (C) any breach of Firm's representations, warranties, obligations or covenants (including the Performance Standards) set forth in this Agreement.

Without limiting the generality of the foregoing, Firm shall hold harmless, defend and indemnify Servicer from and against all actual monetary damages incurred as a result of the Firm's failure to meet agency, investor, insurer, federal or state law requirements. This indemnity obligation shall include, without limitation, actual losses suffered by Servicer relating to interest curtailments by agencies or investors, claim denials, guarantee denials, fines imposed by an agency or investor, bids that are not in accordance with the information provided by Servicer, short reinstatements or payoffs to the extent that the amount received was short due to errors by the Firm, and actual losses resulting from fees or costs that exceed those permitted by Servicer. For example, if an agency or investor assesses a penalty equal to three months interest, or bills Servicer for three months interest, as a result of a delay in the foreclosure, bankruptcy or eviction process, the Firm will indemnify Servicer against the loss to the extent that they delay

8

was attributable to the Firm's failure to promptly and diligently perform the services in accordance with the Performance Standards, investor or agency requirements or this Agreement.

Notwithstanding the foregoing, Firm will not be required to indemnify Servicer for losses resulting directly from the following: (a) losses which arise from the physical condition or defects in legal title to a mortgaged property where such defect or physical condition or failure to identify and disclose such to Servicer, was not proximately caused by negligent or intentional acts or omissions of the Firm; or (b) delays caused by courts, judicial officers, sheriffs and recorders unless not diligently pursued by the Firm; or (c) contested foreclosure cases, unless not diligently pursued by the Firm; or (d) delays caused by Servicer, or its document custodian's failure to provide necessary documents, unless said delay should have been anticipated or could have been mitigated by the Firm; or (e) delays caused by inaccurate information provided by or on behalf of Servicer or the data contained on the Servicer's system, unless said delay should have been anticipated or could have been mitigated by the Firm.

5.2 INDEMNIFICATION OF FIRM BY SERVICER.   Servicer does hereby agree to hold harmless, defend and indemnify the Firm, and each of the Firm's directors, officers and employees (collectively, the "Firm Indemnified Parties"), from and against any and all claims, demands, liabilities, losses, costs and damages (including without limitation court costs and reasonable attorney's fees) that the Firm or the Firm Indemnified Parties may incur or suffer, arising out of the following: (a) third party claims resulting from the wrongful acts or omissions of the Servicer in connection with any mortgage loan referred to Firm for Services hereunder; and (b) any breach of Servicer's representations, warranties, obligations or covenants set forth in this Agreement. However, in the event both PHH and Firm are named in a claim and the Firm is subsequently dismissed, the Firm will seek fee approval for PHH defense and PHH will not seek indemnification.

Servicer will have no obligation to indemnify, defend or hold harmless the Firm or the Firm Indemnified Parties under this Section 5.2 to the extent the claims, demands, liabilities, losses, costs and damages arise out of or are in connection with any matter the Firm is obligated to indemnify Servicer or the Servicer Indemnified Parties for pursuant to Section 5.1 of this Agreement.

5.3 NOTIFICATION OF CLAIM.   Promptly after receipt of notice of a claim by or the commencement of any action, suit or proceeding against the Party claiming indemnification hereunder (the "Indemnitee"), Indemnitee will, if a claim is to be made against the Party indemnifying the Indemnitee (the "Indemnitor") under this Agreement, notify the Indemnitor in writing of Indemnitee's claim for indemnification. Indemnitee's failure to notify the Indemnitor will not relieve Indemnitor from any liability which it may have to Indemnitee under this Agreement except to the extent of the economic loss which the Indemnitor is able to prove directly resulted from Indemnitee's failure to provide timely notice. With respect to any such claim, action, suit or proceeding against Indemnitee, the Indemnitee will be entitled to participate at its own expense as set forth below.

5.4 DEFENSE OF CLAIM.   To the extent that it may wish, the Indemnitor will be entitled to assume the defense of any matter described above in Section 5.3, with counsel selected by the Indemnitor and reasonably satisfactory to Indemnitee.   After notice from the Indemnitor to Indemnitee of its election so to assume the defense, the Indemnitor will not be

9

Z-9

PHH003831

liable to Indemnitee under this Agreement for any legal or other expenses subsequently incurred by Indemnitee in connection with the defense other than reasonable costs of investigation or as otherwise provided below. Indemnitee shall have the right to employ counsel in such action, suit or proceeding but the fees and expenses of such counsel incurred after notice from the Indemnitor of its assumption of the defense shall be at the expense of Indemnitee unless (i) there is a conflict of interest between the Indemnitor and Indemnitee in the conduct of the defense of such action or (ii) the Indemnitor shall not in fact have employed counsel to assume the defense of such action, in each of which cases the fees and expenses of counsel shall be at the expense of the Indemnitor.

5.5 LIABILITY FOR SETTLEMENT. The Indemnitor shall not be liable to indemnify Indemnitee under this Agreement for any amounts paid in settlement of any action or claim unless the Indemnitor's prior written consent to such settlement shall have been obtained. The Indemnitor shall not settle any action or claim in any manner which would impose any penalty, limitation or affirmative duty on Indemnitee without Indemnitee's prior written consent. Neither the Indemnitor nor Indemnitee will unreasonably withhold their consent to any proposed settlement. In the event a settlement offer is proposed and rejected by either the Indemnitor or Indemnitee (the "Rejecting Party") and the matter is adjudicated to a final resolution in which the adjudicated amount against the Indemnitee is greater than the settlement amount, the Rejecting Party shall be liable for the difference.

5.6 REPAYMENT OF EXPENSES. Indemnitee agrees to reimburse the Indemnitor for all reasonable fees and expenses paid by the Indemnitor in defending any action, suit or proceeding described above against Indemnitee if and only to the extent that a final decision by a court having jurisdiction in the matter shall determine that Indemnitee is not entitled to be indemnified by the Indemnitor for such fees and expenses under applicable law.

5.7 REIMBURSEMENT BY INDEMNITOR. If Indemnitee is required to bring any action to enforce rights or to collect moneys due under this Agreement and is successful in such action, the Indemnitor shall reimburse Indemnitee for all of Indemnitee's reasonable fees and expenses in bringing and pursuing such action including, but not limited to, reasonable attorney's fees.

### ARTICLE VI.  RECORDKEEPING/AUDIT RIGHTS

6.1 RECORDS. Firm shall be responsible for maintaining complete and accurate individual records (including, as applicable, accounting records in accordance with generally accepted accounting principles) on all matters referred to it hereunder by Servicer. All files of Servicer matters referred hereunder shall be stored in a secure centralized location or locations in an organized and easily retrievable manner; Firm shall employ a tracking system enabling Firm to locate any files "checked out" of such storage location(s) for use by Firm personnel. Without limiting the foregoing, Firm shall ensure that any original promissory notes or other original loan documents provided to Firm are stored in appropriate secured locations, the whereabouts of such original documents tracked, and Firm must be able to produce or account for such original documents within forty eight (48) hours of Servicer's request. If any such original loan documents are held by a court, Firm shall diligently pursue return of such documents by the court upon Servicer's request. All original loan documents that were provided to Firm shall be

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    2-10                    PHH003832

returned to Servicer within seven (7) business days of the occurrence of the foreclosure sale or other completion of the matter/closing of the Firm's file. Firm shall return files to Servicer in accordance with instructions provided by the Servicer which may include the use of an overnight courier with tracking capabilities. Firm shall enclose a signed transmittal detailing Servicer's loan number(s) and documents enclosed. The foregoing requirements of this Section 6.1 shall be in addition to and not in lieu of Firm's obligations relating to Confidential Information hereinafter set forth.

6.2 AVAILABILITY OF RECORDS/AUDITS. Throughout the term of this Agreement and during any Transition Period (as hereinafter defined) following termination of this Agreement, upon Servicer's demand, Firm shall provide to Servicer, its internal or external auditors, attorneys or other personnel, such access to Firm's premises, systems, personnel, records and documentation relating to the Services as Servicer may reasonably request in order to verify Firm's compliance with the terms of this Agreement. Firm agrees to cooperate in any such review or audit as reasonably requested by Servicer. Any such audit on Firm's premises shall be conducted in a manner that does not compromise the confidentiality of information relating to the Firm's other clients, and without undue disruption to Firm's operations. Without limiting the foregoing right of Servicer to review and/or audit all records relating to the Services, Servicer shall have the right at any time and for any reason to obtain any files, including foreclosure and bankruptcy files, referred to the Firm for Services, and Firm shall not limit Servicer's access to the files and shall assist Servicer in locating any requested files or information. Firm agrees to complete and provide to Servicer upon request a questionnaire containing requests for information including but not limited to the firm's expertise, results on any internal audits or self assessments, capacity, changes in practice and compliance with state law. Firm shall, and shall cause its Third Party Service Providers and affiliates to promptly comply and act with due diligence and act in good faith with any requests for information made by Servicer as it relates to the Services without charge to Servicer. Under no circumstance may Firm or any of its Third Party Service Providers withhold or deny access to Servicer of any file, document or information described in this Article VI or Article IX of the Best Practices Guide due to unpaid invoices of the Firm or any Third Party Service Provider.

6.3 AUDIT RIGHTS. In connection with the audit rights set forth in section 6.2 or otherwise in this Agreement, Firm recognizes that certain of the residential mortgage loans serviced by Servicer or the mortgage servicing rights to certain of the residential mortgage loans serviced by Servicer are owned or controlled by certain of Servicer's clients (the "Clients") or certain of such Client's affiliated entities (such residential mortgage loans are hereinafter referred to as the "Client Loans"). Firm acknowledges and agrees that client (or any other third party with a beneficial interest in the Client Loans) may, from time to time and in such Client's sole and absolute discretion, review or audit Firm with regard to the Client Loans in which such Client has a beneficial interest. Firm agrees that, upon receipt of such written authorization from Client, it will cooperate in any such review or audit as if such review or audit were requested or conducted by Servicer.

## ARTICLE VII. BILLING OF FEES AND EXPENSES

7.1 FEES AND EXPENSES GENERALLY. All fees and expenses must be reasonable, for actual services rendered and to be in accordance with the guidelines and requirements of the

11

applicable investor/insurer.   Any amount above such requirements or guidelines must be approved by Servicer prior to billing of such amount by the Firm.

### 7.2 FLAT FEE MATTERS.

(A)   Unless otherwise specifically agreed to in advance in writing in relation to a specific matter, all foreclosure, bankruptcy and eviction matters shall be billed by the Firm on a "flat fee" or "lump sum" basis, in accordance with applicable investor and/or FHA/VA requirements. The parties acknowledge that such flat fees may change over time, and shall be as set by HUD, FHA, VA, Fannie Mae, Freddie Mac or other applicable investor, or as mutually agreed to by the Firm and Servicer. To the extent that the applicable investor has not communicated such a flat fee schedule to Servicer or Firm, Firm shall follow the Fannie Mae guidelines. In addition to the forgoing flat fee matters, Firm shall perform the types of matter set forth on Exhibit 7.2(A) on a flat fee basis.

(B)   Each flat fee matter shall be billed based on Firm's progress to completion on such matter as further described on Exhibit 7.2(B)

The attached the Firm Fee Schedule supplements the above 7.2(A) and 7.2(B and provides the *SP* fees in the investor guidelines and progress milestones which are subject to change by the investors without notice.

7.3 HOURLY FEE MATTERS. For litigated matters or issues (including foreclosure or bankruptcy referrals that become litigated matters) or other matters assigned to Firm outside of foreclosure, bankruptcy or evictions, Firm will charge Servicer at the lesser of Firm's normal *JF* hourly billing rate for the personnel performing the Services, or an hourly rate of $~~175.00~~215.00 /hour based on actual time worked.

Firm must seek written authorization from Servicer to perform work on a matter on an hourly basis. Such requests shall be accompanied with an itemization of work anticipated to be performed as well as an estimate of the time needed to perform such work.   Servicer may authorize or deny such requests in the exercise of its sole discretion.  Firm shall not perform Services on a matter until  written fee authorization is received from the Servicer, unless Services *JF* are necessary to protect Servicer from legal deadlines.  If fee authorization is exhausted, the Firm shall make all reasonable attempts to obtain additional fee authorization.  In the event additional fee authorization is not approved within a reasonable timeframe, Firm reserves the right to cease proceeding on the matter.

7.4 EXPENSES. Subject to the following sentence, any expenses Firm ~~intends to~~incurrs *JF* it will  pass through to Servicers as expenses ~~must be approved in advance by Servicer in order to be reimbursed.~~ Firm's costs for phone calls, ~~postage,~~ copying, courier, administrative support or similar "overhead" items will not be subject to reimbursement by Servicer.

7.5 CHARGES TO BORROWER. Firm shall not quote to or charge the mortgage loan borrower (including debtors in bankruptcy), in any context, including but not limited to the time of reinstatement or payoff, a higher rate or fee than billed to Servicer, and shall promptly reimburse to the borrower, or Servicer as the case may be, any fees or costs which have been miscalculated, over-estimated or which have not been actually incurred.

12

2-12        PHH003834

All fees and costs billed by Firm in connection with hourly matters must designate such amounts as recoverable and non-recoverable from the related mortgagor(s) based on applicable law. Any changes to an invoice that affect Servicer's ability to collect the related amounts from mortgagor must be disclosed and described to and documented for Servicer within twenty-four (24) hours of Firm's identification of the issue.

7.6 INVOICE TIMING. All invoices shall be submitted to Servicer (via Servicer's bill presentment program) for payment in accordance with the procedures set forth herein:

(A) Foreclosure: Invoices for Services must be submitted to Servicer no more than twice during the period from the initiation of foreclosure proceedings to the completion of the matter: first, upon filing of the complaint (where applicable); and second, within ~~five~~ ten (10~~5~~) business days of completion of sale/disposition of the subject property or when the foreclosure action is otherwise terminated, such as by withdrawal of the matter, reinstatement, interruption by a bankruptcy, etc. All amounts due must be invoiced within thirty (30) days of final completion of the matter. Servicer shall not be obligated to pay any amounts not invoiced within thirty (30) days of completion of the matter.

(B) Bankruptcy: Invoices for Services in connection with routine bankruptcy matters must be submitted to Servicer no more than three times during the period from the initiation of bankruptcy proceedings to the completion of the matter: first, upon filing of the proof of claim (if applicable); second, upon ~~filing~~ completion of the motion for relief from stay (if applicable), and third, within thirty (30) days of dismissal, discharge, confirmation of plan, or other completion of the matter. All amounts due must be invoiced within thirty (30) days of final completion of the matter. Servicer shall not be obligated to pay any amounts not invoiced within thirty (30) days of completion of the matter.

However, if HUD/VA, the title package may not be completed within the thirty 30 day time frame and the Firm shall invoice Servicer after its receipt of the title premium invoice.

(C) Litigation or other hourly billed matters: Invoices for Services shall be submitted on a monthly basis.

7.7 INVOICE REQUIREMENTS. A "flat fee" or "lump sum" bill is allowed only on foreclosure, bankruptcy or eviction matters or such other matters described on Exhibit 7.2(A). Such billing of total charges and fees is not acceptable in litigation or contested matters. Firm must itemize fees and itemize disbursements for all litigated or contested matters or other matters billed on an hourly basis. Invoices for matters billed on an hourly basis must show the task performed, the person performing the task, break down of time to increments of 1/10 of an hour, hourly rate charge for the person(s) providing the service and an itemization of ~~approved~~ expenses incurred in connection with the work performed on behalf of Servicer.

7.8 FEE COMPLIANCE. All charges, costs and fees submitted by Firm must comply with all applicable federal, state, and local laws, investor requirements and court rules, as well as any ethical requirements regarding legal fees to which the Firm or its personnel are subject. Upon Servicer's request, Firm shall provide Servicer with supporting documentation for any fee or charge billed or invoiced to Servicer by Firm or any Third Party Service Provider.

13

7.9 TIME FOR PAYMENT. Servicer agrees to remit payment to Firm within 30 days of receipt of Firm's invoice.

7.10 PAYMENT DELAY. If Firm fails to follow the procedures for billing set forth herein or if Firm has not provided Servicer with a certified IRS W-9 and Federal Tax ID#, Servicer may withold payment until Firm has materially complied with these provisions.

## ARTICLE VIII. CONFIDENTIALITY

8.1 CONFIDENTIAL INFORMATION. Servicer (including its affiliates) and Firm may from time to time disclose to each other (both orally and in writing and in any form or medium) in connection with the Services provided hereunder Confidential Information. As used herein "Confidential Information" shall mean any and all information furnished or disclosed, in whatever form or medium, concerning a disclosing party, unless excluded as hereinafter set forth. Confidential Information, includes, without limitation, such disclosing party's intellectual property, clients, borrowers, customer lists, business contacts, business plans, policies, procedures, techniques, know-how, standards, products, source or object code, product or service specifications, manuals, agreements, economic and financial information, marketing plans, data, reports, analyses, compilations, statistics, summaries, studies, and any other materials or information, or any materials based thereon, whether written or oral, furnished directly or indirectly by a disclosing party or any of such disclosing party's directors, officers, employees, agents, attorneys, accountants, advisors and other representatives. For purposes herein, any technical or business information of a third person furnished or disclosed by one party to the other shall be deemed "Confidential Information" of the disclosing party and subject to the terms of this Section 8. Servicer's Confidential Information also shall include any proprietary and/or confidential information related to Servicer's affiliates, sales representatives, and/or customers.

8.2 NON-DISCLOSURE. The receiving party agrees to treat all Confidential Information provided by the disclosing party pursuant to this Agreement as proprietary and confidential to the disclosing party, and the receiving party shall not (without the prior written consent of the disclosing party) disclose or permit disclosure of such Confidential Information to any third party, provided that the receiving party may disclose, on a need-to-know basis, such Confidential Information to its third party subcontractors who have signed non-disclosure agreements with the receiving party which contains confidentiality and non-disclosure obligations that are at least as protective of the disclosing party's Confidential Information as set forth herein, and/or to its current employees, officers, or directors, or legal or financial representatives, for which the receiving party shall be responsible under this Agreement. The receiving party agrees to safeguard all Confidential Information of the disclosing party with at least the same degree of care (which in no event shall be less than reasonable care) as the receiving party uses to protect its own Confidential Information. The receiving party shall use the disclosing party's Confidential Information solely for the purpose of fulfilling its obligations under this Agreement. The receiving party further agrees not to use or disclose the disclosing party's Confidential Information for its own benefit or for the benefit of others, except as otherwise authorized by this Agreement, or the disclosing party in writing.

14

Z-14

8.3 PERSONALLY IDENTIFIABLE INFORMATION. In addition to the foregoing, in the event that Servicer's Confidential Information contains any personally identifiable information of Servicer's (and/or its Affiliates') employees, or customers (including mortgage loan borrowers) (hereinafter "Personally Identifiable Information"), Firm agrees to comply at all times with (and maintain and safeguard such Personally Identifiable Information in accordance with) (i) Servicer's then-current privacy policies and procedures, to the extent so requested by Servicer and made available to Firm, and (ii) any and all applicable privacy laws, regulations, statutes, and guidelines.

8.4 EXCEPTIONS. Notwithstanding the foregoing, the Parties agree that the following information (except if such information constitutes Personally Identifiable Information) shall not be deemed Confidential Information, and the receiving party shall have no obligation with respect to any such information:

(i)     Information which is independently developed by the receiving party without use of the disclosing party's Confidential Information;

(ii)    Information which is or becomes in the public domain by no fault or wrongful act of the receiving party;

(iii)   Information which is known by the receiving party prior to disclosure by the disclosing party;

(iv)    Information which is disclosed to the receiving party by third party who was not under a similar restriction or obligation of confidentiality to the disclosing party, and without breach of this Agreement;

(v)     Information which is approved for release by written authorization of the disclosing party and/or the third party owner of the disclosed information; or

(vi)    Information which is disclosed pursuant to the lawful requirement or order of a court or governmental agency, provided that, upon the receiving party's request for such a disclosure, the receiving party gives prompt notice thereof to the disclosing party (unless such notice is not possible under the circumstances) so that the disclosing party may have the opportunity to intervene and contest such disclosure and/or seek a protective order or other appropriate remedy. In the event that such protective order or other remedy is not possible under the circumstances, the receiving party shall furnish only that portion of the Confidential Information which is legally required and the receiving party shall exercise its reasonable best efforts to obtain reasonable assurance that confidential treatment will be accorded the Confidential Information.

8.5 All Confidential Information transmitted or disclosed hereunder will be and remain the property of the disclosing party, and the receiving party shall (at the disclosing party's election) promptly destroy or return to the disclosing party any and all copies thereof upon termination or expiration of this Agreement, or upon the written request of the disclosing party. Upon the request of the disclosing party, any such destruction shall be certified in writing by the receiving party.

15

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                   2-15        PHH003837

8.6 Subject to the provisions specifically set forth herein, nothing in this Agreement shall be construed to limit or prohibit the receiving party from independently creating or developing (or having created or developed for it), or from acquiring from third parties, any information, products, concepts, systems, or techniques that are similar to or compete with the information products, concepts, systems, or techniques contemplated by or embodied in the disclosing party's Confidential Information, provided that (in connection with such creation, development, or acquisition) the receiving party does not violate any of its obligations under this Agreement. Notwithstanding the foregoing, the receiving party shall not, nor assist others to, disassemble, decompile, reverse engineer, or otherwise attempt to recreate, the disclosing party's Confidential Information.

8.7 Firm shall not tamper with, compromise, or attempt to circumvent any physical or electronic security or audit measures employed by Servicer or its affiliates in the course of Servicer's or its affiliates' business operations. Firm shall not, without Servicer's prior express written consent, or as otherwise provided in this Agreement, and without complying with Servicer's security policies and procedures, (i) access any Confidential Information or computer systems of Servicer or its affiliates, or (ii) remove from Servicer's premises any Confidential Information, or any other property, whether tangible or intangible, of Servicer or its affiliates.

8.8 The Parties acknowledge and agree that, given the unique and proprietary nature of the Confidential Information, monetary damages may not be calculable or a sufficient remedy for any breach of this Section 8 by the receiving party, and that the disclosing party may suffer great and irreparable injury as a consequence of such breach. Accordingly, each party agrees that, in the event of such a breach or threatened breach, the disclosing party shall be entitled to seek equitable relief (including, but not limited to, injunction and specific performance) in order to remedy such breach or threatened breach. Such remedies shall not be deemed to be exclusive remedies for a breach by the receiving party but shall be in addition to any and all other remedies provided hereunder or available at law or equity to the disclosing party and the receiving party further agrees to waive any requirement for the securing or posting of any bond in connection with such remedy.

8.9 The Parties acknowledge and agree that, due to the attorney – client relationship that exists between the Parties, communications and other information exchanged between the Parties in connection with this Agreement may be subject to the attorney – client privilege and/or the attorney work product doctrine. Servicer reserves all rights available to it in connection with attorney – client privileged communications and/or the attorney work product doctrine. Firm's confidentiality obligations set forth in this Article 8 are in addition to and not in lieu of Firm's legal and ethical obligations to preserve client confidential information and communications, including attorney – client privileged communications and attorney work product.

Firm shall not destroy any documentation or work product created by Firm in performing the Services unless approved by Servicer. Firm acknowledges that all such documentation, records and work product are the property of Servicer. Firm shall retain all documentation, records and work product created or obtained by Firm in performing the Services indefinitely.

8.10 Firm shall promptly disclose to Servicer the occurrence of any breach by Firm or any Third Party Service Provider of Firm's or such Third Party Service Provider's obligations hereunder.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

2-16

PHH003838

8.11   Within thirty (30) days of the date of this Agreement, Firm shall provide Servicer with a copy of its policies and/or contracts with any Third Party Service Provider or Firm Constituent.  Firm shall provide Servicer copies of updates, amendments, restatements or other revisions to such policies and/or contracts within ten (10) Business Days of the effective date of such updates, amendments, restatements or other revisions.   Firm shall ensure that its outsourcing and/or Third Party Servicer Provider contracts contain confidentiality requirements no less strict than the confidentiality requirements set forth herein.

## ARTICLE IX. INFORMATION PROTECTION

9.1 INFORMATION PROTECTION.  Firm shall have in place on the Effective Date, and shall maintain throughout the term of this Agreement, commercially reasonable technical and security measures intended to prevent destruction, alteration, disclosure or access, in each case to the extent unauthorized, or loss of, Servicer data, borrower or loan data, or Confidential Information, including Personally Identifiable Information. Such measures shall be reviewed regularly and revised as needed to address ongoing threats and risks. The following requirements of this Article IX are minimum standards and Servicer does not represent that they are adequate to meet the Firm's needs. The Firm acknowledges that it is the Firm's sole obligation to (i) implement appropriate measures to secure its systems and data, including Servicer Confidential Information, against internal and external threats and risks; and (ii) continuously review and revise those measures to address ongoing threats and risks.

9.2 REMOVABLE MEDIA. Firm shall institute strict physical and logical security controls to prevent transfer of Servicer Confidential Information, including Personally Identifiable Information, via any form of Removable Media.  For purposes of this section, "Removable Media" means portable or removable hard disks, USB memory drives, CDs, DVDs, memory cards, and all other removable data storage media. Firm hereby agrees that in any exception situations to the foregoing involving Servicer Confidential Information or Personally Identifiable Information, that are specifically approved by Servicer in writing, such data will be encrypted using commercially recognized encryption technology, and Firm will provide decryption keys or codes to only the authorized representatives of the recipients via secure out-of band communications only.

9.3 ENCRYPTION, ETC. Servicer Confidential Information, including Personally Identifiable Information (i) may only be made available and accessible to those parties explicitly authorized under this Agreement (including Firm's Third Party Service Providers) or otherwise expressly authorized by Servicer in writing; (ii) if transferred across the Internet, any wireless network, or other public or shared networks, must be encrypted using commercially recognized encryption technology, and (iii) if transferred using Removable Media (if so permitted) must be sent via a bonded courier and encrypted using commercially recognized encryption technology.

17

9.4  FACILITIES. Firm facilities that process Servicer Confidential Information, including Personally Identifiable Information, will contain secure areas to house such information and be protected by perimeter security such as access controls (e.g., the use of guards and/or entry badges) that provide a physically secure environment from unauthorized access, damage, and interference. Within thirty (30) days of ~~the date of this Agreement,~~ Servicer's written request the Firm shall provide Servicer with floor plans of each of Firm's offices at which Servicer's records and files are maintained by Firm. Such floor plans shall identify the location of Servicer's files and records. In the event that Servicer's files and records are relocated, Firm shall provide Servicer with updated floor plans within ten (10) business days after such files and records are relocated.

9.5  SYSTEM SECURITY. Firm shall implement formal procedures to control access to its systems, services, and data, including, but not limited to, user account management procedures and the following controls:

- Network access to both internal and external networked services shall be controlled, including, but not limited to, the use of properly configured firewalls;

- Operating systems will be used to enforce access controls to computer resources including, but not limited to, authentication, authorization, and event logging;

- Applications will include access control to limit user access to information and application system functions; and

- All systems will be monitored to detect deviation from access control policies and identify suspicious activity.

Firm will promptly notify (but in no event more than twenty-four (24) hours after confirmation of the occurrence) the Servicer of any ~~suspected and potential or~~ actual security attacks or incidents, whether directed from internally or externally, involving Servicer Confidential Information or Personally Identifiable Information. The notice shall include the approximate date and time of the occurrence and a summary of the relevant facts, including a description of measures being taken to address the occurrence. Firm will notify PHH of each and every security incident involving PHH's Confidential Information, including Personally Identifiable Information.

9.6  The Firm will certify to Servicer upon its written request, on an annual basis that Firm has complied with the requirements of this Article IX. Such certification shall be substantially in the form of Exhibit 9.6 attached hereto and delivered to Servicer on or before the fifteenth (15th) calendar day of January of the succeeding calendar year.

## ARTICLE X. DISASTER RECOVERY/BUSINESS CONTINUITY

10.1  Firm shall have implemented and will administer a Business Continuity Plan ("BCP") covering the Services. The BCP shall be designed to permit Firm to recover critical Services provided under this Agreement. The BCP shall cover contingency strategies for coping

18

with the prolonged unavailability of critical business processes, equipment, communications services, employees, buildings and access to buildings, and shall enable the recovery of the provision of the Services following any disruption or outage that impacts the Services within twenty four (24) hours of the disruption or outage. The BCP shall list the resources that are required to recover the Services, and must detail the Firm's process for communicating the interruption internally and externally. Firm shall provide to Servicer a then most current copy of its BCP (or summary thereof) upon Servicer's request and within fifteen (15) business days after each anniversary of this Agreement.

10.2 The Firm shall formally exercise the BCP at least once every twelve (12) months during the term of this Agreement, using realistic simulations to demonstrate whether the Services can be resumed within recovery timeframes established pursuant to Section 10.1 above. Firm shall be responsible for coordinating and executing these exercises, and for conducting an assessment of each exercise analyzing the recovery capability of the component part of the BCP exercised to ensure that all critical processes and services tested are adequately protected by Firm's BCP. Any remedial actions and recommendations resulting from Firm's exercising the BCP shall be completed and closed by Firm within a commercially reasonable time after identification of such remedial action. If remedial actions cannot be implemented within such time period, Firm shall notify Servicer and provide a written corrective action plan specifying a timeline for completing implementation of the corrective actions.

10.3 Firm shall, at least every twelve (12) months during the term of this Agreement, review and update (if necessary) the BCP then in effect, to include any changes in facilities, systems and Firm personnel providing the Services.

10.4 If an event occurs resulting in a disruption of the Services, Firm shall (i) promptly provide Servicer with notice of the same, and ongoing status updates, and (ii) promptly implement the BCP upon the occurrence of any such event which adversely affects the provision of the Services to Servicer. If the occurrence of such an event affecting Firm's provision of the Services to Servicer causes Firm to allocate limited resources between or among Firm's clients, Servicer shall receive at least the same priority in respect of such allocation as Firm's other clients.

10.5 The Firm shall, within thirty (30) days after the occurrence of any event described in Section 10.4 above, provide to Servicer a reasonably detailed account of the event, any identified BCP deficiencies, recommendations, action plan(s) and associated activity timelines. Any such actions or recommendations relating to the Firm's ability to implement the BCP and reinstate the Services in accordance with the BCP shall be undertaken and closed by the Firm within a commercially reasonable time after the restoration of the Services. If remedial actions cannot be implemented within such time period, the Firm shall notify Servicer and submit a written corrective action plan specifying a timeline for completing implementation of the corrective actions.

10.6 The Firm will certify to Servicer on an annual basis that Firm has complied with the requirements of this Article X.

10.7 Firm shall disclose to Servicer any Third Party Service Provider and/or affiliate in which Firm relies upon to perform a significant portion of the Services.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

2-19                    PHH003841

### ARTICLE XI. TERM AND TERMINATION

11.1 TERM. This Agreement shall commence on the Effective Date and shall continue in force and effect unless and until terminated as provided herein. The Parties agree that this Agreement shall apply to all pending matters where Firm is providing Services or otherwise representing Servicer's interest on the Effective Date, as well as to new matters referred to Firm on or after the Effective Date.

11.2 TERMINATION BY SERVICER. Servicer may terminate this Agreement, in whole or in part, at any time, by providing written notice to Firm specifying the date such termination shall be effective. For the avoidance of doubt, the Parties acknowledge and agree that the Servicer may specify that termination shall be effective immediately. If Servicer terminates this Agreement only as to certain matters being handled by the Firm, Servicer shall specify the matter(s) regarding which Servicer intends to transfer to other counsel.

11.3 TERMINATION BY FIRM. Subject to (a) any legal requirements or ethical obligations relating to withdrawal or substitution of counsel that the Firm may be subject to in the jurisdictions where the Firm provides the Services, and (b) Firm's obligation to provide Services and/or assistance during the Transition Period set forth below, Firm may terminate this Agreement, in whole or in part, at any time, by providing not less than thirty (30) days advance written notice to Servicer specifying the date such termination shall be effective. If Firm terminates this Agreement only as to certain matters being handled by the Firm, Firm shall specify the matter(s) regarding which Firm no longer intends to represent Servicer.

11.4 PAYMENTS AFTER TERMINATION. In the event of termination, Firm shall be paid the amounts due and owing for Services accrued to the Termination Date within 30 days following the Termination Date, in accordance with the provisions of Article VII hereof.

11.5 SERVICER'S RIGHTS AFTER TERMINATION. Upon termination, the Servicer shall have full power and authority to take possession of all files and records, assume any and all information and documentation that the Servicer selects, and prosecute the matters being handled by Firm to completion.

11.6 FIRM'S RESPONSIBILITIES FOLLOWING TERMINATION.   Upon any termination of this Agreement, Firm shall immediately proceed in accordance with any specific instructions from Servicer, protect and maintain the Services, and make reasonable and diligent efforts to mitigate costs associated with the termination. In the event of termination, Firm will provide Servicer as promptly as possible, but in no event later than five (5) business days after  the effective date of termination, with the following:

(a) a current and updated report detailing all matters being handled and their status, including any critical upcoming dates such as court hearings or depositions;

(b) a current and updated report of all original mortgage loan documents that were provided to the Firm, including the location of each such document;

(c) all funds held on behalf of Servicer and all active files being handled by Firm;

20

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

2-20

PHH003842

(d) all bills for each active matter and all outstanding invoices. These bills and invoices should be submitted in accordance with the billing procedures contained in Article VII; and

(e) any and all files and recorders requested by Servicer; and

(f) the assistance during the Transition Period described below.

11.7 TRANSITION ASSISTANCE. Following the effective date of termination of this Agreement in whole or in part for any reason (whether terminated by Servicer or Firm), Firm shall continue to provide the Services to the extent necessary to protect the Servicer's interests, and otherwise fully cooperate with Servicer in transitioning the Services to new counsel, for a reasonable period of time as requested by Servicer. During the Transition Period, the Firm shall continue to provide any Services needed before new counsel formally assumes responsibility for the matters being transitioned, including appearing at any pending court hearings, depositions, or similar matters, and filing all documents with pending deadlines (or obtaining extensions if so doing will not prejudice Servicer). During the Transition Period the Firm will also execute all substitutions of counsel requested by Servicer or Servicer's new counsel. The Servicer will pay the Firm for all Services provided during the Transition Period in the amounts and through the invoicing process set forth in this Agreement. The foregoing obligations of the Firm to provide transition assistance are in addition to and not in lieu of any legal requirements or ethical obligations relating to withdrawal or substitution of counsel that the Firm may be subject to in the jurisdictions where the Firm provided the Services.

11.8 COSTS. If either (a) Servicer terminates this Agreement in whole or in part for cause, or (b) Firm terminates this Agreement in whole or in part without cause, then Firm shall be liable for the reasonable out of pocket costs incurred by Servicer to transition the matters handled by Firm to new counsel, including costs of ~~copying and shipping~~providing electronic copies of files, ~~and the reasonable fees of new counsel to familiarize themselves with the status of the transferred matter~~. For purposes of this Section 11.8, "for cause" in case of Servicer's termination of this Agreement shall mean the Firm's material breach of any of its obligations hereunder, and "without cause" in case of Firm's termination of this Agreement shall mean termination of this Agreement by Firm for any reason other than (i) Servicer's failure to pay the amounts due for Services to the Firm, or (2) Servicer's failure to reasonably cooperate with Firm in connection with Firm's provision of the Services.

## ARTICLE XII. MISCELLANEOUS PROVISIONS

12.1 GOVERNING LAW. This Agreement shall be deemed to be made in and in all respects shall be interpreted, construed and governed by and in accordance with the internal laws of the State of ~~New Jersey~~ Texas.

12.2 ENTIRE AGREEMENT. This Agreement and the exhibits hereto embody the entire understanding and agreement between the Parties with respect to its subject matter and supersedes any and all prior agreements, arrangements and understandings, whether oral or

21

2-21

PHH003843

written, with respect to its subject matter. All exhibits to this Agreement are hereby incorporated herein and made a part of hereof.

    12.3 NOTIFICATION.   Any and all notifications and/or demands under this contract must be made in writing via email communication directed to:

    DLDAttorneyEscalations@mortgagefamily.com

    Shannon.Tomasso@mortgagefamily.com, and

    Sharon.McMahon@mortgagefamily.com

    12.4 THIRD PARTY BENEFICIARIES.   Firm acknowledges and agrees that this Agreement confers rights and remedies upon the Servicer's Clients. Clients are defined to include only those Clients whom own or control the residential mortgage loan Servicer is servicing, are the investor of the residential mortgage loan Servicer is servicing, or are the primary servicer of the residential mortgage loan which Servicer is subservicing. No person other than the parties and such Clients, has any rights or remedies under the Agreement.

    12.5 AMENDMENT.   No amendment or modification of this Agreement shall be effective unless it is in writing and signed by both Parties. However, should it be necessary for Servicer to notify Firm of a change in process via an electronically communicated directive, Firm must comply with the terms of that directive.

    12.6 CAPTIONS.   The captions of the paragraphs of this Agreement are for reference purposes only and shall not be considered in construing this Agreement.

    12.7 COUNTERPARTS.   This Agreement may be executed in counterparts, all of which together shall constitute one Agreement, binding on the Parties, notwithstanding that the Parties have not executed the original or the same counterpart.

    12.8 SEVERABILITY.   If any one or more of the provisions contained herein shall for any reason be held to be unenforceable in any respect under law, such unenforceability shall not affect any other provision of this Agreement, but this Agreement shall be construed as if such unenforceable provision or provisions had never been contained herein, provided that the removal of such offending term or provision does not materially alter the burdens or benefits of either of the parties under this Agreement

    12.9 SURVIVAL.   In addition to any provision that by its express terms survives termination, the following provisions shall survive termination of this Agreement: Article V (Indemnification); Section 6.2 (Availability of Records/Audits); Article VIII (Confidentiality); Section 11.6 (Firm's Responsibilities Following Termination); Section 11.7 (Transition Assistance); and Article XII (Miscellaneous Provisions).

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

2-22

PHH003844

IN WITNESS WHEREOF, Firm and Servicer have executed this Agreement as of the day and year first above written.

**"Servicer"**
PHH Mortgage Corporation

By: _____

Its: _____SVP_____

Date: _____8/27/2014_____

**"Firm"**
"The BDF Law Group"

By: _____
        James Frappier
Its: ____Managing Partner_____

Date: __April 5, 2013__

23

EXHIBIT 1.1
SERVICES

Statewide foreclosure, bankruptcy, eviction, title, closing and prosecution of related litigation for the state(s) of————————Texas, Georgia, California and Nevada. To be completed in  accordance with applicable federal law, state law, investor guidelines and insurer guidelines.

Perform foreclosure prevention outreach to borrowers as directed by Servicer and in accordance with applicable federal law, state law, investor guidelines and insurer guidelines.

In connection with the foregoing, Servicer authorizes and/or directs the Firm to take the following actions:

\* Order loan documents, once requested from Servicer but if not received within seven (7) business days of receipt of the referral at a cost of $10.00 per document up to maximum cost of $80.00.

\* Send out breach letters to any record owners revealed through a property search that did not execute the mortgage. Breach any mortgagors not listed in the referral and for which Firm did not receive a NOI (the servicing system utilized by PHH only captures two mortgagors so if there are three or more, they may be missed during the breach process). All necessary breach letters sent out in this regard regardless of the number of breach letters that need to be sent will be billed at $50.

\* File and manage all routine title claims at a legal fee of no more than $125.00. In the event a Satisfaction/Release of Mortgage needs to be recorded, PHH will also pay the actual recording cost.

\* Order all VA appraisals.

\* Send out all HUD occupancy letters.

\* Prepare any necessary Assignments of Mortgage at a legal fee of $35.00 per assignment plus filing costs if such assignments are not received by Firm within seven (7) business days of request.

\* Complete an SCRA check for all borrowers utilizing the Department of Defense SCRA check website (currently: www.dmdc.osd.mil/appj/scra/scraHome.do) prior to foreclosure judgment and five (5) days prior to scheduled foreclosure sale date, the day of the scheduled foreclosure sale date prior to the foreclosure sale, and five (5) days following the foreclosure sale date. A copy of the SCRA verification is to be retained in foreclosure file and uploaded to the Systems.

\* Send a post-referral foreclosure alternative solicitation letter on all Fannie Mae and Freddie Mac invested loans within five (5) business days following foreclosure referral but no later than the one hundred twenty fifth (125th) day of delinquency or immediately upon receipt from Servicer if the loan is greater than one hundred twenty five (125) days delinquent. The letter

24

content will be in conformance with Fannie Mae and Freddie Mac requirements.  Sample letter for Fannie Mae invested loans can be found at eFanniemae.com.  Sample letter for Freddie Mac invested loans can be found in the Freddie Mac Guide, Exhibit 94.

\*   Prior to canceling any scheduled foreclosure sale for a Fannie Mae or Freddie Mac invested loan due to non receipt of the written certification required by Fannie Mae and Freddie Mac, Firm will notify Servicer that the written certification is needed within two (2) business days prior to the date the written certification is due to the Firm.

In performing the Services, Firm shall observe and perform each of the covenants and obligations set forth in the Agreement and Servicer's Best Practices Guide for Foreclosure, Eviction, and Bankruptcy Counsel (the "Best Practices Guide").   To the extent of an irreconcilable conflict between the Agreement and the Best Practices Guide, the requirements of the Agreement shall govern and control.

25

2-25   PHH003847

Exhibit 1.1-a

Servicer's Best Practices Guide for
Foreclosure, Eviction, and Bankruptcy Counsel

26

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

2 - 26     PHH003848

EXHIBIT 1.2
PERFORMANCE STANDARDS

**Performance Standard #1: Foreclosure Timelines**

**Metric**
Foreclosure Timeline is the timeframe required by the Investor, Insurer and state legal requirements to complete the foreclosure process measured from referral to sale.

**Monitoring and Reporting**
The Foreclosure Timeline is determined by calculating the number of days starting from foreclosure referral to foreclosure sale.

**Timing**
The Foreclosure Timeline will be calculated monthly on each file that has completed foreclosure sale.

**Required Level of Service**
Foreclosure Timelines must be met on 95% of all loans completing foreclosure sale each month.

**Liabilities**
Firm will reimburse Servicer for any loss or fees assessed including but not limited to compensatory fees assessed by Fannie Mae or Freddie Mac associated with not achieving the indicated Required Level of Service on any foreclosure file. First occurrence on having not achieved the Required Level of Service will require Firm to submit a corrective action plan to Servicer. More than one occurrence within a twelve month period may result in termination.

**Performance Standard #2: Legal Documents**

**Metric**
Legal Documents refer to all documents related to the Services required to be prepared and executed in accordance with Investor, Insurer, State guidelines and applicable law.

**Timing**
Legal Document adequacy and accuracy will be based upon a monthly sample audit of documents completed each month.

**Required Level of Service**
Legal Documents must be 100% accurate relative to adequacy, content, execution and notarization. Zero tolerance for any changes made to documents post execution.

**Liabilities**
First occurrence on having not achieved the indicated Required Level of Service may result in termination.

27

2-27        PHH003849

### Performance Level #3: FHA First Legal Timeframes

**Metric**
FHA First Legal Timeframe is the timeframe required by HUD to complete the first legal action in regards to foreclosure processing on HUD insured loans.

**Monitoring and Reporting**
FHA First Legal Timeframe is determined by calculating the number of days from first date of default to the day the first legal action is completed.

**Timing**
FHA First Legal Timeframe will be calculated monthly on all HUD insured files that completed the first legal action.

**Required Level of Service**
FHA First Legal Timeframe must be met on 98% of all HUD insured files that complete a first legal action each month.

**Liabilities**
Firm to reimburse Servicer for any loss including but not limited to HUD claim curtailments or penalties associated with not achieving the indicated Required Level of Service on any FHA foreclosure file. First occurrence on having not achieved the Required Level of Service will require Firm to submit a corrective action plan to Servicer. More than one occurrence within a twelve month period may result in termination.

### Performance Level #4: Response to Written Inquiry Timeframe

**Metric**
Response to Written Inquiry Timeframe is required by Servicer in accordance with Section 1.2(A).

**Monitoring and Reporting**
Response to Written Inquiry Timeframe is determined by calculating the number of days from Firm's receipt of a written inquiry to the day a response is provided to Servicer.

**Timing**
Response to Written Inquiry must be met on 100% of all written inquiries submitted by Servicer each month.

**Liabilities**
First occurrence on having not achieved the indicated Required Level of Service may result in termination.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Z-28

PHH003850

**Performance Level #5: Fees Assessed by Firm**

**Metric**
Fees Assessed by Firm are those fees permitted in accordance with Investor, Insurer, State requirements, applicable law and this Agreement.

**Timing**
Fees assessed by Firm in compliance with Investor, Insurer, State requirements, applicable law and this Agreement will be based upon a monthly sample audit of fees assessed each month.

**Required Level of Service**
Fees assessed by Firm must be 100% in compliance with Investor, Insurer, State requirements, applicable law and this Agreement.

**Liabilities**
Firm will immediately reimburse Servicer the amount of any fee assessed in excess of Investor, Insurer, State requirements, applicable law and this Agreement.  First occurrence on having not achieved the indicated Required Level of Service may result in termination.

29

2 - 29

Exhibit 1.4

Form of Monthly Status Report

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

2-30   PHH003852

Exhibit 2.8

Servicer Information Handling Requirements

PHH Information Handling Requirements

This Exhibit sets forth information security procedures to be established by Supplier and maintained throughout the Term. These procedures are in addition to the requirements of the Agreement and present a minimum standard only.  However, it is Supplier's sole obligation to (i) implement appropriate measures to secure its systems and data, including PHH Confidential Information, against internal and external threats and risks; and (ii) continuously review and revise those measures to address ongoing threats and risks.  Failure to address compliance gaps in a mutually agreeable manner and within a mutually agreeable timeframe, as related to the minimum standards as set forth in this Exhibit will constitute a material, non-curable breach of the Agreement by Supplier, entitling PHH, in addition to and cumulative of all other remedies available to it at law, in equity, or under the Agreement, to immediately terminate the Agreement.  In the event there is a failure to comply with the minimum standards set forth in this Exhibit, PHH may direct Supplier to develop a written plan of corrective action for consideration by PHH.  Unless specifically defined in this Exhibit, capitalized terms shall have the meanings set forth in the Agreement.

    **1.** Security Policy.   Supplier shall establish and maintain a formal, documented, mandated, company-wide information security program, including security policies, standards and procedures (collectively "Information Security Policy"). The Information Security Policy will be communicated to all Supplier personnel and contractors in a relevant, accessible, and understandable form and will be regularly reviewed and evaluated to ensure its operational effectiveness, compliance with all applicable laws and regulations, and to address new threats and risks.

    **2.** Personnel and Supplier Protections.  Supplier shall screen all personnel with access to PHH Confidential Information, including PHH Customer Information, for potential security risks and require all employees, contractors, and subcontractors to sign an appropriate written confidentiality/non-disclosure agreement, which confidentiality/non-disclosure agreement may be (a) included in Supplier's general employee confidentiality/non-disclosure agreement, or (b) included in Supplier's agreements with contractors and subcontractors.  All agreements with third parties involving access to Supplier's systems and data, including all outsourcing arrangements and maintenance and support agreements (including facilities maintenance), shall specifically address security risks, controls, and procedures for information systems.  Supplier shall supply each of its personnel and contractors with appropriate, ongoing training regarding information security procedures, risks, and threats.  Supplier shall have an established set of procedures to ensure personnel and contractors promptly report actual and/or suspected breaches of security.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

2-31          PHH003853

**3.** Removable Media.   Except in the context of Supplier's routine back-ups or as otherwise specifically authorized by PHH in writing, Supplier shall institute strict physical and logical security controls to prevent transfer of PHH Customer Information via any form of Removable Media.   For purposes of this Exhibit, "Removable Media" means portable or removable hard disks, floppy disks, USB memory drives, zip disks, optical disks, CDs, DVDs, digital film, memory cards (e.g., Secure Digital (SD), Memory Sticks (MS), CompactFlash (CF), SmartMedia (SM), MultiMediaCard (MMC), and xD-Picture Card (xD)), magnetic tape, and all other removable data storage media. Supplier hereby agrees that in any exception situations involving Customer Information, that are specifically approved by PHH in writing, such data will be encrypted using encryption algorithms such as Triple DES-4 or the Rijndael, Advanced Encryption Standard (AES) or such other commercially recognized encryption technology as PHH shall approve in writing from time to time, and Supplier will provide decryption keys or codes to only the authorized representatives of the third parties via secure out-of band communications only.

**4.** Data Control; Media Disposal and Servicing.  PHH Confidential Information (i) may only be made available and accessible to those parties explicitly authorized under the Agreement or otherwise expressly authorized by PHH in writing; (ii) if transferred across the Internet, any wireless network (e.g., cellular, 802.11x, or similar technology), or other public or shared networks, must be encrypted using encryption algorithms such as Triple DES-4 or the Rijndael, Advanced Encryption Standard (AES),  or such other commercially recognized encryption technology as PHH shall designate in writing from time to time, and (iii) if transferred using Removable Media (as defined above) must be sent via a bonded courier and encrypted using encryption algorithms such as Triple DES-4 or the Rijndael, Advanced Encryption Standard (AES), or such other commercially recognized encryption technology as PHH shall designate in writing from time to time.  The foregoing requirements shall apply to back-up data stored by Supplier at off-site facilities.  In the event any hardware, storage media, or Removable Media must be disposed of or sent off-site for servicing, Supplier shall ensure all PHH Confidential Information, including Customer Information, has been "scrubbed" from such hardware and/or media using methods that are considered sound in the financial services industry and in compliance with Applicable Law and Applicable Guidelines.   To the extent that Supplier encrypts information as described above, Supplier will provide decryption keys or codes only to the authorized representatives of the third parties via secure out-of band communications only.

**5.** Hardware Return.  Upon termination or expiration of the Agreement or at any time upon PHH's request, Supplier will return all hardware, if any, provided by PHH containing PHH Confidential Information to PHH. The PHH Confidential Information shall not be removed or altered in any way. The hardware should be physically sealed and returned via a bonded courier or as otherwise directed by PHH.  In the event the hardware is owned by Supplier or a third-party, a notarized statement, detailing the destruction method used and the data sets involved, the date of destruction, and the company or individual who performed the destruction will be sent to a designated PHH security representative within fifteen (15) days of termination or expiration of the Agreement or at any time upon PHH's request.  Supplier's destruction or erasure of PHH Information pursuant to this Section shall be in accordance with practices that are considered reasonable in the financial services industry and in compliance with Applicable Law and Applicable Guidelines.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER   2-32   PHH003854

**6.** Physical and Environmental Security.   Supplier facilities that process PHH Confidential Information will be housed in secure areas and protected by perimeter security such as access controls (e.g., the use of guards and entry badges) that provide a physically secure environment from unauthorized access, damage, and interference.

**7.** Communications and Operational Management.   Supplier shall (i) monitor and manage all of its information processing facilities, including, without limitation, implementing operational procedures, change management and incident response procedures; and (ii) deploy adequate anti-viral software and adequate back-up facilities to ensure essential business information can be promptly recovered in the event of a disaster or media failure; and (iii) ensure its operating procedures will be adequately documented and designed to protect information, computer media, and data from theft and unauthorized access.

**8.** Access Control.  Supplier shall implement formal procedures to control access to its systems, services, and data, including, but not limited to, user account management procedures and the following controls:

- Network access to both internal and external networked services shall be controlled, including, but not limited to, the use of properly configured firewalls;

- Operating systems will be used to enforce access controls to computer resources including, but not limited to, authentication, authorization, and event logging;

- Applications will include access control to limit user access to information and application system functions; and

- All systems will be monitored to detect deviation from access control policies and identify suspicious activity.  Supplier shall record, review and act upon all events in accordance with incident response policies set forth below.

**9.** Compliance, Right to Audit, and Incident Notification.  Supplier will promptly notify (but in no event more than twenty-four (24) hours after confirmation of the occurrence) the designated PHH security contact by telephone and subsequently via written letter of any suspected and potential or actual security attacks or incidents, whether directed from internally or externally. The notice shall include the approximate date and time of the occurrence and a summary of the relevant facts, including a description of measures being taken to address the occurrence. A security incident includes instances in which internal personnel access systems in excess of their authorized user rights or use the systems inappropriately for the purpose of committing theft or fraud or otherwise compromising PHH's Confidential Information, including Customer Information. Supplier will notify PHH of each and every security incident involving PHH's Confidential Information, including Customer Information._Upon reasonable notice to Supplier of at least thirty (30) days, PHH or its third party designee may, but is not obligated to, perform audits and security tests of Supplier's environment that may include, but are not limited to, interviews of relevant personnel, review of documentation, or technical inspection of systems, as they relate to the receipt, maintenance, use, retention, and authorized destruction of PHH Confidential Information.  PHH agrees to limit the scope of such audit to information not available in Supplier's then current annual report prepared in accordance with AICPA Statement on Standards for Attestation Engagements (SSAE) No. 16 (SSAE 16) SOC 2 Type 2, unless such

33

report indicates areas of deficiency or the occurrence of security incidents or the results of testing, audits, or other quality assurance processes indicate a lack of adequate controls. To the extent PHH is permitted to conduct an audit with regard to information available in Supplier's SSAE 16 report, PHH shall have access only to those processes and systems pertaining to the services provided under the agreement. In the case of a notified security incident, the 30 day minimum notice requirement will be waived. In the event PHH desires to conduct unannounced vulnerability testing, PHH shall provide contemporaneous notice to Supplier's Vice President of Audit, Chief Information Security Officer, or other such equivalent position. Any of PHH's regulators shall have the same right upon request. Supplier shall provide all information reasonably requested by PHH in connection with any such audits and shall provide reasonable access and assistance to PHH or its regulators upon request. Supplier agrees to comply with all reasonable recommendations that result from such inspections, tests, and audits within reasonable timeframes. PHH reserves the right to view, upon request, any original security reports that Supplier has undertaken on its behalf to assess Supplier's own network security, assuming such reports do not compromise information of other Supplier clients not related to PHH. If requested, copies of these reports will be sent via bonded courier to the PHH security contact. In all cases, Supplier reserves the right to limit the external release of technical or other proprietary information (including but not limited to IP address ranges, passwords, domains, naming conventions, and listings of Supplier employee names) that could be used to compromise the security of Supplier systems unless compelled to do so by a law enforcement agency or any of PHH's regulators. Such proprietary materials will be provided for on site inspection on Supplier's premise under audit rights described above.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

2-34                PHH003856

Exhibit 2.10

Firm Affiliates

(To be furnished by Firm)

Law Firms:
Barrett Daffin Frappier Treder & Weiss, LLP (CA/NV)
Barrett Daffin Frappier Levine & Block, LLP (GA)

(aka "NDEX")
National Default Exchange Holdings, LP
National Default Exchange, LP
NDEX Title Services, LLP
NDEX West, LLC



TitleStar Mortgagee Services, LLC
Trinity Notary Services, LLC
NetDirector, LLC

35

2-35

PHH003857

Exhibit 7.2(A)

Other Flat Fee Matter Types

*Bid at senior (Defense File-Sale) - flat rate fee is $450 annually
• If the Firm incurs a cost for hiring an outside trustee to attend the sale (due to timing or location of the senior sale), that is billed as an additional cost.
• Excess bid funds are returned to the servicer within four (4) business days of sale.
• If the senior lien sells to a third party above the client's bid, the Firm charges an additional $150.00 to pursue and collect non-judicially the excess funds for the junior lien client. Per hour basis for contested and/or judicial excess funders in collections.
• Any excess sale proceeds payable to the junior lien are sent to the junior lien client within three (3) business days after receipt.
• If the firm is handling the senior foreclosure sale in-house and the junior lien client requests senior lien monitoring (and all conflicts are waived), the firm will collect from the excess proceeds its normal trustee's fees and attorney fees/costs as provided by the senior lien loan documents.

*Rescission fees for Texas and Georgia reflect $355.00 for uncontested nonjudicial rescissions, and per hour basis for contested and/or judicial rescission litigation.\

See attached Firm Fee Schedule

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

2-36   PHH003858

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

## Exhibit 7.2A & B Flat Fee Schedule and Progress Billing

| Service | Fee | Conditions | Progress Billing |
|---|---|---|---|
| Mediation | $750/for HUD loans 7 hours at ~~215~~ $175/hour | For FNMA and FHLMC published guidelines should be used. If additional fees are required over the allowable please present to PHH for approval. | Bill once fee is approved and work begins. For hourly billing bill once 7 hours of work is completed. |
| Nevada Petition for Judicial Review | $2000/for HUD loans 10 hours at $175/hour  *215* | | Bill once fee is approved and work begins. For hourly billing bill once 10 hours of work is completed. |
| Title Claim Filing | $150.00 | | Bill once fee is approved and work begins |
| QWR or Regulatory Response Letter Review | 1 hour at $175/hour  *215* | | Bill once fee is approved and work begins |
| Condo/HOA/Jr Lien FC Management and Monitoring | $500.00/for HUD loans 3 hours at $175/hour  *215* | | Bill once fee is approved and work begins. For hourly billing bill once 3 hours of work is completed. |

PHH003859

Exhibit 7.2(B)

Progress Billing Schedule of Flat Fee Matters

37

$2-38$

PHH003860

Exhibit 9.6

Form of Firm Certification in respect of Information Protection Obligations

Certification in respect of Information Protection Obligations

I, _____, the _____ of [Firm name] ("Firm"), do hereby certify that I have read and understand the Firm's obligations as set forth in that certain Legal Services Agreement dated as of _____, 20__ between PHH Mortgage Corporation and Firm (the "LSA") including without limitation, the Firm's obligations set forth in Article IX thereof.

I further certify that for the calendar year ending December 31, 20___, the Firm has met, in all material respects, each of its obligations set forth in Article IX of the LSA.

I further certify that I am authorized to make this certification on behalf of the Firm.

IN WITNESS WHEREOF, I have hereunto signed my name.

Dated: January ___, 20___

By: _____
Name: _____
Title: _____

38

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

2-39

PHH003861

**Robin Turton**

| | |
|---|---|
| **From:** | Robin Turton |
| **Sent:** | Friday, April 05, 2013 2:53 PM |
| **To:** | 'shannon.tomasso@mortgagefamily.com' |
| **Cc:** | bdflawgroup@bdfgroup.com |
| **Subject:** | FW: ***Attention Required PHH Mortgage Corporation Legal Services Agreement*** |
| **Attachments:** | PHH-BDF Law Group 4-5-13.pdf; Legal Services Agreement FINAL.docx; Ex 1.1a Best Practices Guide.docx; Exhibit 7.2 - BDF Law Group Fee Schedule Addendum 4-5-13.xlsx |

**Importance:**   High

Hi Shannon:

I am returning a copy of the executed agreement on behalf of our three Firms Barrett Daffin Frappier Turner & Engel, LLP in Texas, Barrett Daffin Frappier Levine & Block, LLP in Georgia, and Barrett Daffin Frappier Treder & Weiss, LLP in California/Nevada, aka "the BDF Law Group". Our partner executed subject to the redline changes noted within. I have attached both versions, the executed PDF draft and the redline DOC Agreement and Guide, for your viewing convenience. I will return the hard copy to you at the address noted below.

To ensure compliance on a go forward basis, we would appreciate if you would provide further direction with regards PHH's preferred SCRA search process milestones for evictions (pg 10 & 11 of the Guide).

Thanks again for your assistance!


**Robin Turton**
Contracts Administrator



*an affiliated service provider for*
**Barrett Daffin Frappier Turner & Engel, LLP (TX)**
**Barrett Daffin Frappier Levine & Block, LLP (GA)**
**Barrett Daffin Frappier Treder & Weiss, LLP (CA/NV)**
**NDeX West, LLC (CA/NV)**
15000 Surveyor Boulevard
Addison, Texas 75001
972-341-5302 direct
972-386-5040 main
972-341-0679 fax
robint@ndexteamwest.com


**From:** Tomasso, Shannon M. (MBS) [mailto:Shannon.Tomasso@mortgagefamily.com]
**Sent:** Friday, March 22, 2013 1:37 PM
**To:** Tomasso, Shannon M. (MBS)
**Subject:** ***Attention Required PHH Mortgage Corporation Legal Services Agreement***
**Importance:** High

Good Afternoon,
PHH Mortgage Corporation has made some amendments to our Legal Services Agreement. As a valued member of the PHH attorney network, PHH looks forward to continuing to work with you in the future and is asking that you execute the updated Legal Services Agreement. Full details of the execution can be found in the attached documents.

1

2-40

Once reviewed, please print and execute **2 copies** of the Legal Services Agreement and mail them to me at the below address.  Once PHH receives the executed copies we will execute and then return one fully executed copy to you for your records.

Mailing Address:
PHH Mortgage Corporation
2001 Bishops Gate Blvd
Mt Laurel NJ 08054
Mailstop SV-01
Attention Shannon Tomasso

If you are not the correct contact for your firm, please forward to the correct contact and include me so I can updated my records.

If you have questions or need additional information please just let me know.
Thank You
Shannon Tomasso
Foreclosure/Bankruptcy Director
PHH Mortgage
856-917-4033
shannon.tomasso@mortgagefamily.com

Please consider the environment before printing this email

NOTICE: This communication and any attachments may contain non-public, confidential and/or proprietary information for disclosure to and use by the intended recipient only. If you have received this communication in error, please delete or destroy it and all copies and attachments immediately, and notify the sender. If you are not the intended recipient, be advised that any review, distribution or printing of this communication is prohibited. An error in transmission is not intended to waive confidentiality or privilege. We reserve the right, to the extent permitted under applicable law, to monitor electronic communications.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

2-41

PHH003863

## BDF LAW GROUP FEE SCHEDULE ADDENDUM
### PRIVILEGED & CONFIDENTIAL
*SUBJECT TO CHANGE WITHOUT NOTICE*
*Bankruptcy*

| Loan type | | MFR Chapter 13 | MFR Chapter 7 | POC | Plan Review | Objection to Plan | Objection to Claim | Filing of Notice/Certification of Default | Agreed Final Cure Payment | Disagreed Final Cure Payment | Regulation Change Date | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| All States | FHA | $1,000 minus previously billed on bk case number | $650 minus previously billed on bk case number | $275.00 | $150.00 | $400.00 | $400.00 | $50.00 | $50.00 | $250.00 | 9/1/2005 | $1,000 max can be invoiced for a Chapter 13 bankruptcy case. $650 max can be invoiced for a Chapter 7 bankruptcy case.

This fee assumes that all required procedural steps have been completed. The maximum attorney's fee varies based upon on the chapter under which the bankruptcy action is filed.

The update to HUD's Schedule of Attorney Fees will be effective for all bankruptcy clearances undertaken on or after September 1, 2005. These fees represent the maximum allowable amounts for customary |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

PHH003864

2 - 42

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

| VA | $850 minus previously billed on bk case number | $650 minus previously billed on bk case number | $275.00 | $150.00 | $400.00 | $400.00 | $50.00 | $50.00 | $150.00 | 2/5/2008 | $850 max can be invoiced for a Chapter 13 bankruptcy case. $650 max can be invoiced for a Chapter 7 bankruptcy case.<br><br>The new regulation and maximum allowable attorney fees will be applicable to all loan terminations completed on or after February 1, 2008. |

2-43

PHH003865

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

| FNMA | $650.00 | $550.00 | $275.00 | $150.00 | $400.00 | | $50.00 | $50.00 | $250.00 | 12/1/2011 | Fees for Chapter 11 or Chapter 12 cases, adversary proceedings, or any other fees not covered [the Allowable Bankruptcy Attorney Fees] schedule must be submitted as an excess fee request.<br><br>Fannie Mae will not reimburse bankruptcy fees or costs for the following without prior excess fee approval:<br>• PACER and mailing (preparation and postage),<br>• Mortgage loan document retrieval, or<br>• Motions for Relief from Stay in Chapter 7 cases when filed more than 60 days from the bankruptcy petition date. |

2-44

PHH003866

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

2-45

PHH003667

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| FHLMC (program) Referrals received PRIOR to 5/1/2012 | $750 Pre-Confirmation minus previously billed on bk case number/$450 Post-Confirmation | $600.00 | $275.00 | $150.00 | $400.00 | $400.00 | $150.00 | $50.00 | $50.00 | 5/4/2011 | The MFR fee includes all negotiations, correspondence, attendance at up to two (2) hearings and entry of Order<br><br>$750 Chapter 13 - Maximum legal fee (pre-confirmation)<br>$450 Chapter 13 - Maximum legal fee (post-confirmation)<br>$600 Chapter 7 - Maximum legal fee<br>$800 Chapter 11 - Maximum legal fee<br>$200 for additional court appearances beyond 1st 2 appearances |
| FHLMC (program) Referrals received ON or AFTER 5/1/2012 | $650.00 | $550.00 | $275.00 | $150.00 | $400.00 | $400.00 | $150.00 | $50.00 | $50.00 | 5/1/2012 | The MFR fee includes all negotiations, correspondence, attendance at up to two (2) hearings and entry of Order |
| FHLMC (non-program) | Follows Servicer contract based upon Conventional/VA/FHA fees | | | | | | | | | | |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

*FORECLOSURE*

**Texas**

| Loan type | Maximum | File Received | Posting NOS | | Sale | Regulation Change Date | Notes |
|---|---|---|---|---|---|---|---|
| FHA | $600.00 | 75% | 75% | | 100% | 9/1/2005 | HUD specifies that 75% can be charged if the forelcosure referral is closed prior to completing sale. |
| VA | $550.00 | client specified | client specified | | 100% | 2/5/2008 | VA does not specify the allowable percentages VA Initiated sale resets is $350 |
| Rural Housing | $600.00 | 75% | 75% | | 100% | 2/1/2003 | RHS specifies that 75% can be charged if the forelcosure referral is closed prior to completing sale. |
| FNMA | $900.00 | 45% | 90% | | 100% | 6/1/2012 | The 2010 FNMA guidelines discuss pro-rating under the restart allowable section. The rate change is effective on all referrals received on or after 6/1/2012 |
| FHLMC (program) | $750.00 | 48% | 82% | | 100% | 5/1/2011 | Restarts - $525 program (represents 70% as indicated in the fee schedule). |
| FHLMC (non-program) | $650.00 | client specified | client specified | | 100% | 7/25/2011 | Restarts - $455 non-program (represents 70% as indicated In the fee schedule). |

*FORECLOSURE*

**Georgia**

| Loan type | Maximum | File Received | Publication | | Sale | Regulation Change Date | Notes |
|---|---|---|---|---|---|---|---|
| FHA | $650.00 | 75% | 75% | | 100% | 9/1/2005 | HUD specifies that 75% can be charged if the forelcosure referral is closed prior to completing sale. |
| VA | $600.00 | client specified | client specified | | 100% | 2/5/2008 | VA does not specify the allowable percentages |
| Rural Housing | $650.00 | 75% | 75% | | 100% | 9/1/2005 | RHS specifies that 75% can be charged if the forelcosure referral is closed prior to completing sale. |
| FNMA | $900.00 | client specified | client specified | | 100% | 6/1/2012 | The 2010 FNMA guidelines discuss pro-rating under the restart allowable section. The rate change is effective on all referrals received on or after 6/1/2012 |
| FHLMC (program) | Not Designated in Georgia | | | | | | |
| FHLMC (non-program) | $650.00 | client specified | client specified | | 100% | 7/25/2011 | Restarts - $455 non-program (represents 70% as indicated in the fee schedule). |

2-46

PHH003868

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

2-47

PHH003869

**California**

| FORECLOSURE | | | | | | | |
|---|---|---|---|---|---|---|---|
| Loan type | Maximum | File Received | NOD Recorded | Publication | Sale | Regulation Change Date | Notes |
| FHA | $650.00 | 75% | 75% | 75% | 100% | 9/1/2005 | HUD specifies that 75% can be charged if the forelcosure referral is closed prior to completing sale. |
| VA | $600.00 | client specified | client specified | client specified | 100% | 2/5/2008 | VA does not specify the allowable percentages |
| FNMA | $650.00 | client specified | client specified | client specified | 100% | 6/1/2012 | The 2010 FNMA guideline discuss pro-rating under the restart allowable section. The rate change is effective on all referrals received on or after 6/1/2012 |
| FNMA | $1,000.00 | 0% | 50% | 75% | 100% | 10/1/2012 | Changes are effective on referrals received on or after 6/1/2012 |
| FHLMC (program) | | Not Designated in California | | | | | |
| FHLMC (non-program) | $650.00 | client specified | client specified | client specified | 100% | 7/25/2011 | Restarts - $455 non-program (represents 70% as indicated in the fee schedule). |

**Nevada**

| FORECLOSURE | | | | | | | |
|---|---|---|---|---|---|---|---|
| Loan type | Maximum | File Received | NOD Recorded | Publication | Sale | Regulation Change Date | Notes |
| FHA | $650.00 | 75% | 75% | 75% | 100% | 9/1/2005 | HUD specifies that 75% can be charged if the forelcosure referral is closed prior to completing sale. |
| VA | $600.00 | client specified | client specified | client specified | 100% | 2/5/2008 | VA does not specify the allowable percentages |
| FNMA | $1,100.00 | client specified | client specified | client specified | 100% | 6/1/2012 | The 2010 FNMA guidelines discuss pro-rating under the restart allowable section. The rate change is effective on all referrals received on or after 6/1/2012 |
| FHLMC (program) | | Not Designated in Nevada | | | | | |
| FHLMC (non-program) | $650.00 | client specified | client specified | client specified | 100% | 7/25/2011 | Restarts - $455 non-program (represents 70% as indicated in the fee schedule). |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

## EVICTION FEES

|  | FHLMC-NP | | FHA | | FNMA | | Bank Owned-REO |
|---|---|---|---|---|---|---|---|
| California | $ | 550 | $ | 525 | $ | 650 | $ | 650 |
| Georgia | $ | 450 | $ | 375 | $ | 500 | $ | 500 |
| Nevada | $ | 650 | $ | 375 | $ | 375 | $ | 650 |
| Texas | $ | 400 | $ | 325 | $ | 525 | $ | 525 |

## LITIGATION FEES

Associate Attorneys: $215/hr.

Senior Attorneys: $275-$300/hr.

Partner: $350/hr.

* If suit on note becomes contested the Firm will request hourly fee approval.

## MISC. FEES

*Rescission fees for Texas and Georgia reflect $355.00 for uncontested nonjudicial rescissions, and per hour basis for contested and/or judicial rescission litigation.

*Bid at senior (Defense File-Sale) - flat rate fee is $450 annually

• If the Firm incurs a cost for hiring an outside trustee to attend the sale (due to timing or location of the senior sale), that is billed as an additional cost.

• Excess bid funds are returned to the servicer within four (4) business days of sale.

• If the senior lien sells to a third party above the client's bid, the Firm charges an additional $150.00 to pursue and collect nonjudicially the excess funds for the junior lien client.  Per hour basis for contested and/or judicial excess funders in collections.

• Any excess sale proceeds payable to the junior lien are sent to the junior lien client within three (3) business days after receipt.

• If the firm is handling the senior foreclosure sale in-house and the junior lien client requests senior lien monitoring (and all conflicts are waived), the firm will collect from the excess proceeds its normal trustee's fees and attorney fees/costs as provided by the senior lien loan documents.

PHH003870

Exhibit 12



**MORTGAGE**

1 Mortgage Way
Mt. Laurel, NJ 08054

Tel  800-449-8767
Fax  856-917-8300

February 29, 2016

**VIA ELECTRONIC SUBMISSION**
Dustin J. Dreher
BDF Law Group
15000 Surveyor Boulevard
Addison, Texas 75001
dustind@bdfgroup.com

RE:      **Termination of Contractual Relationship with PHH Mortgage Corporation**

Dear Mr. Dreher:

PHH Mortgage Corporation ("PHH") retained Barrett Daffin Frappier Turner & Engel, LLP (TX), Barrett Daffin Frappier Treder & Weiss, LLP (CA), and Barrett Daffin Frappier Levine & Block, LLP (GA), collectively the "Firm," pursuant to a Legal Services Agreement (LSA).

This letter will serve as notification that PHH has decided to terminate its relationship with the Firm, effective March 1 2016, pursuant to Article XI, "Term and Termination," of the LSA.

Until the matters now being handled by the Firm are transferred to new counsel, PHH expects that the Firm will continue to perform in accordance with the LSA's terms for those matters in a manner that protects PHH's interests, and will fully cooperate in transitioning the Services to new counsel.

Please feel free to contact us if you have any questions.

Sincerely,

Ed Robinson, SVP, Servicing Operations
PHH Mortgage

Cc: Frances Kelly, Manager, Default Attorney Quality Assurance, PHH
    Sharon McMahon, Servicing Compliance Attorney
    Shannon Tomasso, Director, Foreclosure/Bankruptcy, PHH

EXHIBIT
PLAINTIFF'S
67
01/26/17

*Log in to MortgageQuestions.com — your servicing website connection.*

Exhibit 23

**BARRETT DAFFIN FRAPPIER**
TURNER & ENGEL, LLP
A PARTNERSHIP INCLUDING
PROFESSIONAL CORPORATIONS

ATTORNEYS AND COUNSELORS AT LAW

15000 SURVEYOR BOULEVARD
ADDISON, TEXAS 75001

TELEPHONE:  (972) 386-5040
TELECOPIER:  (972) 386-7673

September 7, 2011

*__VIA FED-X #7975 1877 1904__*

PHH Mortgage
c/o Mr. Jim Scott
Mail Stop: SV01
2001 Bishops Gate Blvd
Mount Laurel, NJ  08054

RE:     **PHH Legal Services Agreement "Agreement" for the following "Firms":**
        Barrett Daffin Frappier Turner & Engel, LLP ("BDFTE")  (Texas)
        Barrett Daffin Frappier Levine & Block, LLP ("BDFLB") (Georgia)
        Barrett Daffin Frappier Treder & Weiss, LLP ("BDFTW") (California/Nevada)

Dear Jim:

We received the above Agreements from PHH on behalf of our Firms.  Jay Frappier, our Managing Partner executed and I am returning subject to the comments and noted herein.

<u>Article 1.1</u>  States that the Firm is responsible to pay all related third party "licensing and other fees" to utilize requested systems/services.  This Firm will pay fees except where such fees conflict with fee payment directives for on Fannie Mae and Freddie Mac loans.

<u>Article 4.</u>  States that the Firm will provide a monthly status report by the 15th of each month including a chronology of every foreclosure file scheduled for sale.  The Firm uses middleware systems (i.e LPS) to provide updates that are required of us at various stages of the file level.  Those systems were developed to eliminate the need for monthly reporting since they provide a variety of reporting functions.  Any additional monthly status reporting will need to be further clarified by PHH and scope of services agreed to by the Firm.

<u>7.6 Invoicing</u>  The Firm will follow PHH's invoicing directive for submission ie. 7.6(A)"no more than twice"… except whereby such delay is caused by the Servicer or Investor.

<u>Exhibit A</u>  Requires that we perform a"SCRA check on all bankruptcy borrowers prior to filing a Motion For Relief from the Automatic Stay…. and uploaded to the Systems".   Eric Donowho, of the Firm discussed with you and Walt, and it was agreed that we could disregard this requirement since A Motion for Relief is not an action *against* the borrower, but a defensive request by the creditor for relief from the debtor's action against the creditor, and therefore such SCRA checks are not required. This paragraph is deleted.

Please feel free to call me if you need further assistance (972-341-5302 direct or robint@bdfgroup.com).

Sincerely,

Robin Turton
NDEX, Contracts Administrator



EXHIBIT
PLAINTIFF'S
1
01/26/17 JB

i-1

**PHH Mortgage Services**

**PHH**

August 19, 2011

Barrett Daffin Frappier Treder & Weiss
Ed Treder
20955 Pathfinder Rd, Suite 300
Diamond Bar , CA  91765

Re: Legal Services Agreement

Dear Ed Treder ,

Please find enclosed for your review and execution a Legal Services Agreement.  This agreement shall represent the arrangement between PHH Mortgage Corporation (PHH) and your firm whereby PHH wishes to retain your firm to provide the legal services stated within the agreement.

This agreement shall supersede and void any preexisting legal services or similar agreements between PHH and your firm.

Please execute both original versions of the agreement.  Retain one version for your files and return one version to PHH at the following address no later than September 6, 2011.

> PHH Mortgage Corporation
> Attention: Jim Scott, Director
> Mail Stop: SV01
> 2001 Bishops Gate Blvd
> Mount Laurel, NJ 08054

Should you have any questions please feel free to me at 856-917-8513.  Your prompt attention to this matter is greatly appreciated.

Sincerely,

Jim Scott
Director, Default Administration
PHH Mortgage Corporation

BDFTW016661

1 - 2

## LEGAL SERVICES AGREEMENT

This Legal Services Agreement (this "Agreement") is made and entered into this _31_ day of July, 2011, by and between PHH Mortgage Corporation, a New Jersey corporation ("Servicer") whose principal address is 1 Mortgage Way, Mount Laurel, New Jersey 08054 and _Barrett Daffin Frappier Treder & Weiss, LLP_ ("Firm") whose principal address is _15000 Surveyor Blvd, Addison, TX 75001_. Servicer and Firm may be collectively referred to as "Parties" and each singularly as a "Party".

## RECITALS

Servicer is in the business of servicing residential first and second lien mortgage loans, some of which are currently in default, and Servicer requires residential mortgage loan default related legal services, including legal services relating to loss mitigation, foreclosure, eviction, bankruptcy and condominium and homeowner association dues delinquencies;

Firm and its agents, members or affiliates are practicing attorneys or otherwise active in the business of providing such residential mortgage loan default related legal services;

Servicer wishes to retain Firm to provide the legal services stated herein;

**NOW, THEREFORE**, in consideration of the premises and the representations, warranties, covenants and agreements contained herein, the parties hereto, intending to be legally bound, agree as follows:

## ARTICLE I. SERVICES

1.1 SERVICES GENERALLY. Firm agrees to provide the legal services described in this Agreement, including Exhibit A hereto (the "Services"). Firm shall utilize the Servicer's approved automated communications and invoicing systems, including, when applicable, the systems of Servicer's third party vendors (collectively, "Systems"), in connection with the Services. Any licensing fees or other fees of Servicer's third party vendors to utilize such vendors' systems required in connection with the Services shall be paid by the Firm directly to such third party vendor. Communications between Firm and Servicer or Servicer's third party vendor shall primarily occur thought the Systems. Relevant documents related to the Services shall be uploaded into the appropriate Systems by the Firm. Firm shall upload into the appropriate Systems any documents so requested to be uploaded by Servicer.

1.2 PERFORMANCE STANDARDS. In addition to the other requirements relating to the Services set forth in this Agreement, the Firm shall provide all Services in conformance with, and otherwise meet, the performance standards set forth on Exhibit B hereto (the "Performance Standards").

(A) Responsiveness. Firm shall respond to Servicer inquiries presented via e-mail, through the Systems, or any other form of written inquiry from Servicer (including requests for indemnification by Servicer pursuant to Article V) within forty eight (48) hours of Firm's receipt of the inquiry.

1

BDFTW016662

1-3

1.3. INITIAL REFERRAL. Servicer or Servicer's third party vendor, on Servicer's behalf (as applicable), shall provide Firm with an initial loan referral in form and substance to be agreed upon by Servicer and Firm (each an "Initial Referral"). The Initial Referral shall be provided to Firm at the same time Servicer or Servicer's vendor delivers the referred file to Firm. In the event Servicer subsequently obtains new or updated information necessary for the Firm to perform the Services ("Additional Information"), Servicer or Servicer's vendor shall provide Firm with a written supplement to the Initial Referral disclosing the Additional Information within a reasonable time.

1.4 MONTHLY STATUS REPORTS. Firm agrees that it will provide, either electronically or in writing, a monthly status report (the "Monthly Status Report") of the matters being handled by Firm hereunder. The Monthly Status Report shall indicate the following information:

    A.    the loan number and mortgagor(s) name(s);

    B.    the date of referral of the applicable file;

    C.    the current status on each referred file, specifically noting whether the case is contested and actively being opposed and if substantive defenses and/or counterclaims have been advanced;

    D.    in the case of foreclosure referrals, chronological reporting and the disposition of all foreclosure files scheduled for sale within the month including completed sales, reinstatements, bankruptcy filings, postponements, etc. ;E.    report of cases completed within and outside of Fannie Mae, Freddie Mac, FHA, VA or other applicable timelines, and

    F.    capacity information including the number of cases or actions being handled per paralegal or attorney.

Firm shall provide Servicer with a copy of the Monthly Status Report on or before the 15th day of every month. The Monthly Status Report shall not limit Servicer's right under this Agreement to obtain any other report or examine any of the applicable records in Firm's possession. In addition to the Monthly Status Report, Servicer may require additional reports, and Firm agrees to provide such additional reports when reasonably requested by Servicer.

1.5 LITIGATION. If, in the course of representing the interest of Servicer, it becomes necessary for Firm to pursue or defend litigation (other than uncontested judicial foreclosures), Firm agrees that it will immediately notify Servicer in writing seeking approval and indicating (i) the necessity of litigation, (ii) the proposed course of action, (iii) anticipated fees and costs, and (iv) any documentation needed from Servicer. Upon receiving such notification from Firm, Servicer agrees to respond to Firm's request for litigation approval within five (5) business days, indicating approval or disapproval of the proposed course of action and anticipated fees and costs. For the avoidance of doubt, Firm agrees that it shall immediately notify Servicer as provided herein of any answer or affirmative defense, counterclaim, motion, deposition notice or other discovery demand, or any similar filing or request received by Firm in any matter where Firm is providing Services hereunder.

1-4

BDFTW016663

1.6 NO MINIMUM VOLUME, ETC. Servicer is not obligated to refer any minimum volume of matters to the Firm during the term of this Agreement or any portion thereof. Servicer may reduce the volume of matters being referred to the Firm, or cease referring any new matters to the Firm, at any time. Firm is not Servicer's exclusive provider of legal services in the jurisdictions where the Firm provides legal services, and Servicer may utilize other attorneys or providers in such jurisdictions in Servicer's sole discretion.

## ARTICLE II. REPRESENTATIONS AND WARRANTIES OF FIRM

Firm represents and warrants to Servicer as of the Effective Date and throughout the term of this Agreement that:

2.1 ORGANIZATION. Firm is a [                    ], validly existing and in good standing under the laws of the state of its organization and has the requisite power and authority to carry on its business in every jurisdiction in which the Services contemplated under this Agreement will be performed. Firm is qualified to do business and is in good standing in each jurisdiction required to perform the Services.

2.2 AUTHORITY. Firm has full power and authority to enter into this Agreement and to consummate the performance contemplated hereby. No other proceedings on the part of Firm are necessary to authorize the execution and delivery of this Agreement or the consummation of the performance contemplated hereunder. The execution of this Agreement does not conflict with Firm's organizational documents or ethics rules applicable to the Firm. This Agreement constitutes a valid and legally binding agreement of Firm, enforceable against Firm in accordance with its terms, except as enforcement may be limited by bankruptcy or similar insolvency laws, or general equitable principles.

2.3 INVESTOR, ETC. REQUIREMENTS. If the Firm is approved as Freddie Mac designated counsel, or approved by Fannie Mae (as defined by, respectively, the Freddie Mac or Fannie Mae approved foreclosure and/or bankruptcy attorney list, which may change from time to time), Firm will comply with all Freddie Mac or Fannie Mae guidelines applicable to the Services. Firm will also comply with all requirements and guidelines, as applicable, of the U.S. Department of Housing and Urban Development ("HUD"), including the Federal Housing Administration ("FHA") and the U.S. Department of Veteran's Affairs, or Veteran's Administration ("VA") in performing the Services. Firm shall also comply with all requirements and guidelines, as applicable, of private investors, and insurers (including private mortgage insurers).

2.4 NO LITIGATION. There are no claims, suits, actions or proceedings pending or, to the Firm's knowledge, threatened against the Firm, before any court, or any judgment, decree, injunction, rule or order of any court, governmental department, commission, agency, instrumentality or authority, or any arbitrator that reasonably could have a material adverse effect on Firm's ability to perform its obligations under this Agreement.

2.5 LICENSES. Firm has all licenses, permits or other approvals necessary to provide the Services.

3

1-5

2.6 COMPLIANCE WITH LAW, ETC. In performing the Services the Firm will comply with, and all Services shall conform to, all applicable rules of professional conduct, as well as all applicable federal, state and local laws, regulations, ordinances, rules or orders, including but not limited to state foreclosure laws and regulations, the United States Bankruptcy Code, and the federal Fair Debt Collection Practices Act.

2.7 NO CONFLICT OF INTEREST. Neither the Firm nor any of its officers, directors or employees has any business or financial arrangement with any other entity which would conflict with Firm's representation of Servicer in providing the Services.

2.8 NO CODES OR VIRUSES. Firm shall not introduce into any Servicer system, sub-system, software, hardware or any other component or element of Servicer's business or technology environment (collectively, the "Servicer Technology Environment") any code which is designed to have the effect of disabling or otherwise shutting down all or any portion of the Servicer Technology Environment. Firm shall use commercially reasonable efforts to (i) to ensure that no viruses, software traps, worms, trap doors, back doors, Trojan horses, or other similar malicious program code, programming instruction, or software, or similar items (collectively, a "Virus") are coded in, introduced in, allowed to be introduced in, or included in the Servicer's Technology Environment; and/or (ii) to assist the Servicer in reducing the effects of any Virus on the Servicer Technology Environment.

2.9 COMPETENT PERFORMANCE. All Services shall be performed in a competent and professional manner by qualified personnel. Firm and each of its officers, directors employees, agents, contractors and subcontractors performing the Services has the proper skill, training and background necessary to accomplish their assigned tasks.

## ARTICLE III. REPRESENTATIONS AND WARRANTIES OF SERVICER

Servicer represents and warrants to Firm as of the Effective Date and throughout the term of this Agreement that:

3.1 ORGANIZATION. Servicer is a New Jersey corporation, validly existing and in good standing under the laws of the state of its incorporation and has the requisite power and authority to carry on its business and perform its obligations under this Agreement. Servicer is qualified to do business and is in good standing in each jurisdiction required to perform its obligations under this Agreement.

3.2 AUTHORITY. Servicer has full power and authority to enter into this Agreement and to consummate the performance contemplated hereby. No other proceedings on the part of Servicer are necessary to authorize the execution and delivery of this Agreement or the consummation of the performance contemplated hereunder. The execution of this Agreement does not conflict with Servicer's articles of incorporation or bylaws. This Agreement constitutes a valid and legally binding agreement of Servicer, enforceable against Servicer in accordance with its terms, except as enforcement may be limited by bankruptcy or similar insolvency laws, or general equitable principles.

BDFTW016665

1-6

3.3 NO LITIGATION.  There are no claims, suits, actions or proceedings pending or, to the Servicer's knowledge, threatened against the Servicer, before any court, or any judgment, decree, injunction, rule or order of any court, governmental department, commission, agency, instrumentality or authority, or any arbitrator that reasonably could have a material adverse effect on Servicer's ability to perform its obligations under this Agreement.

## ARTICLE IV.  INSURANCE REQUIREMENTS

4.1 INSURANCE TYPES/LIMITS.  At all times during the performance of the Services hereunder, Firm shall keep in full force and effect and maintain, at no additional cost to Servicer, the following policies of insurance:

(a) Professional Liability and Errors and Omissions Liability Insurance/Legal Malpractice Insurance covering acts, errors, omissions, and equipment/machine malfunctions arising out of Firm's operations or provision of the Services in an amount not less than three million dollars ($3,000,000.00) per occurrence; and

(b) Commercial (Comprehensive) General Liability Insurance, including coverage for independent contractors, personal or bodily injury, products liability, premises/operations, completed operations, and broad form property damage, with combined single limits of not less than three million dollars ($3,000,000.00) per occurrence; and

(c) Crime Insurance (including fidelity bond, employee dishonesty, and computer fraud coverage) covering losses arising out of or in connection with any fraudulent or dishonest acts committed by Firm's (or its subcontractors') personnel, acting alone or with others, with a limit of not less than two million dollars ($2,000,000.00); and

(d) Workers' Compensation Insurance (in compliance with State and Federal laws) covering all of Firm's (and/or its subcontractors') employees engaged in the performance of Services hereunder, and Employers' Liability Insurance with a limit of not less than one million dollars ($1,000,000.00); and

(e) Commercial Business Automobile Liability Insurance covering all owned, non-owned, leased, and hired vehicles, and providing coverage for bodily injury and property damage liability with combined single limits of not less than two million dollars ($2,000,000.00) per occurrence.

4.2 OTHER INSURANCE REQUIREMNTS.  All insurance policies required by this Agreement shall be written by insurance carriers rated at least "A-" or better by A.M. Best. Firm shall provide evidence of the insurance coverage required hereunder to Servicer on an annual basis as well as promptly upon request. Firm shall notify Servicer in writing at least twenty (20) days in advance if Firm intends to decrease the amount of or materially change any other terms of any required insurance policy. By requiring insurance as provided herein, Servicer does not represent that the coverage and limits required will be necessarily adequate to protect Firm or

BDFTW016666

1-7

Servicer. Firm is responsible for providing, at Firm's expense, any additional insurance that Firm deems necessary to protect Firm's interests. The limits required by PHH hereunder shall not be deemed a limitation of Firm's liability hereunder.

## ARTICLE V. INDEMNIFICATION

5.1 INDEMNIFICATION OF SERVICER BY FIRM. Firm does hereby agree to hold harmless, defend and indemnify Servicer, and each of Servicer's directors, officers and employees (collectively, the "Servicer Indemnified Parties"), from and against any and all claims, demands, liabilities, losses, costs and damages (including without limitation court costs and reasonable attorney's fees) that the Servicer or the Servicer Indemnified Parties may incur or suffer, arising out of the following: (a) Negligence, gross negligence, or willful misconduct by any of Firm's officers, directors or employees; (b) Any and all actions relating to the Services taken by or on behalf of Firm that (i) are not permitted by this Agreement, or (ii) are not within the scope of Firm's duties under this Agreement, or (iii) are not within Firm's actual or implied authority under this Agreement; and (C) any breach of Firm's representations, warranties, obligations or covenants (including the Performance Standards) set forth in this Agreement.

Without limiting the generality of the foregoing, Firm shall hold harmless, defend and indemnify Servicer from and against all actual monetary damages incurred as a result of the Firm's failure to meet agency, investor, insurer or state law requirements. This indemnity obligation shall include, without limitation, actual losses suffered by Servicer relating to interest curtailments by agencies or investors, claim denials, guarantee denials, fines imposed by an agency or investor, bids that are not in accordance with the information provided by Servicer, short reinstatements or payoffs to the extent that the amount received was short due to errors by the Firm, and actual losses resulting from fees or costs that exceed those permitted by Servicer. For example, if an agency or investor assesses a penalty equal to three months interest, or bills Servicer for three months interest, as a result of a delay in the foreclosure, bankruptcy or eviction process, the Firm will indemnify Servicer against the loss to the extent that they delay was attributable to the Firm's failure to promptly and diligently perform the services in accordance with the Performance Standards, investor or agency requirements or this Agreement.

Notwithstanding the foregoing, Firm will not be required to indemnify Servicer for losses resulting directly from the following: (a) losses which arise from the physical condition or defects in legal title to a mortgaged property where such defect or physical condition was not proximately caused by negligent or intentional acts or omissions of the Firm; or (b) delays caused by courts, judicial officers, sheriffs and recorders unless not diligently pursued by the Firm; or (c) contested foreclosure cases, unless not diligently pursued by the Firm; or (d) delays caused by Servicer, or its document custodian's failure to provide necessary documents, unless said delay should have been anticipated or could have been mitigated by the Firm; or (e) delays caused by inaccurate information provided by or on behalf of Servicer or the data contained on the Servicer's system, unless said delay should have been anticipated or could have been mitigated by the Firm.

5.2 INDEMNIFICATION OF FIRM BY SERVICER. Servicer does hereby agree to hold harmless, defend and indemnify the Firm, and each of the Firm's directors, officers and

6

1-8

BDFTW016667

employees (collectively, the "Firm Indemnified Parties"), from and against any and all claims, demands, liabilities, losses, costs and damages (including without limitation court costs and reasonable attorney's fees) that the Firm or the Firm Indemnified Parties may incur or suffer, arising out of the following: (a) third party claims resulting from the wrongful acts or omissions of the Servicer in connection with any mortgage loan referred to Firm for Services hereunder; and (b) any breach of Servicer's representations, warranties, obligations or covenants set forth in this Agreement.

Servicer will have no obligation to indemnify, defend or hold harmless the Firm or the Firm Indemnified Parties under this Section 5.2 to the extent the claims, demands, liabilities, losses, costs and damages arise out of or are in connection with any matter the Firm is obligated to indemnify Servicer or the Servicer Indemnified Parties for pursuant to Section 5.1 of this Agreement.

5.3 NOTIFICATION OF CLAIM.  Promptly after receipt of notice of a claim by or the commencement of any action, suit or proceeding against the Party claiming indemnification hereunder (the "Indemnitee"), Indemnitee will, if a claim is to be made against the Party indemnifying the Indemnitee (the "Indemnitor") under this Agreement, notify the Indemnitor in writing of Indemnitee's claim for indemnification.  Indemnitee's failure to notify the Indemnitor will not relieve Indemnitor from any liability which it may have to Indemnitee under this Agreement except to the extent of the economic loss which the Indemnitor is able to prove directly resulted from Indemnitee's failure to provide timely notice.  With respect to any such claim, action, suit or proceeding against Indemnitee, the Indemnitee will be entitled to participate at its own expense as set forth below.

5.4 DEFENSE OF CLAIM.  To the extent that it may wish, the Indemnitor will be entitled to assume the defense of any matter described above in Section 5.3, with counsel selected by the Indemnitor and reasonably satisfactory to Indemnitee.  After notice from the Indemnitor to Indemnitee of its election so to assume the defense, the Indemnitor will not be liable to Indemnitee under this Agreement for any legal or other expenses subsequently incurred by Indemnitee in connection with the defense other than reasonable costs of investigation or as otherwise provided below.  Indemnitee shall have the right to employ counsel in such action, suit or proceeding but the fees and expenses of such counsel incurred after notice from the Indemnitor of its assumption of the defense shall be at the expense of Indemnitee unless (i) there is a conflict of interest between the Indemnitor and Indemnitee in the conduct of the defense of such action or (ii) the Indemnitor shall not in fact have employed counsel to assume the defense of such action, in each of which cases the fees and expenses of counsel shall be at the expense of the Indemnitor.

5.5 LIABILITY FOR SETTLEMENT.  The Indemnitor shall not be liable to indemnify Indemnitee under this Agreement for any amounts paid in settlement of any action or claim unless the Indemnitor's prior written consent to such settlement shall have been obtained.  The Indemnitor shall not settle any action or claim in any manner which would impose any penalty, limitation or affirmative duty on Indemnitee without Indemnitee's prior written consent.  Neither the Indemnitor nor Indemnitee will unreasonably withhold their consent to any proposed settlement.  In the event a settlement offer is proposed and rejected by either the Indemnitor or Indemnitee (the "Rejecting Party") and the matter is adjudicated to a final resolution in which the

7

1-9

BDFTW016668

adjudicated amount against the Indemnitee is greater than the settlement amount, the Rejecting Party shall be liable for the difference.

5.6 REPAYMENT OF EXPENSES.  Indemnitee agrees to reimburse the Indemnitor for all reasonable fees and expenses paid by the Indemnitor in defending any action, suit or proceeding described above against Indemnitee if and only to the extent that a final decision by a court having jurisdiction in the matter shall determine that Indemnitee is not entitled to be indemnified by the Indemnitor for such fees and expenses under applicable law.

5.7 REIMBURSEMENT BY INDEMNITOR.  If Indemnitee is required to bring any action to enforce rights or to collect moneys due under this Agreement and is successful in such action, the Indemnitor shall reimburse Indemnitee for all of Indemnitee's reasonable fees and expenses in bringing and pursuing such action.

## ARTICLE VI.  RECORDKEEPING/AUDIT RIGHTS

6.1 RECORDS.  Firm shall be responsible for maintaining complete and accurate individual records (including, as applicable, accounting records in accordance with generally accepted accounting principles) on all matters referred to it hereunder by Servicer.  All files of Servicer matters referred hereunder shall be stored in a secure centralized location or locations in an organized and easily retrievable manner; Firm shall employ a tracking system enabling Firm to locate any files "checked out" of such storage location(s) for use by Firm personnel. Without limiting the foregoing, Firm shall ensure that any original promissory notes or other original loan documents provided to Firm are stored in appropriate secured locations, the whereabouts of such original documents tracked, and Firm must be able to produce or account for such original documents within forty eight (48) hours of Servicer's request. If any such original loan documents are held by a court, Firm shall diligently pursue return of such documents by the court upon Servicer's request. All original loan documents that were provided to Firm shall be returned to Servicer within seven (7) business days of the occurrence of the foreclosure sale or other completion of the matter/closing of the Firm's file. Firm shall return files to Servicer in accordance with instructions provided by the Servicer which may include the use of an overnight courier with tracking capabilities.  Firm shall enclose a signed transmittal detailing Servicer's loan number(s) and documents enclosed.  The foregoing requirements of this Section 6.1 shall be in addition to and not in lieu of Firm's obligations relating to Confidential Information hereinafter set forth.

6.2 AVAILABILITY OF RECORDS/AUDITS.  Throughout the term of this Agreement and during any Transition Period (as hereinafter defined) following termination of this Agreement, Firm shall provide to Servicer, its internal or external auditors, attorneys or other personnel, such access to Firm's premises, systems, personnel, records and documentation relating to the Services as Servicer may reasonably request in order to verify Firm's compliance with the terms of this Agreement. Firm agrees to cooperate in any such review or audit as reasonably requested by Servicer. Any such audit on Firm's premises shall be conducted in a manner that does not compromise the confidentiality of information relating to the Firm's other clients, and without undue disruption to Firm's operations. Without limiting the foregoing right

8

BDFTW016669

1-10

of Servicer to review and/or audit all records relating to the Services, Servicer shall have the right at any time and for any reason to obtain any files, including foreclosure and bankruptcy files, referred to the Firm for Services, and Firm shall not limit Servicer's access to the files and shall assist Servicer in locating any requested files or information. Firm agrees to complete and provide to Servicer upon request a questionnaire including but not limited to the firm's expertise, results on any internal audits or self assessments, capacity, changes in practice and compliance with state law.

## ARTICLE VII. BILLING OF FEES AND EXPENSES

7.1 FEES AND EXPENSES GENERALLY. All fees and expenses must be reasonable, for actual services rendered and to be in accordance with the guidelines and requirements of the applicable investor/insurer. Any amount above such requirements or guidelines must be approved by Servicer prior to billing of such amount by the Firm.

7.2 FLAT FEE MATTERS. Unless otherwise specifically agreed to in advance in writing in relation to a specific matter, all foreclosure, bankruptcy and eviction matters shall be billed by the Firm on a "flat fee" or "lump sum" basis, in accordance with applicable investor and/or FHA/VA requirements. The parties acknowledge that such flat fees may change over time, and shall be as set by HUD, FHA, VA, Fannie Mae, Freddie Mac or other applicable investor, or as mutually agreed to by the Firm and Servicer. To the extent that the applicable investor has not communicated such a flat fee schedule to Servicer or Firm, Firm shall follow the Fannie Mae guidelines.

7.3 HOURLY FEE MATTERS. For litigated matters or issues (including foreclosure or bankruptcy referrals that become litigated matters) or other matters assigned to Firm outside of foreclosure, bankruptcy or evictions, Firm will charge Servicer at the lesser of Firm's normal hourly billing rate for the personnel performing the Services, or an hourly rate of $175.00/hour.

7.4 EXPENSES. Subject to the following sentence, any expenses Firm intends to pass through to Servicer must be approved in advance by Servicer in order to be reimbursed. Firm's costs for phone calls, postage, copying, courier or similar "overhead" items will not be subject to reimbursement by Servicer.

7.5 CHARGES TO BORROWER. Firm shall not quote to or charge the mortgage loan borrower (including debtors in bankruptcy), in any context, including but not limited to the time of reinstatement or payoff, a higher rate or fee than billed to Servicer, and shall promptly reimburse to the borrower, or Servicer as the case may be, any fees or costs which have been miscalculated, over-estimated or which have not been actually incurred.

7.6 INVOICE TIMING. All invoices shall be submitted to Servicer (via Servicer's bill presentment program) for payment in accordance with the procedures set forth herein:

(A) Foreclosure: Invoices for Services must be submitted to Servicer no more than twice during the period from the initiation of foreclosure proceedings to the completion of the matter: first, upon filing of the complaint (where applicable); and second, within five (5) business days of completion of sale/disposition of the subject property or when the foreclosure action is

BDFTW016670

1-11

otherwise terminated, such as by withdrawal of the matter, reinstatement, interruption by a bankruptcy, etc. All amounts due must be invoiced within thirty (30) days of final completion of the matter. Servicer shall not be obligated to pay any amounts not invoiced within thirty (30) days of completion of the matter.

(B) Bankruptcy: Invoices for Services in connection with routine bankruptcy matters must be submitted to Servicer no more than three times during the period from the initiation of bankruptcy proceedings to the completion of the matter: first, upon filing of the proof of claim (if applicable); second, upon filing of the motion for relief from stay (if applicable), and third, within thirty (30) days of dismissal, discharge, confirmation of plan, or other completion of the matter. All amounts due must be invoiced within thirty (30) days of final completion of the matter. Servicer shall not be obligated to pay any amounts not invoiced within thirty (30) days of completion of the matter.

(C) Litigation or other hourly billed matters: Invoices for Services shall be submitted on a monthly basis.

7.7 INVOICE REQUIREMENTS. A "Flat Fee" or "Lump Sum" bill is allowed only on foreclosure, bankruptcy or eviction matters. Such billing of total charges and fees is not acceptable in litigation or contested matters. Firm must itemize fees and itemize disbursements for all litigated or contested matters or other matters billed on an hourly basis. Invoices for matters billed on an hourly basis must show the task performed, the person performing the task, break down of time to increments of 1/10 of an hour, hourly rate charge for the person(s) providing the service and an itemization of approved expenses incurred in connection with the work performed on behalf of Servicer.

7.8 FEE COMPLIANCE. All charges, costs and fees submitted by Firm must comply with all applicable federal, state, and local laws and court rules, as well as any ethical requirements regarding legal fees to which the Firm or its personnel are subject.

7.9 TIME FOR PAYMENT. Servicer agrees to remit payment to Firm within 30 days of receipt of Firm's invoice.

7.10 PAYMENT DELAY. If Firm fails to follow the procedures for billing set forth herein or if Firm has not provided Servicer with a certified IRS W-9 and Federal Tax ID#, Servicer may withold payment until Firm has materially complied with these provisions.


### ARTICLE VIII. CONFIDENTIALITY

8.1 CONFIDENTIAL INFORMATION. Servicer (including its affiliates) and Firm may from time to time disclose to each other (both orally and in writing and in any form or medium) in connection with the Services provided hereunder Confidential Information. As used herein "Confidential Information" shall mean any and all information furnished or disclosed, in whatever form or medium, concerning a disclosing party, unless excluded as hereinafter set forth. Confidential Information, includes, without limitation, such disclosing party's intellectual property, clients, borrowers, customer lists, business contacts, business plans, policies,

10

*1-12*

BDFTW016671

procedures, techniques, know-how, standards, products, source or object code, product or service specifications, manuals, agreements, economic and financial information, marketing plans, data, reports, analyses, compilations, statistics, summaries, studies, and any other materials or information, or any materials based thereon, whether written or oral, furnished directly or indirectly by a disclosing party or any of such disclosing party's directors, officers, employees, agents, attorneys, accountants, advisors and other representatives. For purposes herein, any technical or business information of a third person furnished or disclosed by one party to the other shall be deemed "Confidential Information" of the disclosing party and subject to the terms of this Section 8. Servicer's Confidential Information also shall include any proprietary and/or confidential information related to PHH's affiliates, sales representatives, and/or customers.

8.2 NON-DISCLOSURE. The receiving party agrees to treat all Confidential Information provided by the disclosing party pursuant to this Agreement as proprietary and confidential to the disclosing party, and the receiving party shall not (without the prior written consent of the disclosing party) disclose or permit disclosure of such Confidential Information to any third party, provided that the receiving party may disclose, on a need-to-know basis, such Confidential Information to its third party subcontractors who have signed non-disclosure agreements with the receiving party which contains confidentiality and non-disclosure obligations that are at least as protective of the disclosing party's Confidential Information as set forth herein, and/or to its current employees, officers, or directors, or legal or financial representatives, for which the receiving party shall be responsible under this Agreement. The receiving party agrees to safeguard all Confidential Information of the disclosing party with at least the same degree of care (which in no event shall be less than reasonable care) as the receiving party uses to protect its own Confidential Information. The receiving party shall use the disclosing party's Confidential Information solely for the purpose of fulfilling its obligations under this Agreement. The receiving party further agrees not to use or disclose the disclosing party's Confidential Information for its own benefit or for the benefit of others, except as otherwise authorized by this Agreement, or the disclosing party in writing.

8.3 PERSONALLY IDENTIFIABLE INFORMATION. In addition to the foregoing, in the event that Servicer's Confidential Information contains any personally identifiable information of Servicer's (and/or its Affiliates') employees, or customers (including mortgage loan borrowers) (hereinafter "Personally Identifiable Information"), Firm agrees to comply at all times with (and maintain and safeguard such Personally Identifiable Information in accordance with) (i) Servicer's then-current privacy policies and procedures, to the extent so requested by Servicer and made available to Firm, and (ii) any and all applicable privacy laws, regulations, statutes, and guidelines.

8.4 EXCEPTIONS. Notwithstanding the foregoing, the Parties agree that the following information (except if such information constitutes Personally Identifiable Information) shall not be deemed Confidential Information, and the receiving party shall have no obligation with respect to any such information:

    (i)    Information which is independently developed by the receiving party without use of the disclosing party's Confidential Information;

11

$1-13$

BDFTW016672

(ii)   Information which is or becomes in the public domain by no fault or wrongful act of the receiving party;

(iii)   Information which is known by the receiving party prior to disclosure by the disclosing party;

(iv)   Information which is disclosed to the receiving party by third party who was not under a similar restriction or obligation of confidentiality to the disclosing party, and without breach of this Agreement;

(v)   Information which is approved for release by written authorization of the disclosing party and/or the third party owner of the disclosed information; or

(vi)   Information which is disclosed pursuant to the lawful requirement or order of a court or governmental agency, provided that, upon the receiving party's request for such a disclosure, the receiving party gives prompt notice thereof to the disclosing party (unless such notice is not possible under the circumstances) so that the disclosing party may have the opportunity to intervene and contest such disclosure and/or seek a protective order or other appropriate remedy. In the event that such protective order or other remedy is not possible under the circumstances, the receiving party shall furnish only that portion of the Confidential Information which is legally required and the receiving party shall exercise its reasonable best efforts to obtain reasonable assurance that confidential treatment will be accorded the Confidential Information.

8.5 All Confidential Information transmitted or disclosed hereunder will be and remain the property of the disclosing party, and the receiving party shall (at the disclosing party's election) promptly destroy or return to the disclosing party any and all copies thereof upon termination or expiration of this Agreement, or upon the written request of the disclosing party. Upon the request of the disclosing party, any such destruction shall be certified in writing by the receiving party.

8.6 Subject to the provisions specifically set forth herein, nothing in this Agreement shall be construed to limit or prohibit the receiving party from independently creating or developing (or having created or developed for it), or from acquiring from third parties, any information, products, concepts, systems, or techniques that are similar to or compete with the information products, concepts, systems, or techniques contemplated by or embodied in the disclosing party's Confidential Information, provided that (in connection with such creation, development, or acquisition) the receiving party does not violate any of its obligations under this Agreement. Notwithstanding the foregoing, the receiving party shall not, nor assist others to, disassemble, decompile, reverse engineer, or otherwise attempt to recreate, the disclosing party's Confidential Information.

8.7 Firm shall not tamper with, compromise, or attempt to circumvent any physical or electronic security or audit measures employed by Servicer or its affiliates in the course of Servicer's or its affiliates' business operations. Firm shall not, without Servicer's prior express written consent, or as otherwise provided in this Agreement, and without complying with

1-14

BDFTW016673

Servicer's security policies and procedures, (i) access any Confidential Information or computer systems of Servicer or its affiliates, or (ii) remove from Servicer's premises any Confidential Information, or any other property, whether tangible or intangible, of Servicer or its affiliates.

8.8 The Parties acknowledge and agree that, given the unique and proprietary nature of the Confidential Information, monetary damages may not be calculable or a sufficient remedy for any breach of this Section 8 by the receiving party, and that the disclosing party may suffer great and irreparable injury as a consequence of such breach. Accordingly, each party agrees that, in the event of such a breach or threatened breach, the disclosing party shall be entitled to seek equitable relief (including, but not limited to, injunction and specific performance) in order to remedy such breach or threatened breach. Such remedies shall not be deemed to be exclusive remedies for a breach by the receiving party but shall be in addition to any and all other remedies provided hereunder or available at law or equity to the disclosing party and the receiving party further agrees to waive any requirement for the securing or posting of any bond in connection with such remedy.

8.9 The Parties acknowledge and agree that, due to the attorney – client relationship that exists between the Parties, communications and other information exchanged between the Parties in connection with this Agreement may be subject to the attorney – client privilege and/or the attorney work product doctrine. Servicer reserves all rights available to it in connection with attorney – client privileged communications and/or the attorney work product doctrine. Firm's confidentiality obligations set forth in this Article 8 are in addition to and not in lieu of Firm's legal and ethical obligations to preserve client confidential information and communications, including attorney – client privileged communications and attorney work product.

## ARTICLE IX. INFORMATION PROTECTION

9.1 INFORMATION PROTECTION.  Firm shall have in place on the Effective Date, and shall maintain throughout the term of this Agreement, commercially reasonable technical and security measures intended to prevent destruction, alteration, disclosure or access, in each case to the extent unauthorized, or loss of, Servicer data, borrower or loan data, or Confidential Information, including Personally Identifiable Information. Such measures shall be reviewed regularly and revised as needed to address ongoing threats and risks. The following requirements of this Article IX are minimum standards and Servicer does not represent that they are adequate to meet the Firm's needs. The Firm acknowledges that it is the Firm's sole obligation to (i) implement appropriate measures to secure its systems and data, including Servicer Confidential Information, against internal and external threats and risks; and (ii) continuously review and revise those measures to address ongoing threats and risks.

9.2 REMOVABLE MEDIA. Firm shall institute strict physical and logical security controls to prevent transfer of Servicer Confidential Information, including Personally Identifiable Information, via any form of Removable Media.  For purposes of this section, "Removable Media" means portable or removable hard disks, USB memory drives, CDs, DVDs, memory cards, and all other removable data storage media. Firm hereby agrees that in any exception situations to the foregoing involving Servicer Confidential Information or Personally

13

*1-15*

BDFTW016674

Identifiable Information, that are specifically approved by Servicer in writing, such data will be encrypted using commercially recognized encryption technology, and Firm will provide decryption keys or codes to only the authorized representatives of the recipients via secure out-of-band communications only.

9.3 ENCRYPTION, ETC. Servicer Confidential Information, including Personally Identifiable Information (i) may only be made available and accessible to those parties explicitly authorized under this Agreement or otherwise expressly authorized by Servicer in writing; (ii) if transferred across the Internet, any wireless network, or other public or shared networks, must be encrypted using commercially recognized encryption technology, and (iii) if transferred using Removable Media (if so permitted) must be sent via a bonded courier and encrypted using commercially recognized encryption technology.

9.4 FACILITIES. Firm facilities that process Servicer Confidential Information, including Personally Identifiable Information, will contain secure areas to house such information and be protected by perimeter security such as access controls (e.g., the use of guards and/or entry badges) that provide a physically secure environment from unauthorized access, damage, and interference.

9.5 SYSTEM SECURITY. Firm shall implement formal procedures to control access to its systems, services, and data, including, but not limited to, user account management procedures and the following controls:

- Network access to both internal and external networked services shall be controlled, including, but not limited to, the use of properly configured firewalls;

- Operating systems will be used to enforce access controls to computer resources including, but not limited to, authentication, authorization, and event logging;

- Applications will include access control to limit user access to information and application system functions; and

- All systems will be monitored to detect deviation from access control policies and identify suspicious activity.

Firm will promptly notify (but in no event more than twenty-four (24) hours after confirmation of the occurrence) the Servicer of any suspected and potential or actual security attacks or incidents, whether directed from internally or externally, involving Servicer Confidential Information or Personally Identifiable Information. The notice shall include the approximate date and time of the occurrence and a summary of the relevant facts, including a description of measures being taken to address the occurrence. Firm will notify PHH of each and every security incident involving PHH's Confidential Information, including Personally Identifiable Information.

BDFTW016675

1-16

9.6 The Firm will certify to Servicer on an annual basis that Firm has complied with the requirements of this Article IX.

## ARTICLE X. DISASTER RECOVERY/BUSINESS CONTINUITY

10.1 Firm shall have implemented and will administer a Business Continuity Plan ("BCP") covering the Services. The BCP shall be designed to permit Firm to recover critical Services provided under this Agreement. The BCP shall cover contingency strategies for coping with the prolonged unavailability of critical business processes, equipment, communications services, employees, buildings and access to buildings, and shall enable the recovery of the provision of the Services following any disruption or outage that impacts the Services within twenty four (24) hours of the disruption or outage. The BCP shall list the resources that are required to recover the Services, and must detail the Firm's process for communicating the interruption internally and externally. Firm shall provide to Servicer a then most current copy of its BCP (or summary thereof) upon request.

10.2 The Firm shall formally exercise the BCP at least once every twelve (12) months during the term of this Agreement, using realistic simulations to demonstrate whether the Services can be resumed within recovery timeframes established pursuant to Section 10.1 above. Firm shall be responsible for coordinating and executing these exercises, and for conducting an assessment of each exercise analyzing the recovery capability of the component part of the BCP exercised to ensure that all critical processes and services tested are adequately protected by Firm's BCP. Any remedial actions and recommendations resulting from Firm's exercising the BCP shall be completed and closed by Firm within a commercially reasonable time after identification of such remedial action. If remedial actions cannot be implemented within such time period, Firm shall notify Servicer and provide a written corrective action plan specifying a timeline for completing implementation of the corrective actions.

10.3 Firm shall, at least every twelve (12) months during the term of this Agreement, review and update (if necessary) the BCP then in effect, to include any changes in facilities, systems and Firm personnel providing the Services.

10.4 If an event occurs resulting in a disruption of the Services, Firm shall (i) promptly provide Servicer with notice of the same, and ongoing status updates, and (ii) promptly implement the BCP upon the occurrence of any such event which adversely affects the provision of the Services to Servicer. If the occurrence of such an event affecting Firm's provision of the Services to Servicer causes Firm to allocate limited resources between or among Firm's clients, Servicer shall receive at least the same priority in respect of such allocation as Firm's other clients.

10.5 The Firm shall, within thirty (30) days after the occurrence of any event described in Section 10.4 above, provide to Servicer a reasonably detailed account of the event, any identified BCP deficiencies, recommendations, action plan(s) and associated activity timelines. Any such actions or recommendations relating to the Firm's ability to implement the BCP and reinstate the Services in accordance with the BCP shall be undertaken and closed by the Firm within a commercially reasonable time after the restoration of the Services. If remedial actions cannot be implemented within such time period, the Firm shall notify Servicer and submit a written

15

BDFTW016676

/-/7

corrective action plan specifying a timeline for completing implementation of the corrective actions.

10.6 The Firm will certify to Servicer on an annual basis that Firm has complied with the requirements of this Article X.

## ARTICLE XI. TERM AND TERMINATION

11.1 TERM. This Agreement shall commence on the Effective Date and shall continue in force and effect unless and until terminated as provided herein. The Parties agree that this Agreement shall apply to all pending matters where Firm is providing Services or otherwise representing Servicer's interest on the Effective Date, as well as to new matters referred to Firm on or after the Effective Date.

11.2 TERMINATION BY SERVICER. Servicer may terminate this Agreement, in whole or in part, at any time, by providing written notice to Firm specifying the date such termination shall be effective. For the avoidance of doubt, the Parties acknowledge and agree that the Servicer may specify that termination shall be effective immediately. If Servicer terminates this Agreement only as to certain matters being handled by the Firm, Servicer shall specify the matter(s) regarding which Servicer intends to transfer to other counsel.

11.3 TERMINATION BY FIRM. Subject to (a) any legal requirements or ethical obligations relating to withdrawal or substitution of counsel that the Firm may be subject to in the jurisdictions where the Firm provides the Services, and (b) Firm's obligation to provide Services and/or assistance during the Transition Period set forth below, Firm may terminate this Agreement, in whole or in part, at any time, by providing not less than thirty (30) days advance written notice to Servicer specifying the date such termination shall be effective. If Firm terminates this Agreement only as to certain matters being handled by the Firm, Firm shall specify the matter(s) regarding which Firm no longer intends to represent Servicer.

11.4 PAYMENTS AFTER TERMINATION. In the event of termination, Firm shall be paid the amounts due and owing for Services accrued to the Termination Date within 30 days following the Termination Date, in accordance with the provisions of Article VII hereof.

11.5 SERVICER'S RIGHTS AFTER TERMINATION. Upon termination, the Servicer shall have full power and authority to take possession of all files and records, assume any and all information and documentation that the Servicer selects, and prosecute the matters being handled by Firm to completion.

11.6 FIRM"S RESPONSIBILITIES FOLLOWING TERMINATION. Upon any termination of this Agreement, Firm shall immediately proceed in accordance with any specific instructions from Servicer, protect and maintain the Services, and make reasonable and diligent efforts to mitigate costs associated with the termination. In the event of termination, Firm will provide Servicer as promptly as possible, but in no event later than five (5) days after the effective date of termination, with the following:

1-18

BDFTW016677

(a) a current and updated report detailing all matters being handled and their status, including any critical upcoming dates such as court hearings or depositions;

(b) a current and updated report of all original mortgage loan documents that were provided to the Firm, including the location of each such document;

(c) all funds held on behalf of Servicer and all active files being handled by Firm;

(d) all bills for each active matter and all outstanding invoices. These bills and invoices should be submitted in accordance with the billing procedures contained in Article VII; and

(e) the assistance during the Transition Period described below. 11.7 TRANSITION ASSISTANCE. Following the effective date of termination of this Agreement in whole or in part for any reason (whether terminated by Servicer or Firm), Firm shall continue to provide the Services to the extent necessary to protect the Servicer's interests, and otherwise fully cooperate with Servicer in transitioning the Services to new counsel, for a reasonable period of time as requested by Servicer, not to exceed one hundred eighty (180) days following the effective date of termination (the "Transition Period"). During the Transition Period, the Firm shall continue to provide any Services needed before new counsel formally assumes responsibility for the matters being transitioned, including appearing at any pending court hearings, depositions, or similar matters, and filing all documents with pending deadlines (or obtaining extensions if so doing will not prejudice Servicer). During the Transition Period the Firm will also execute all substitutions of counsel requested by Servicer or Servicer's new counsel. The Servicer will pay the Firm for all Services provided during the Transition Period in the amounts and through the invoicing process set forth in this Agreement. The foregoing obligations of the Firm to provide transition assistance are in addition to and not in lieu of any legal requirements or ethical obligations relating to withdrawal or substitution of counsel that the Firm may be subject to in the jurisdictions where the Firm provided the Services.

11.7 COSTS. If either (a) Servicer terminates this Agreement in whole or in part for cause, or (b) Firm terminates this Agreement in whole or in part without cause, then Firm shall be liable for the reasonable out of pocket costs incurred by Servicer to transition the matters handled by Firm to new counsel, including costs of copying and shipping files, and the reasonable fees of new counsel to familiarize themselves with the status of the transferred matter. For purposes of this Section 11.8, "for cause" in case of Servicer's termination of this Agreement shall mean the Firm's material breach of any of its obligations hereunder, and "without cause" in case of Firm's termination of this Agreement shall mean termination of this Agreement by Firm for any reason other than (i) Servicer's failure to pay the amounts due for Services to the Firm, or (2) Servicer's failure to reasonably cooperate with Firm in connection with Firm's provision of the Services.

17

1-19

BDFTW016678

## ARTICLE XII. MISCELLANEOUS PROVISIONS

12.1 GOVERNING LAW. This Agreement shall be deemed to be made in and in all respects shall be interpreted, construed and governed by and in accordance with the internal laws of the State of New Jersey.

12.2 ENTIRE AGREEMENT. This Agreement embodies the entire understanding and agreement between the Parties with respect to its subject matter and supersedes any and all prior agreements, arrangements and understandings, whether oral or written, with respect to its subject matter.

12.3 NO THIRD PARTY BENEFICIARIES. There shall be no third party beneficiaries of this Agreement. The obligations undertaken by Firm or Servicer in this Agreement (i) shall be for their respective sole benefit, (ii) shall not be for the benefit of any third party, and (iii) and may not be enforced by any person other than Firm or Servicer.

12.4 AMENDMENT. No amendment or modification of this Agreement shall be effective unless it is in writing and signed by both Parties.

12.5 CAPTIONS. The captions of the paragraphs of this Agreement are for reference purposes only and shall not be considered in construing this Agreement.

12.6 COUNTERPARTS. This Agreement may be executed in counterparts, all of which together shall constitute one Agreement, binding on the Parties, notwithstanding that the Parties have not executed the original or the same counterpart.

12.7 SEVERABILITY. If any one or more of the provisions contained herein shall for any reason be held to be unenforceable in any respect under law, such unenforceability shall not affect any other provision of this Agreement, but this Agreement shall be construed as if such unenforceable provision or provisions had never been contained herein, provided that the removal of such offending term or provision does not materially alter the burdens or benefits of either of the parties under this Agreement

12.8 SURVIVAL. In addition to any provision that by its express terms survives termination, the following provisions shall survive termination of this Agreement: Article V (Indemnification); Section 6.2 (Availability of Records/Audits); Article VIII (Confidentiality); Section 11.7 (Firm's Responsibilities Following Termination); Section 11.8 (Transition Assistance); and Article XII (Miscellaneous Provisions).

IN WITNESS WHEREOF, Firm and Servicer have executed this Agreement as of the day and year first above written.

"Servicer"
PHH Mortgage Corporation

By: _____

18

BDFTW016679

1 - 20

Its:  <u>Senior Vice President</u>

"Firm"

~~Barrett Daffin Frappier Trader & Weiss, LLP~~

By: _____ Jay Frappier

Its: _____ MANAGING PARTNER

\* Subject to comments on cover letter dated
9/7/11 and as noted herein

19

BDFTW016680

1-21

EXHIBIT A
SERVICES

Statewide foreclosure, bankruptcy, eviction, title, closing and prosecution of related litigation for the state(s) of _CA, NV_. To be completed in accordance with state law, investor and insurer guidelines.

Perform foreclosure prevention outreach to borrowers as directed by Servicer and in accordance with applicable law, investor and insurer guidelines.

In connection with the foregoing, Servicer authorizes and/or directs the Firm to take the following actions:

*   Order loan documents if not received within seven (7) business days of receipt of the referral at a cost of $10.00 per document up to maximum cost of $80.00.

*   Send out breach letters to any record owners revealed through a property search that did not execute the mortgage. Breach any mortgagors not listed in the referral and for which Firm did not receive a NOI (the servicing system utilized by PHH only captures two mortgagors so if there are three or more, they may be missed during the breach process). All necessary breach letters sent out in this regard regardless of the number of breach letters that need to be sent will be billed at $50.

*   File and manage all routine title claims at a legal fee of no more than $125.00. In the event a Satisfaction/Release of Mortgage needs to be recorded, PHH will also pay the actual recording cost.

*   Order all VA appraisals.

*   Send out all HUD occupancy letters.

*   Prepare any necessary Assignments of Mortgage at a legal fee of $35.00 per assignment plus filing costs if such assignments are not received by Firm within seven (7) business days of request.

*   Complete an SCRA check for all foreclosure borrowers utilizing the Department of Defense SCRA check website (currently: www.dmdc.osd.mil/appj/scra/scraHome.do) prior to foreclosure judgment and five (5) days prior to scheduled foreclosure sale date. A copy of the SCRA verification is to be retained in foreclosure file and uploaded to the Systems.

*   Complete an SCRA check for all bankruptcy borrowers utilizing the Department of Defense SCRA check website (currently: www.dmdc.osd.mil/appj/scra/scraHome.do) prior to filing a Motion for Relief from the Automatic Stay. A copy of the SCRA verification is to be retained in the bankruptcy file and uploaded to the Systems.

20

BDFTW016681

1-22

*   Order a property search report on all bankruptcy loans that were not previously in foreclosure, prior to filing a bankruptcy Proof of Claim or newly filed delinquent Chapter 7 Motion for Relief, to determine current title prior to filing with the bankruptcy court.

*   Send a post-referral foreclosure alternative solicitation letter on all Fannie Mae and Freddie Mac invested loans within five (5) business days following foreclosure referral but no later than the one hundred twenty fifth (125th) day of delinquency or immediately upon receipt from Servicer if the loan is greater than one hundred twenty five (125) days delinquent. The letter content will be in conformance with Fannie Mae and Freddie Mac requirements. Sample letter for Fannie Mae invested loans can be found at eFanniemae.com. Sample letter for Freddie Mac invested loans can be found in the Freddie Mac Guide, Exhibit 94.

*   Prior to canceling any scheduled foreclosure sale for a Fannie Mae or Freddie Mac invested loan due to non receipt of the written certification required by Fannie Mae and Freddie Mac, Firm will notify Servicer that the written certification is needed within two (2) business days prior to the date the written certification is due to the Firm.

1-23

BDFTW016682

EXHIBIT B
PERFORMANCE STANDARDS

**Performance Standard #1:  Foreclosure Timelines**

**Metric**
Foreclosure Timeline is the timeframe required by the Investor, Insurer and state legal requirements to complete the foreclosure process measured from referral to sale.

**Monitoring and Reporting**
The Foreclosure Timeline is determined by calculating the number of days starting from foreclosure referral to foreclosure sale.

**Timing**
The Foreclosure Timeline will be calculated monthly on each file that has completed foreclosure sale.

**Required Level of Service**
Foreclosure Timelines must be met on 95% of all loans completing foreclosure sale each month.

**Liabilities**
Firm will reimburse Servicer for any loss or fees assessed including but not limited to compensatory fees assessed by Fannie Mae or Freddie Mac associated with not achieving the indicated Required Level of Service on any foreclosure file.  First occurrence on having not achieved the Required Level of Service will require Firm to submit a corrective action plan to Servicer.  More than one occurrence within a twelve month period may result in termination.

BDFTW016683

1-24

**Performance Standard #2: Legal Documents**

### Metric
Legal Documents refer to all documents related to the Services required to be prepared and executed in accordance with Investor, Insurer, State guidelines and applicable law.

### Timing
Legal Document adequacy and accuracy will be based upon a monthly sample audit of documents completed each month.

### Required Level of Service
Legal Documents must be 100% accurate relative to adequacy, content, execution and notarization. Zero tolerance for any changes made to documents post execution.

### Liabilities
First occurrence on having not achieved the indicated Required Level of Service may result in termination.

23

1-25

BDFTW016684

**Performance Level #3:  FHA First Legal Timeframes**

### Metric
FHA First Legal Timeframe is the timeframe required by HUD to complete the first legal action in regards to foreclosure processing on HUD insured loans.

### Monitoring and Reporting
FHA First Legal Timeframe is determined by calculating the number of days from first date of default to the day the first legal action is completed.

### Timing
FHA First Legal Timeframe will be calculated monthly on all HUD insured files that completed the first legal action.

### Required Level of Service
FHA First Legal Timeframe must be met on 98% of all HUD insured files that complete a first legal action each month.

### Liabilities
Firm to reimburse Servicer for any loss including but not limited to HUD claim curtailments or penalties associated with not achieving the indicated Required Level of Service on any FHA foreclosure file.  First occurrence on having not achieved the Required Level of Service will require Firm to submit a corrective action plan to Servicer.  More than one occurrence within a twelve month period may result in termination.

24

BDFTW016685

1-26

**Performance Level #4: Response to Written Inquiry Timeframe**

**Metric**
Response to Written Inquiry Timeframe is required by Servicer in accordance with Section 1.2(A).

**Monitoring and Reporting**
Response to Written Inquiry Timeframe is determined by calculating the number of days from Firm's receipt of a written inquiry to the day a response is provided to Servicer.

**Timing**
Response to Written Inquiry must be met on 100% of all written inquiries submitted by Servicer each month.

**Liabilities**
First occurrence on having not achieved the indicated Required Level of Service may result in termination.

1-27

BDFTW016686

**Performance Level #5: Fees Assessed by Firm**

### Metric
Fees Assessed by Firm are those fees permitted in accordance with Investor, Insurer, State requirements, applicable law and this Agreement.

### Timing
Fees assessed by Firm in compliance with Investor, Insurer, State requirements, applicable law and this Agreement will be based upon a monthly sample audit of fees assessed each month.

### Required Level of Service
Fees assessed by Firm must be 100% in compliance with Investor, Insurer, State requirements, applicable law and this Agreement.

### Liabilities
Firm will immediately reimburse Servicer the amount of any fee assessed in excess of Investor, Insurer, State requirements, applicable law and this Agreement. First occurrence on having not achieved the indicated Required Level of Service may result in termination.

1-28

BDFTW016687