KIEVE LAW OFFICES
    Loren Kieve (Bar No. 56280)
2655 Steiner Street
San Francisco, California 94115
Telephone:     (415) 364-0060
Facsimile:     (435) 304-0060
lk@kievelaw.com

Counsel for plaintiff PHH Mortgage Corporation

UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PHH MORTGAGE CORPORATION,<br><br>            Plaintiff,<br><br>        vs.<br><br>BARRETT, DAFFIN, FRAPPIER, TREDER & WEISS, LLP,<br><br>            Defendant. | Civil Action No. 2:16-cv-00832-KJM-EFB<br><br>SECOND DECLARATION OF LOREN KIEVE IN SUPPORT OF PHH MORTGAGE CORPORATION'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT<br><br>Date:  October 20, 2017<br><br>Time:  10:00 a.m. |

Loren Kieve states:

1.  I am counsel for plaintiff PHH Mortgage Corporation ("PHH") in this action. I have personal knowledge of the facts set forth below and I could and would testify to the truth of these facts.

2.  I took the deposition of defendant Barrett, Daffin, Frappier, Treder & Weiss, LLP (the "Firm") under Fed. R. Civ. P. 30(b)(6) on January 26, 2017. The Firm designated its managing attorney, Edward Alan Treder, as the person most knowledgeable to testify on the designated topics.

3.  Mr. Treder testified under oath in that deposition.  Relevant portions of that deposition are cited below as "[Treder Dep. at ___]" and attached as **Exhibit 22**.

4.  Mr. Treder testified as follows:

5. He identified Deposition Exhibit 1 as "two letters, one from Barrett Daffin Frappier Turner & Engel LLP to PHH Mortgage; a letter dated August 19, 2011 from Barrett Daffin Frappier Treder & Weises; and a 26-page Legal Services Agreement dated July 31, 2011." [Treder Dep. at 41-42]

6. A true and correct copy Deposition Exhibit 1 in the Treder deposition is attached as **Exhibit 23.**

7. The first letter in Exhibit 1 is dated September 7, 2011 and is on the letterhead of Barrett Daffin Frappier Turner & Engel LLP with an address of 15000 Surveyor Boulevard, Addison Texas 75001.

8. The September 7, 2011 letter has the following "RE:" reference:

   RE: PHH Legal Services Agreement "Agreement" for the following "Firms":

   Barrett Daffin Frappier Turner & Engel, LLP ("BDFTE") (Texas)

   Barrett Daffin Frappier Levine & Block, LLP ("BDFLB") (Georgia)

   Barrett Daffin Frappier Treder & Weiss, LLP ("BDFTW") (California/Nevada)

9. The letter reads in part:

   Dear Jim:

   We received the above agreements from PHH on behalf of our Firms. Jay Frappier, our Managing Partrner executed and I am returning subject to the comments and noted herein.

10. The letter is signed by "Robin Turton, NDEX, Contracts Administrator."

11. The accompanying Legal Services Agreement reflects that it is "between PHH Mortgage Corporation, a New Jersey corporation, and Barrett Daffin Frappier Treder & Weiss LLP ('Firm'), whose principal address is 15000 Surveyor Blvd, Addison, TX 75007."

12. The letter from PHH dated August 19, 2011 was to Mr. Treder and, although he did not have a specific recollection of it, it was "typical of a transmittal letter that [he had] seen previously." [Treder Dep. at 42]

Second Declaration of Loren Kieve in Opposition to Barrett Daffin Motion for Summary Judgment
2
Civil Action No. 2:16-cv-00832-KJM-EFB

13. The letter reflected that "This agreement [the accompanying Legal Services Agreement] shall supersede and void any preexisting legal services or similar agreements between PHH and your firm."  [Treder Dep. at 42]

14. Mr. Treder's Firm had represented PHH since the Firm was established in 2008. [Treder Dep. at 42]

15. The Barrett Daffin firm in Texas and Georgia has had a relationship with the PHH since 1990. [Treder Dep. at 45]

16. The *Linza* matter was initially referred by PHH to "what was then an affiliated nonjudicial foreclosure firm called NDEX West LLC" for two foreclosure actions. [Treder Dep. at 42]

17. The *Linza* matter was subsequently referred to Mr. Treder's Firm. [Treder Dep. at 44]

18. The Legal Services Agreement dated July 31, 2011 identified as Treder Deposition Exhibit 1 is in fact a legal services agreement between PHH Mortgage and the Barrett Daffin firm. [Treder Dep. at 54]

19. Prior to this time, there were other documents like it that had similar terms. [Treder Dep. at 55-56]

20. From the time the July 31, 2011 Legal Services Agreement was entered into until sometime later, it governed the relationship between PHH and Barrett Daffin with respect to litigation.  Or, as Mr. Treder phrased it, "With respect to the range of services that we – that we performed on behalf of PHH, yes." [Treder Dep. at 54]

21. The *Linza* matter was referred to the Firm when it became litigation. [Treder Dep. at 54]

22. Treder Deposition Exhibit 2 [which PHH previously submitted as **Exhibit 1** in its compendium of exhibits in opposition to the Firm's summary judgment motion, and is attached here again for the Court's convenience] is a "legal services agreement dated as of the 5th day of April 2013" between PHH Mortgage and the Barrett Daffin firm. [Treder Dep. at 65-66]

Second Declaration of Loren Kieve in       3       Civil Action No. 2:16-cv-00832-KJM-EFB
Opposition to Barrett Daffin Motion for
Summary Judgment

1    23. The April 5, 2013 Legal Services Agreement [Treder Deposition Exhibit 2,

2        Compendium **Exhibit 1**] superseded the prior Legal Services Agreement that was

3        identified as Treder Deposition Exhibit 1 (**Exhibit 23**). [Treder Dep. at 65-66]

4    24. The pages of the deposition testimony of Mr. Treder where he testified that the April 5,

5        2013 Legal Services Agreement [Treder Deposition Exhibit 2] superseded the prior

6        July 31, 2011 Legal Services Agreement that was identified as Treder Deposition

7        Exhibit 1, namely pages 65-66, were included in the pages PHH previously submitted

8        as part of its opposition to the Firm's motion for summary judgment.  See PHH

9        Compendium of Exhibits, ECF Doc. 61-5, Exh. 21, at page 144 of 154.

10    25. The prior July 31, 2011 Legal Services Agreement has the following provision at page

11        18:

12        12.1 GOVERNING LAW. This Agreement shall be deemed to be made in and in

13        all respects shall be interpreted, construed and governed by and in accordance with

14        the internal laws of the State of New Jersey.

15    I declare under penalty of perjury under the laws of the United States that the foregoing is

16  true and correct.

17  Executed this 24th day of October, 2017.

18

19                  Loren Kieve

20                  Counsel for plaintiff
                      PHH Mortgage Corporation

21

22

23

24

25

26

27

28

Second Declaration of Loren Kieve in       4       Civil Action No. 2:16-cv-00832-KJM-EFB
Opposition to Barrett Daffin Motion for
Summary Judgment

Exhibit 22



1

```
1        UNITED STATES DISTRICT COURT FOR THE
2           EASTERN DISTRICT OF CALIFORNIA
3
4   PHH MORTGAGE CORPORATION,          )
                                       )
5           Plaintiff,                 )
                                       )
6   v.                 ) Civil Action No.
                       ) 2:16-cv 00832-KJM-EFB
7   BARRETT, DAFFIN, FRAPPIER, TREDER )
    & WEISS, LLP            )
8                          )
            Defendants.     )
9   _____)
10
11
12
13
14
15
16      DEPOSITION OF EDWARD ALAN TREDER
17             TAKEN ON
18        THURSDAY, JANUARY 26, 2017
19
20
21
22   DONNA BALL, CSR NO. 11191
23
24
25
```

2

```
1        UNITED STATES DISTRICT COURT FOR THE
2           EASTERN DISTRICT OF CALIFORNIA
3
4   PHH MORTGAGE CORPORATION,          )
                                       )
5           Plaintiff,                 )
                                       )
6   v.                 ) Civil Action No.
                       ) 2:16-cv 00832-KJM-EFB
7   BARRETT, DAFFIN, FRAPPIER, TREDER )
    & WEISS, LLP            )
8                          )
            Defendants.     )
9   _____)
10
11
12
13
14
15   DEPOSITION OF EDWARD ALAN TREDER, taken on behalf of
16   Plaintiff, at 20955 Pathfinder Road, Suite 300,
17   Diamond Bar, California 91765, commencing at 9:03 a.m.,
18   on Thursday, January 26, 2017, before DONNA BALL,
19   Certified Shorthand Reporter, License No. 11191
20
21
22
23
24
25
```

3

```
1   APPEARANCES OF COUNSEL:
2
3
4   FOR PLAINTIFF:
5     KIEVE LAW OFFICES
      BY:  LOREN KIEVE, ESQ.
6     2655 Steiner Street
      San Francisco, California 94115
7     (415) 364-0060
8
9   FOR DEFENDANT:
10    HANSEN, KOHLS, SOMMER & JACOB, LLP
      BY:  BRET BATCHMAN, ESQ.
11    1520 Eureka Road
      Suite 100
12    Roseville, California 95661
      (916) 781-2550
13
14
15
16
17
18
19
20
21
22
23
24
25
```

4

```
1               INDEX
2   WITNESS
3   EDWARD ALAN TREDER
4
5
6   EXAMINATION BY                      PAGE
7     MR. KIEVE              8, 151
8     AFTERNOON SESSION              151
9
10
11               EXHIBITS
12  PLAINTIFF'S      DESCRIPTION        PAGE
13   45    Notice of Deposition of the    25
          Barret Daffin Law Firm
14
     1    Document dated 9/07/11 from Barrett  41
15        Daffin and other documents
16   2    Legal Services Agreement dated   65
          April 13, 2013
17
     70   PHH Mortgage Best Practices Guide   70
18        For Foreclosure, Eviction and
          Bankruptcy Counsel
19
     4    E-Mail from Dustin Dreher to Vendor  72
20        Quality Assurance dated May 13, 2014
          And Various E-Mails.
21
     3    PHH Mortgage Best Practices Guide   86
22        For Foreclosure, Eviction and
          Bankruptcy Counsel
23
     47   Notice Of Hearing On General      88
24        Demurrer and General Demurrer of
          Defendant PHH Mortgage Corporation's
25        Demurrer to Plaintiff's Complaint
```

**Page 5**

EXHIBITS (CONTINUED)
PLAINTIFF'S    DESCRIPTION    PAGE

13  First Amended Complaint For Various  92
    Causes Of Action Filed In The Linza
    Case
48  Defendant PHH Mortgage Corporation  93
    And Defendant U.S. Bank National
    Association As Trustee for BAFC
    2006-ST2's Answer To Plaintiff's
    Unverified First Amended Complaint
49  Second Amended Complaint Filed in  95
    The Linza Case
50  PHH Mortgage Corporation Answer to  96
    Plaintiff's Unverified Second
    Amended Complaint
51  Trial Brief of PHH Mortgage Services  97
31  Jury Verdict Form  105
32  Jury Verdict Form  125
52  Litigation Comments  132
53  Foreclosure Comments  160
33  Multiple Statements  166
54  E-Mail from Kim Fontaine to  186
    Elizabeth Gonsalves 10/22/14
55  E-Mail from Arlene Tolbert to  187
    Elizabeth Gonsalves 11/25/14
56  Various E-Mails Beginning With  189
    Monique Schexnayder 03/09/15
57  (Exhibit Deleted Per stipulation  190
    by Both Counsel)
58  E-Mail from Darlene Hernandez to  199
    Multiple People Beginning 03/27/14
36  Various E-Mails starting 07/24/14  206

**Page 6**

EXHIBITS (CONTINUED)
PLAINTIFF'S    DESCRIPTION    PAGE

37  Various E-Mails Beginning 07/25/14  207
59  Association of Counsel dated  209
    08/21/14 or 08/22/14
68  Memorandum of Costs (Summary)  210
61  PHH Mortgage Corporation's Notice  211
    of Motion and Motion for Judgment
    Notwithstanding a Verdict
62  PHH Mortgage Corporation's Notice  212
    Of Motion and Motion for New Trial
63  Notice of Withdrawal of Attorneys  212
    Darlene F. Hernandez, Masumi Patel,
    Edward A. Treder, Jan Chilton and
    Mark Lonergan dated 09/23/2014
64  Plaintiff's Points and Authorities  214
    in Opposition to Defendant's Motion
    for New Trial
65  Various E-Mails Beginning 10/27/14  215
66  PHH Mortgage Services Opposition to  216
    Plaintiff's Motion for Attorneys' Fees
67  02/29/16 Letter to Dustin J. Dreher  217
21  Plaintiff's Mediation Brief  218
68  Mediation Brief of PHH and US Bank  220
8   Plaintiff's Mandatory Settlement  224
    Conference Statement
69  Invoice and Various Documents  229
25  Letter to Darlene Hernandez from  237
    W. Christopher Sims dated 08/23/12
16  Various E-Mails  238

**Page 7**

EXHIBITS (CONTINUED)
PLAINTIFF'S    DESCRIPTION    PAGE

14  Supplemental Mediation Brief  239
28  Various E Mails dated 05/2013  240
29  Various E-Mail dated 07/2013  242
30  Compromised Settlement and Release  247
    Agreement
70  Various E-Mails  248
12  Various E-Mails Document No. 4419  249
71  Various E-Mails  250
72  Various E-Mails May 2014  252
9   various E-Mails Document No. 10844  255
73  Various E-Mails Document No. 3150  260
11  Various E-Mails Document No. 3156  261
20  E-Mails Document No. 10737 03/14/14  262
15  Various E-Mails Document No. 3163  264
74  Various E-Mails Document No. 6856  264

QUESTIONS NOT ANSWERED
    Page  Line
     40    16
     41     3

INFORMATION REQUESTED
    (None)

**Page 8**

DIAMOND BAR, CALIFORNIA; THURSDAY, JANUARY 26, 2017
9:03 A.M.
oOo

EDWARD ALAN TREDER,
the deponent herein, after having
been first duly sworn, was deposed
and testified as follows:

EXAMINATION
BY MR. KIEVE:

Q  Would you state your full name, please.
A  Edward Alan Treder.
Q  What do you do?
A  I am a lawyer.
Q  How long have you been a lawyer?
A  32 years.
Q  Could you give me your brief life history since
the time you became a lawyer? Where did you graduate
from?
A  Law school?
Q  Yeah.
A  Pepperdine University.
Q  And then?
A  While I was at Pepperdine, I took a job as a law

41

```
 1        THE WITNESS:  Yes.
 2   BY MR. KIEVE:
 3        Q   Which ones?
 4        MR. BATCHMAN:  To the extent that you reviewed
 5   documents with me and refreshed your recollection as to
 6   specific documents, I'll instruct you not to answer that
 7   question.
 8   BY MR. KIEVE:
 9        Q   Mr. Treder, don't answer anything without
10   consulting your counsel on this matter.
11        MR. BATCHMAN:  He was going to ask a question.
12        MR. KIEVE:  I apologize.
13        THE WITNESS:  I was going to ask if we can take a
14   five-minute break so I can go to the rest room.
15        MR. KIEVE:  Of course.
16        MR. BATCHMAN:  I thought that was the question.
17        (A break was taken.)
18        MR. KIEVE:  Would you mark this as Exhibit 1.
19        (Plaintiff's Exhibit 1 was marked for
20        identification and is attached hereto.)
21   BY MR. KIEVE:
22        Q   I'm handing you what has been marked as Exhibit
23   1.  Can you identify this for me?
24        A   Appears to be a package of documents including
25   two letters, one from Barrett Daffin Frappier Turner &
```

42

```
 1   Engel, LLP to PHH Mortgage; a letter dated August 19,
 2   2011, from PHH Mortgage to Barrett Daffin Frappier Treder
 3   & Weiss; and a 26-page Legal Services Agreement dated July
 4   31, 2011.
 5        Q   Prior to this time -- would you turn to the
 6   second page of this document which has a page No. 16661?
 7        A   Yes, sir.
 8        Q   Letter dated August 19, 2011, letter to you?
 9        A   Yes, sir.
10        Q   Do you recall this letter?
11        A   I don't have a specific recollection of this
12   letter, but this is typical of a transmittal letter that
13   I've seen previously.
14        Q   The letter reads, "Dear Ed Treder," and I'll skip
15   the first paragraph and then go to the second one that
16   says, "This agreement shall supersede and void any
17   preexisting legal services or similar agreements between
18   PHH and your firm."
19        A   I see that.
20        Q   How long has PHH had a relationship with the
21   Barrett Daffin firm?
22        A   Since 2008 when the firm was established.
23        Q   And how did that relationship come about in
24   2008?
25        A   I had a preexisting relationship with PHH when I
```

43

```
 1   worked at the Law Office of Robert E. Weiss.  My partners
 2   at Barrett Daffin Frappier Turner & Engel also had
 3   preexisting relationships with PHH Mortgage in connection
 4   with legal services that they have provided to PHH in the
 5   states of Texas and Georgia.  And when the firm was
 6   established in 2008, we reached out to PHH to inform them
 7   that we had established this new law firm in California
 8   and that we wanted to be a -- what they would refer to as
 9   a foreclosure vendor or processing loans, traditional
10   foreclosures, certain bankruptcy services that arise when
11   their borrowers file bankruptcy, most foreclosure eviction
12   services and related title curative and defensive
13   litigation matters.
14        Q   Am I correct that it's standard practice in the
15   relationship between PHH and the Barrett Daffin firm, that
16   when the Barrett Daffin firm is having a foreclosure for a
17   client that is serviced by PHH and that goes into
18   litigation, the Barrett Daffin firm automatically take
19   over the litigation?
20        A   Not necessarily, but in many instances, that's
21   true.
22        Q   You agree that's the case in 99 percent of the
23   cases?
24        A   I wouldn't assign a probable percentage to it.
25   There are some instances where matters are not assigned to
```

44

```
 1   our firm.  One that comes to mind immediately, but -- it's
 2   probably a high percentage, but I don't know that I would
 3   agree that it's 99 percent.
 4        Q   The Linza case was given to the Barrett firm to
 5   handle for foreclosure; correct?
 6        A   Actually, the foreclosure -- there were two
 7   foreclosure referrals, both sent to what was then an
 8   affiliated nonjudicial foreclosure firm called NDEX West,
 9   LLC.
10        Q   Hm-hmm.
11        A   And NDEX processed both the 2009 and 2012
12   foreclosure matters.
13        Q   And when it became a litigation matter, it was
14   transitioned to Barrett Daffin?
15        A   Eventually, while Mr. Linza was in bankruptcy, we
16   received the law firm, Barrett Daffin Frappier Treder &
17   Weiss, LLP received initially a referral to file a proof
18   of claim.  Because Mr. Linza initially filed the case as a
19   chapter 13 matter.  And we also received a referral to
20   evaluate and potentially file a motion for relief from the
21   automatic stay.
22        Q   The automatic bankruptcy stay?
23        A   Yes, sir.  And then ultimately we received -- we,
24   Barrett Daffin Frappier Treder & Weiss, received a
25   litigation referral.
```

45

1    Q    Would it be correct to say that Barrett Daffin
2  has had a long relationship with PHH?
3    A    Since 2008 -- well, again, Barrett Daffin, being
4  Barrett Daffin Frappier Treder & Weiss, LLP has had a
5  relationship with PHH since the law firm was established
6  in June of 2008.
7    Q    And prior to that, you had had a relationship
8  with PHH in your capacity as a lawyer with the Weiss
9  firm?
10   A    Yes, sir, I did.
11   Q    How long?
12   A    20 years.
13   Q    Okay.  And prior to that, the Barrett Daffin firm
14 in Texas and Georgia had a relationship with PHH; is that
15 correct?
16   A    Yes, sir.
17   Q    For how long?
18   A    My best estimate would be from at or about the
19 time that firm was established in 1990.
20   Q    PHH relies upon the Barrett Daffin firm to give
21 it competent legal representation?
22   A    I can't speculate as to what PHH does or doesn't
23 do.
24   Q    The Barrett Daffin firm represents itself to PHH
25 and its other clients as giving competent legal

46

1  representation; right?
2    A    Yes.
3    Q    In your handling or your firm's handling of a
4  typical PHH case, am I correct that PHH expects the law
5  firm to basically run the show, to tell them what the-
6  issues are, to tell PHH what problems they may have, and
7  advise PHH competently as to how to handle that particular
8  lawsuit?
9        MR. BATCHMAN:  Objection.  Overbroad.
10       THE WITNESS:  And I would say I think it's an
11 incomplete statement.
12 BY MR. KIEVE:
13   Q    Describe for me how a typical PHH litigation
14 matter, a defensive litigation matter, is handled by the
15 Barrett Daffin firm, in your opinion?
16   A    Well, I'm not sure what you mean by "typical."  I
17 guess I will just speak in generalities here.  We receive
18 a litigation referral, get set up in our case management
19 system.  The matter is assigned to an associate to review
20 the pleadings, evaluate the claims, communicate with the
21 client, and ascertain, get, obtain information from the
22 client to be able to evaluate the claims and the risks
23 associated with it, and obtain fee authorization to do the
24 work.
25       During the 2008 to 2012 or '13 time frame,

47

1  stopped the foreclosure lawsuits, which is how I
2  characterize the vast majority of defensive litigation
3  matters that we handled for PHH and our other servicers.
4  Seemed to multiply at a rather rapid pace.  We saw many
5  cases that were similar, both in terms of the structure of
6  the complaint, the legal theories that were pled, the law
7  firms that were filing the cases.  They became fairly
8  routine in that respect.
9        And our clients, including PHH Mortgage, had a
10 fairly routine way of defending the cases.  So to the
11 extent that you are asking me about whether, you know, PHH
12 relied upon us to tell the client how to handle the case,
13 I would suggest that PHH had sort of a template by which
14 these cases were to be defended.  And that's the way we
15 defended them.
16   Q    And did you feel comfortable doing that?
17   A    Well, define what you mean by "comfortable."
18   Q    Did you feel you were adequately performing your
19 responsibilities as a law firm to the client in following
20 that template?
21   A    We were achieving the results that the client
22 desired us to achieve.
23   Q    Which were?
24   A    Trying to steer cases into mediation, rather ADR,
25 and resolve them with a loan modification, deed in lieu of

48

1  foreclosure, cash for keys deal, or some other reasonable
2  settlements.  The goal was, for PHH and other clients, was
3  not to try cases, it was to settle them.
4    Q    And PHH expected the Barrett Daffin firm to
5  advise at how best to manage the case, settle it for trial
6  as the case went on; correct?
7        MR. BATCHMAN:  Objection.  Calls for speculation.
8        THE WITNESS:  I can't speculate as to what PHH's
9  expectations may have been.  All I can tell you is how PHH
10 and other mortgage servicers directed us in general and in
11 specific matters to manage the litigation for them.
12 BY MR. KIEVE:
13   Q    And they expected the Barrett Daffin firm to --
14 PHH expected the Barrett Daffin firm to manage the
15 litigation for them; is that a fair statement?
16       MR. BATCHMAN:  Objection.  I'm sorry.  Calls for
17 speculation.
18       THE WITNESS:  Again, I can't speculate as to what
19 PHH may have expected or not expected.
20 BY MR. KIEVE:
21   Q    Did you understand that PHH expected that the
22 Barrett Daffin firm would manage the litigation for it?
23   A    I understood that PHH wanted us to defend
24 litigation matters at the lowest cost possible; to try to
25 cue the cases up for resolution through a loan

53

1     A    At the law firm where she is currently working,
2  Shapiro, Van Ness and somebody-somebody.
3     Q    Sitting here today, can you identify any specific
4  conversation with Ms. Hernandez with respect to her view
5  or her communication of review to PHH that PHH should sign
6  the July 2013 document signed by Ms. Linza?
7     A    Conversations we had contemporaneously with the
8  litigation and the subsequent follow-up communications
9  with PHH and with opposing counsel to try to consummate
10  that deal.
11     Q    Can you recall any specific conversation?
12     A    By the day or time of day or --
13     Q    Yes.
14     A    I'd have to go back through the records and
15  e-mails. I'm sure they would refresh my memory. But as I
16  sit here, no.
17     Q    In preparation for your deposition today, did you
18  review those e-mails?
19     A    I reviewed some e-mails, yes.
20     Q    Not the ones that would refresh your recollection
21  as to those communications?
22     A    Again, some of the e-mails that I reviewed might
23  very well refresh my memory if you'd like to show them to
24  me.
25     Q    But you can't tell me which ones, as you're

54

1  sitting here today, you reviewed?
2     A    I did not examine them for the date and time
3  stamp.
4     Q    Can you take a look at Exhibit No. 1 in front of
5  you?
6     A    Okay. What page?
7     Q    Page 2 of the actual agreement.
8        Let me just confirm that this -- in fact, page 3,
9  is a legal services agreement between PHH Mortgage and the
10  Barrett Daffin firm; correct?
11     A    It appears to be.
12     Q    Dated 31, July 2011; correct?
13     A    That's the date that appears on the document.
14     Q    And prior to this time, there were other
15  documents like this that had similar terms; is that
16  correct?
17     A    I believe there were, yes.
18     Q    And from the time it was entered into on July
19  31st of 2011 up until sometime later this governed the
20  relationship between PHH and Barrett Daffin, correct, with
21  respect to the litigation?
22     A    With respect to the range of services that we --
23  that we performed on behalf of PHH, yes.
24     Q    Would you turn to the second page of the actual
25  Legal Services Agreement as a Bates No. 16663.

55

1     A    Yes.
2     Q    Do you see that?
3     A    I do.
4     Q    Item 1.5, Litigation, reads, "If, in the course
5  of representing the interest of Servicer" -- and servicer
6  would be PHH; correct?
7     A    Yes.
8     Q    -- "it becomes necessary for the Firm" -- the
9  firm would be Barrett Daffin; correct?
10     A    Yes.
11     Q    -- "to defend litigation (other than uncontested
12  judicial foreclosures), the Firm agrees that it will
13  immediately notify Servicer in writing, seeking approval
14  and indicating, one, the necessity of litigation; two, the
15  proposed course of action; three, anticipated fees and
16  costs; and four, any documentation needed from Servicer."
17        Do you see that?
18     A    I do.
19     Q    And with respect to the Linza case, when it
20  became litigation, did the Barrett Daffin firm immediately
21  notify PHH in writing seeking approval and indicating,
22  one, the necessity of litigation?
23        Did it?
24     A    I -- we certainly were in written communication
25  with PHH regarding the litigation at the time and shortly

56

1  after the time that the litigation was referred to us.
2     Q    Did you --
3     A    In fact, I believe they referred it to us in
4  writing.
5     Q    The question is did the firm notify the servicer
6  in writing seeking approval and indicating the necessity
7  of litigation?
8     A    Well, let's parse it a little bit.
9        After the referral was sent to us, we did
10  communicate to PHH in writing seeking approval and fee
11  authorization to undertake legal services necessary to
12  defend the litigation.
13     Q    Did the firm, Barrett Daffin, ever send PHH in
14  writing seeking approval and indicating the proposed
15  course of action?
16     A    I believe that there were numerous written
17  communications, primarily in the form of e-mails, in which
18  the scope of the representation was explained and/or
19  listed in an itemized format as part of a request for fee
20  authorization.
21     Q    Can you identify any one specifically for me?
22     A    Not without looking at them. They were among the
23  documents that I reviewed in preparation for the
24  deposition. And there were, over the course of the
25  lawsuit, probably seven or eight different specific

65

1    A    That was specifically in connection with
2  responding to the request for preliminary injunction.
3    Q    So at the time that Barrett Daffin filed a
4  demurrer to the initial complaint, it had no specific
5  authorization for fees or otherwise to file a demurrer,
6  did it?
7    A    I don't know if that's true.  There was a
8  subsequent request for fee authorization for five hours,
9  which was approved.
10    Q    For what?
11    A    I'd have to go back and look at the request and
12  the approval.  I don't recall off the top of my head.
13  That may have encompassed services related to the demurrer
14  to the original complaint.
15    Q    Sitting here today, can you identify any specific
16  fee request in advance by Barrett Daffin to PHH to prepare
17  and file a demurrer at any point in this case?
18    A    Not without looking at the fee authorization
19  request or the approvals.
20    MR. KIEVE:  Would you mark this as Exhibit No. 2,
21  please.
22    (Plaintiff's Exhibit 2 was marked for
23    identification and is attached hereto.)
24  BY MR. KIEVE:
25    Q    Exhibit No. 2 is a legal services agreement dated

66

1  as of the 5th day of April 2013 between PHH Mortgage and
2  the Barrett Daffin law firm; correct?
3    A    It appears to be.
4    Q    Okay.  And this would have been -- this would
5  have superseded the prior legal services agreement that
6  we've identified in connection with Exhibit 1; correct?
7    A    Unless there was an intervening legal services
8  agreement that I am not aware of as I sit here, but this
9  would certainly appear to be a later iteration.
10    Q    Okay.  Item No. -- turn to the second page of
11  this, item No. 1.4.  "Firm agrees that it will provide,
12  either electronically or in writing (the Monthly Status
13  Report) for the matters being handled by Firm hereunder."
14    Did the Barrett Daffin firm provide a monthly
15  status report to PHH for the Linza litigation?
16    A    Outside of normal regular communications, I'm --
17  I don't believe that a monthly status report summarizing
18  all pending litigation was being provided to PHH.
19    Q    Would you turn to page 12 of this document?
20    A    Okay.
21    Q    Item 7.3, "Hourly Fee Matters."  Do you have
22  that?
23    A    Yes, sir.
24    Q    And was the Linza case an hourly fee matter?
25    A    Yes, it was.

67

1    Q    Second paragraph of that particular provision,
2  paragraph 7.3 states, "Firm must seek written
3  authorization from Servicer" -- firm being Barrett Daffin;
4  correct?
5    A    Yes, sir.
6    Q    Servicer being PHH?
7    A    Yes, sir.
8    Q    -- "to perform work on a matter on an hourly
9  basis.  Such requests shall be accompanied with an
10  itemization of work anticipated to be performed, as well
11  as an estimate of the time needed to perform such work."
12  Servicer may authorize or deny such request in the
13  exercise of its sole discretion."
14    It says, "Firm shall not perform services on a
15  matter until written fee authorization is received from
16  the Servicer, unless services are necessary to protect
17  Servicer from legal deadlines.  If fee authorization is
18  exhausted, the Firm shall make all reasonable attempts to
19  obtain additional fee authorization.  In the event
20  additional fee authorization is not approved within a
21  reasonable time frame, the Firm reserves the right to
22  cease proceeding on the matter."
23    At any time in connection with the Barrett Daffin
24  representation of PHH in the Linza matter, did the firm
25  ever suggest that you should stop proceeding on the

68

1  matter?
2    A    Not in so many words.  But I do recall a fee
3  authorization request and/or follow-up request for fee
4  authorization where we communicated frustration with the
5  lack of response over an extended time period, and
6  expressed that we had continued to provide legal services
7  in good faith but could not continue to do so unless we
8  received approval of our fee authorization request.
9    Q    Am I correct, then, that in this case, the Linza
10  case, despite not having advanced fee authorization, the
11  firm still continued to represent PHH in the Linza case?
12    A    We did continue to perform legal services up to a
13  point.
14    Q    Am I also correct that every single fee
15  authorization request that was made ultimately
16  approved and paid in the Linza case?
17    A    No, you're not correct.
18    Q    What fee request was not approved and paid in the
19  Linza case?
20    A    I believe there were two fee authorization
21  requests that I specifically remember, and I apologize, I
22  don't recall the date and time stamps for them.  But I
23  believe there was a request for 73 hours that was made
24  twice.  And it may have been for the same range of
25  services for which we never received any response.

Exhibit 23

**BARRETT DAFFIN FRAPPIER**
TURNER & ENGEL, LLP
A PARTNERSHIP INCLUDING
PROFESSIONAL CORPORATIONS

ATTORNEYS AND COUNSELORS AT LAW

15000 SURVEYOR BOULEVARD
ADDISON, TEXAS 75001

TELEPHONE:  (972) 386-5040
TELECOPIER: (972) 386-7673

September 7, 2011

*VIA FED-X #7975 1877 1904*

PHH Mortgage
c/o Mr. Jim Scott
Mail Stop: SV01
2001 Bishops Gate Blvd
Mount Laurel, NJ  08054

RE:     **PHH Legal Services Agreement "Agreement" for the following "Firms":**
        Barrett Daffin Frappier Turner & Engel, LLP ("BDFTE")  (Texas)
        Barrett Daffin Frappier Levine & Block, LLP ("BDFLB") (Georgia)
        Barrett Daffin Frappier Treder & Weiss, LLP ("BDFTW") (California/Nevada)

Dear Jim:

We received the above Agreements from PHH on behalf of our Firms.  Jay Frappier, our Managing Partner executed and I am returning subject to the comments and noted herein.

Article 1.1   States that the Firm is responsible to pay all related third party "licensing and other fees" to utilize requested systems/services.  This Firm will pay fees except where such fees conflict with fee payment directives for on Fannie Mae and Freddie Mac loans.

Article 4.   States that the Firm will provide a monthly status report by the 15th of each month including a chronology of every foreclosure file scheduled for sale.  The Firm uses middleware systems (i.e LPS) to provide updates that are required of us at various stages of the file level.  Those systems were developed to eliminate the need for monthly reporting since they provide a variety of reporting functions.  Any additional monthly status reporting will need to be further clarified by PHH and scope of services agreed to by the Firm.

7.6 Invoicing   The Firm will follow PHH's invoicing directive for submission ie. 7.6(A)"no more than twice"… except whereby such delay is caused by the Servicer or Investor.

Exhibit A   Requires that we perform a"SCRA check on all bankruptcy borrowers prior to filing a Motion For Relief from the Automatic Stay…. and uploaded to the Systems".   Eric Donowho, of the Firm discussed with you and Walt, and it was agreed that we could disregard this requirement since A Motion for Relief is not an action *against* the borrower, but a defensive request by the creditor for relief from the debtor's action against the creditor, and therefore such SCRA checks are not required. This paragraph is deleted.

Please feel free to call me if you need further assistance (972-341-5302 direct or robint@bdfgroup.com).

Sincerely,

Robin Turton
NDEX, Contracts Administrator



EXHIBIT
PLAINTIFFS
1
01/26/17

i-1

**PHH Mortgage Services**

**PHH**

August 19, 2011

Barrett Daffin Frappier Treder & Weiss
Ed Treder
20955 Pathfinder Rd, Suite 300
Diamond Bar , CA  91765

Re: Legal Services Agreement

Dear Ed Treder ,

Please find enclosed for your review and execution a Legal Services Agreement.  This
agreement shall represent the arrangement between PHH Mortgage Corporation (PHH)
and your firm whereby PHH wishes to retain your firm to provide the legal services
stated within the agreement.

This agreement shall supersede and void any preexisting legal services or similar
agreements between PHH and your firm.

Please execute both original versions of the agreement.  Retain one version for your files
and return one version to PHH at the following address no later than September 6, 2011.

> PHH Mortgage Corporation
> Attention: Jim Scott, Director
> Mail Stop: SV01
> 2001 Bishops Gate Blvd
> Mount Laurel, NJ 08054

Should you have any questions please feel free to me at 856-917-8513.  Your prompt
attention to this matter is greatly appreciated.

Sincerely,

Jim Scott
Director, Default Administration
PHH Mortgage Corporation

## LEGAL SERVICES AGREEMENT

This Legal Services Agreement (this "Agreement") is made and entered into this _31_ day of July, 2011, by and between PHH Mortgage Corporation, a New Jersey corporation ("Servicer") whose principal address is 1 Mortgage Way, Mount Laurel, New Jersey 08054 and _Barrett Daffin Frappier Turner & Weiss, LLP_ ("Firm") whose principal address is _15000 Surveyor Blvd, Addison, TX 75001_. Servicer and Firm may be collectively referred to as "Parties" and each singularly as a "Party".

## RECITALS

Servicer is in the business of servicing residential first and second lien mortgage loans, some of which are currently in default, and Servicer requires residential mortgage loan default related legal services, including legal services relating to loss mitigation, foreclosure, eviction, bankruptcy and condominium and homeowner association dues delinquencies;

Firm and its agents, members or affiliates are practicing attorneys or otherwise active in the business of providing such residential mortgage loan default related legal services;

Servicer wishes to retain Firm to provide the legal services stated herein;

**NOW, THEREFORE**, in consideration of the premises and the representations, warranties, covenants and agreements contained herein, the parties hereto, intending to be legally bound, agree as follows:

## ARTICLE I. SERVICES

1.1 SERVICES GENERALLY. Firm agrees to provide the legal services described in this Agreement, including Exhibit A hereto (the "Services"). Firm shall utilize the Servicer's approved automated communications and invoicing systems, including, when applicable, the systems of Servicer's third party vendors (collectively, "Systems"), in connection with the Services. Any licensing fees or other fees of Servicer's third party vendors to utilize such vendors' systems required in connection with the Services shall be paid by the Firm directly to such third party vendor. Communications between Firm and Servicer or Servicer's third party vendor shall primarily occur thought the Systems. Relevant documents related to the Services shall be uploaded into the appropriate Systems by the Firm. Firm shall upload into the appropriate Systems any documents so requested to be uploaded by Servicer.

1.2 PERFORMANCE STANDARDS.  In addition to the other requirements relating to the Services set forth in this Agreement, the Firm shall provide all Services in conformance with, and otherwise meet, the performance standards set forth on Exhibit B hereto (the "Performance Standards").

(A) Responsiveness. Firm shall respond to Servicer inquiries presented via e-mail, through the Systems, or any other form of written inquiry from Servicer (including requests for indemnification by Servicer pursuant to Article V) within forty eight (48) hours of Firm's receipt of the inquiry.

1

BDFTW016662

1-3

1.3. INITIAL REFERRAL. Servicer or Servicer's third party vendor, on Servicer's behalf (as applicable), shall provide Firm with an initial loan referral in form and substance to be agreed upon by Servicer and Firm (each an "Initial Referral"). The Initial Referral shall be provided to Firm at the same time Servicer or Servicer's vendor delivers the referred file to Firm. In the event Servicer subsequently obtains new or updated information necessary for the Firm to perform the Services ("Additional Information"), Servicer or Servicer's vendor shall provide Firm with a written supplement to the Initial Referral disclosing the Additional Information within a reasonable time.

1.4 MONTHLY STATUS REPORTS. Firm agrees that it will provide, either electronically or in writing, a monthly status report (the "Monthly Status Report") of the matters being handled by Firm hereunder. The Monthly Status Report shall indicate the following information:

A.    the loan number and mortgagor(s) name(s);

B.    the date of referral of the applicable file;

C.    the current status on each referred file, specifically noting whether the case is contested and actively being opposed and if substantive defenses and/or counterclaims have been advanced;

D.    in the case of foreclosure referrals, chronological reporting and the disposition of all foreclosure files scheduled for sale within the month including completed sales, reinstatements, bankruptcy filings, postponements, etc. ;E.    report of cases completed within and outside of Fannie Mae, Freddie Mac, FHA, VA or other applicable timelines, and

F.    capacity information including the number of cases or actions being handled per paralegal or attorney.

Firm shall provide Servicer with a copy of the Monthly Status Report on or before the 15th day of every month. The Monthly Status Report shall not limit Servicer's right under this Agreement to obtain any other report or examine any of the applicable records in Firm's possession. In addition to the Monthly Status Report, Servicer may require additional reports, and Firm agrees to provide such additional reports when reasonably requested by Servicer.

1.5 LITIGATION. If, in the course of representing the interest of Servicer, it becomes necessary for Firm to pursue or defend litigation (other than uncontested judicial foreclosures), Firm agrees that it will immediately notify Servicer in writing seeking approval and indicating (i) the necessity of litigation, (ii) the proposed course of action, (iii) anticipated fees and costs, and (iv) any documentation needed from Servicer. Upon receiving such notification from Firm, Servicer agrees to respond to Firm's request for litigation approval within five (5) business days, indicating approval or disapproval of the proposed course of action and anticipated fees and costs. For the avoidance of doubt, Firm agrees that it shall immediately notify Servicer as provided herein of any answer or affirmative defense, counterclaim, motion, deposition notice or other discovery demand, or any similar filing or request received by Firm in any matter where Firm is providing Services hereunder.

2

1-4

BDFTW016663

1.6 NO MINIMUM VOLUME, ETC. Servicer is not obligated to refer any minimum volume of matters to the Firm during the term of this Agreement or any portion thereof. Servicer may reduce the volume of matters being referred to the Firm, or cease referring any new matters to the Firm, at any time. Firm is not Servicer's exclusive provider of legal services in the jurisdictions where the Firm provides legal services, and Servicer may utilize other attorneys or providers in such jurisdictions in Servicer's sole discretion.

## ARTICLE II. REPRESENTATIONS AND WARRANTIES OF FIRM

Firm represents and warrants to Servicer as of the Effective Date and throughout the term of this Agreement that:

2.1 ORGANIZATION. Firm is a [                    ], validly existing and in good standing under the laws of the state of its organization and has the requisite power and authority to carry on its business in every jurisdiction in which the Services contemplated under this Agreement will be performed. Firm is qualified to do business and is in good standing in each jurisdiction required to perform the Services.

2.2 AUTHORITY. Firm has full power and authority to enter into this Agreement and to consummate the performance contemplated hereby. No other proceedings on the part of Firm are necessary to authorize the execution and delivery of this Agreement or the consummation of the performance contemplated hereunder. The execution of this Agreement does not conflict with Firm's organizational documents or ethics rules applicable to the Firm. This Agreement constitutes a valid and legally binding agreement of Firm, enforceable against Firm in accordance with its terms, except as enforcement may be limited by bankruptcy or similar insolvency laws, or general equitable principles.

2.3 INVESTOR, ETC. REQUIREMENTS. If the Firm is approved as Freddie Mac designated counsel, or approved by Fannie Mae (as defined by, respectively, the Freddie Mac or Fannie Mae approved foreclosure and/or bankruptcy attorney list, which may change from time to time), Firm will comply with all Freddie Mac or Fannie Mae guidelines applicable to the Services. Firm will also comply with all requirements and guidelines, as applicable, of the U.S. Department of Housing and Urban Development ("HUD"), including the Federal Housing Administration ("FHA") and the U.S. Department of Veteran's Affairs, or Veteran's Administration ("VA") in performing the Services. Firm shall also comply with all requirements and guidelines, as applicable, of private investors, and insurers (including private mortgage insurers).

2.4 NO LITIGATION. There are no claims, suits, actions or proceedings pending or, to the Firm's knowledge, threatened against the Firm, before any court, or any judgment, decree, injunction, rule or order of any court, governmental department, commission, agency, instrumentality or authority, or any arbitrator that reasonably could have a material adverse effect on Firm's ability to perform its obligations under this Agreement.

2.5 LICENSES. Firm has all licenses, permits or other approvals necessary to provide the Services.

3

1-5

2.6 COMPLIANCE WITH LAW, ETC.  In performing the Services the Firm will comply with, and all Services shall conform to, all applicable rules of professional conduct, as well as all applicable federal, state and local laws, regulations, ordinances, rules or orders, including but not limited to state foreclosure laws and regulations, the United States Bankruptcy Code, and the federal Fair Debt Collection Practices Act.

2.7 NO CONFLICT OF INTEREST.  Neither the Firm nor any of its officers, directors or employees has any business or financial arrangement with any other entity which would conflict with Firm's representation of Servicer in providing the Services.

2.8 NO CODES OR VIRUSES.  Firm shall not introduce into any Servicer system, sub-system, software, hardware or any other component or element of Servicer's business or technology environment (collectively, the "Servicer Technology Environment") any code which is designed to have the effect of disabling or otherwise shutting down all or any portion of the Servicer Technology Environment. Firm shall use commercially reasonable efforts to (i) to ensure that no viruses, software traps, worms, trap doors, back doors, Trojan horses, or other similar malicious program code, programming instruction, or software, or similar items (collectively, a "Virus") are coded in, introduced in, allowed to be introduced in, or included in the Servicer's Technology Environment; and/or (ii) to assist the Servicer in reducing the effects of any Virus on the Servicer Technology Environment.

2.9 COMPETENT PERFORMANCE.  All Services shall be performed in a competent and professional manner by qualified personnel. Firm and each of its officers, directors employees, agents, contractors and subcontractors performing the Services has the proper skill, training and background necessary to accomplish their assigned tasks.

## ARTICLE III.  REPRESENTATIONS AND WARRANTIES OF SERVICER

Servicer represents and warrants to Firm as of the Effective Date and throughout the term of this Agreement that:

3.1 ORGANIZATION.  Servicer is a New Jersey corporation, validly existing and in good standing under the laws of the state of its incorporation and has the requisite power and authority to carry on its business and perform its obligations under this Agreement. Servicer is qualified to do business and is in good standing in each jurisdiction required to perform its obligations under this Agreement.

3.2 AUTHORITY.  Servicer has full power and authority to enter into this Agreement and to consummate the performance contemplated hereby.  No other proceedings on the part of Servicer are necessary to authorize the execution and delivery of this Agreement or the consummation of the performance contemplated hereunder.  The execution of this Agreement does not conflict with Servicer's articles of incorporation or bylaws.  This Agreement constitutes a valid and legally binding agreement of Servicer, enforceable against Servicer in accordance with its terms, except as enforcement may be limited by bankruptcy or similar insolvency laws, or general equitable principles.

BDFTW016665

1 - 6

3.3 NO LITIGATION.  There are no claims, suits, actions or proceedings pending or, to the Servicer's knowledge, threatened against the Servicer, before any court, or any judgment, decree, injunction, rule or order of any court, governmental department, commission, agency, instrumentality or authority, or any arbitrator that reasonably could have a material adverse effect on Servicer's ability to perform its obligations under this Agreement.

## ARTICLE IV.  INSURANCE REQUIREMENTS

4.1 INSURANCE TYPES/LIMITS.  At all times during the performance of the Services hereunder, Firm shall keep in full force and effect and maintain, at no additional cost to Servicer, the following policies of insurance:

(a) Professional Liability and Errors and Omissions Liability Insurance/Legal Malpractice Insurance covering acts, errors, omissions, and equipment/machine malfunctions arising out of Firm's operations or provision of the Services in an amount not less than three million dollars ($3,000,000.00) per occurrence; and

(b) Commercial (Comprehensive) General Liability Insurance, including coverage for independent contractors, personal or bodily injury, products liability, premises/operations, completed operations, and broad form property damage, with combined single limits of not less than three million dollars ($3,000,000.00) per occurrence; and

(c) Crime Insurance (including fidelity bond, employee dishonesty, and computer fraud coverage) covering losses arising out of or in connection with any fraudulent or dishonest acts committed by Firm's (or its subcontractors') personnel, acting alone or with others, with a limit of not less than two million dollars ($2,000,000.00); and

(d) Workers' Compensation Insurance (in compliance with State and Federal laws) covering all of Firm's (and/or its subcontractors') employees engaged in the performance of Services hereunder, and Employers' Liability Insurance with a limit of not less than one million dollars ($1,000,000.00); and

(e) Commercial Business Automobile Liability Insurance covering all owned, non-owned, leased, and hired vehicles, and providing coverage for bodily injury and property damage liability with combined single limits of not less than two million dollars ($2,000,000.00) per occurrence.

4.2 OTHER INSURANCE REQUIREMNTS.  All insurance policies required by this Agreement shall be written by insurance carriers rated at least "A-" or better by A.M. Best. Firm shall provide evidence of the insurance coverage required hereunder to Servicer on an annual basis as well as promptly upon request. Firm shall notify Servicer in writing at least twenty (20) days in advance if Firm intends to decrease the amount of or materially change any other terms of any required insurance policy. By requiring insurance as provided herein, Servicer does not represent that the coverage and limits required will be necessarily adequate to protect Firm or

BDFTW016666

1-7

Servicer. Firm is responsible for providing, at Firm's expense, any additional insurance that Firm deems necessary to protect Firm's interests. The limits required by PHH hereunder shall not be deemed a limitation of Firm's liability hereunder.

## ARTICLE V. INDEMNIFICATION

5.1 INDEMNIFICATION OF SERVICER BY FIRM. Firm does hereby agree to hold harmless, defend and indemnify Servicer, and each of Servicer's directors, officers and employees (collectively, the "Servicer Indemnified Parties"), from and against any and all claims, demands, liabilities, losses, costs and damages (including without limitation court costs and reasonable attorney's fees) that the Servicer or the Servicer Indemnified Parties may incur or suffer, arising out of the following: (a) Negligence, gross negligence, or willful misconduct by any of Firm's officers, directors or employees; (b) Any and all actions relating to the Services taken by or on behalf of Firm that (i) are not permitted by this Agreement, or (ii) are not within the scope of Firm's duties under this Agreement, or (iii) are not within Firm's actual or implied authority under this Agreement; and (C) any breach of Firm's representations, warranties, obligations or covenants (including the Performance Standards) set forth in this Agreement.

Without limiting the generality of the foregoing, Firm shall hold harmless, defend and indemnify Servicer from and against all actual monetary damages incurred as a result of the Firm's failure to meet agency, investor, insurer or state law requirements. This indemnity obligation shall include, without limitation, actual losses suffered by Servicer relating to interest curtailments by agencies or investors, claim denials, guarantee denials, fines imposed by an agency or investor, bids that are not in accordance with the information provided by Servicer, short reinstatements or payoffs to the extent that the amount received was short due to errors by the Firm, and actual losses resulting from fees or costs that exceed those permitted by Servicer. For example, if an agency or investor assesses a penalty equal to three months interest, or bills Servicer for three months interest, as a result of a delay in the foreclosure, bankruptcy or eviction process, the Firm will indemnify Servicer against the loss to the extent that they delay was attributable to the Firm's failure to promptly and diligently perform the services in accordance with the Performance Standards, investor or agency requirements or this Agreement.

Notwithstanding the foregoing, Firm will not be required to indemnify Servicer for losses resulting directly from the following: (a) losses which arise from the physical condition or defects in legal title to a mortgaged property where such defect or physical condition was not proximately caused by negligent or intentional acts or omissions of the Firm; or (b) delays caused by courts, judicial officers, sheriffs and recorders unless not diligently pursued by the Firm; or (c) contested foreclosure cases, unless not diligently pursued by the Firm; or (d) delays caused by Servicer, or its document custodian's failure to provide necessary documents, unless said delay should have been anticipated or could have been mitigated by the Firm; or (e) delays caused by inaccurate information provided by or on behalf of Servicer or the data contained on the Servicer's system, unless said delay should have been anticipated or could have been mitigated by the Firm.

5.2 INDEMNIFICATION OF FIRM BY SERVICER. Servicer does hereby agree to hold harmless, defend and indemnify the Firm, and each of the Firm's directors, officers and

BDFTW016667

1-8

employees (collectively, the "Firm Indemnified Parties"), from and against any and all claims, demands, liabilities, losses, costs and damages (including without limitation court costs and reasonable attorney's fees) that the Firm or the Firm Indemnified Parties may incur or suffer, arising out of the following: (a) third party claims resulting from the wrongful acts or omissions of the Servicer in connection with any mortgage loan referred to Firm for Services hereunder; and (b) any breach of Servicer's representations, warranties, obligations or covenants set forth in this Agreement.

Servicer will have no obligation to indemnify, defend or hold harmless the Firm or the Firm Indemnified Parties under this Section 5.2 to the extent the claims, demands, liabilities, losses, costs and damages arise out of or are in connection with any matter the Firm is obligated to indemnify Servicer or the Servicer Indemnified Parties for pursuant to Section 5.1 of this Agreement.

5.3 NOTIFICATION OF CLAIM.  Promptly after receipt of notice of a claim by or the commencement of any action, suit or proceeding against the Party claiming indemnification hereunder (the "Indemnitee"), Indemnitee will, if a claim is to be made against the Party indemnifying the Indemnitee (the "Indemnitor") under this Agreement, notify the Indemnitor in writing of Indemnitee's claim for indemnification.  Indemnitee's failure to notify the Indemnitor will not relieve Indemnitor from any liability which it may have to Indemnitee under this Agreement except to the extent of the economic loss which the Indemnitor is able to prove directly resulted from Indemnitee's failure to provide timely notice.  With respect to any such claim, action, suit or proceeding against Indemnitee, the Indemnitee will be entitled to participate at its own expense as set forth below.

5.4 DEFENSE OF CLAIM.  To the extent that it may wish, the Indemnitor will be entitled to assume the defense of any matter described above in Section 5.3, with counsel selected by the Indemnitor and reasonably satisfactory to Indemnitee.  After notice from the Indemnitor to Indemnitee of its election so to assume the defense, the Indemnitor will not be liable to Indemnitee under this Agreement for any legal or other expenses subsequently incurred by Indemnitee in connection with the defense other than reasonable costs of investigation or as otherwise provided below.  Indemnitee shall have the right to employ counsel in such action, suit or proceeding but the fees and expenses of such counsel incurred after notice from the Indemnitor of its assumption of the defense shall be at the expense of Indemnitee unless (i) there is a conflict of interest between the Indemnitor and Indemnitee in the conduct of the defense of such action or (ii) the Indemnitor shall not in fact have employed counsel to assume the defense of such action, in each of which cases the fees and expenses of counsel shall be at the expense of the Indemnitor.

5.5 LIABILITY FOR SETTLEMENT.  The Indemnitor shall not be liable to indemnify Indemnitee under this Agreement for any amounts paid in settlement of any action or claim unless the Indemnitor's prior written consent to such settlement shall have been obtained.  The Indemnitor shall not settle any action or claim in any manner which would impose any penalty, limitation or affirmative duty on Indemnitee without Indemnitee's prior written consent.  Neither the Indemnitor nor Indemnitee will unreasonably withhold their consent to any proposed settlement.  In the event a settlement offer is proposed and rejected by either the Indemnitor or Indemnitee (the "Rejecting Party") and the matter is adjudicated to a final resolution in which the

7

1-9

BDFTW016668

adjudicated amount against the Indemnitee is greater than the settlement amount, the Rejecting Party shall be liable for the difference.

5.6 REPAYMENT OF EXPENSES.  Indemnitee agrees to reimburse the Indemnitor for all reasonable fees and expenses paid by the Indemnitor in defending any action, suit or proceeding described above against Indemnitee if and only to the extent that a final decision by a court having jurisdiction in the matter shall determine that Indemnitee is not entitled to be indemnified by the Indemnitor for such fees and expenses under applicable law.

5.7 REIMBURSEMENT BY INDEMNITOR.  If Indemnitee is required to bring any action to enforce rights or to collect moneys due under this Agreement and is successful in such action, the Indemnitor shall reimburse Indemnitee for all of Indemnitee's reasonable fees and expenses in bringing and pursuing such action.

## ARTICLE VI.  RECORDKEEPING/AUDIT RIGHTS

6.1 RECORDS.  Firm shall be responsible for maintaining complete and accurate individual records (including, as applicable, accounting records in accordance with generally accepted accounting principles) on all matters referred to it hereunder by Servicer. All files of Servicer matters referred hereunder shall be stored in a secure centralized location or locations in an organized and easily retrievable manner; Firm shall employ a tracking system enabling Firm to locate any files "checked out" of such storage location(s) for use by Firm personnel. Without limiting the foregoing, Firm shall ensure that any original promissory notes or other original loan documents provided to Firm are stored in appropriate secured locations, the whereabouts of such original documents tracked, and Firm must be able to produce or account for such original documents within forty eight (48) hours of Servicer's request. If any such original loan documents are held by a court, Firm shall diligently pursue return of such documents by the court upon Servicer's request. All original loan documents that were provided to Firm shall be returned to Servicer within seven (7) business days of the occurrence of the foreclosure sale or other completion of the matter/closing of the Firm's file. Firm shall return files to Servicer in accordance with instructions provided by the Servicer which may include the use of an overnight courier with tracking capabilities.  Firm shall enclose a signed transmittal detailing Servicer's loan number(s) and documents enclosed.  The foregoing requirements of this Section 6.1 shall be in addition to and not in lieu of Firm's obligations relating to Confidential Information hereinafter set forth.

6.2 AVAILABILITY OF RECORDS/AUDITS.  Throughout the term of this Agreement and during any Transition Period (as hereinafter defined) following termination of this Agreement, Firm shall provide to Servicer, its internal or external auditors, attorneys or other personnel, such access to Firm's premises, systems, personnel, records and documentation relating to the Services as Servicer may reasonably request in order to verify Firm's compliance with the terms of this Agreement. Firm agrees to cooperate in any such review or audit as reasonably requested by Servicer. Any such audit on Firm's premises shall be conducted in a manner that does not compromise the confidentiality of information relating to the Firm's other clients, and without undue disruption to Firm's operations. Without limiting the foregoing right

BDFTW016669

1-10

of Servicer to review and/or audit all records relating to the Services, Servicer shall have the right at any time and for any reason to obtain any files, including foreclosure and bankruptcy files, referred to the Firm for Services, and Firm shall not limit Servicer's access to the files and shall assist Servicer in locating any requested files or information. Firm agrees to complete and provide to Servicer upon request a questionnaire including but not limited to the firm's expertise, results on any internal audits or self assessments, capacity, changes in practice and compliance with state law.

## ARTICLE VII. BILLING OF FEES AND EXPENSES

7.1 FEES AND EXPENSES GENERALLY. All fees and expenses must be reasonable, for actual services rendered and to be in accordance with the guidelines and requirements of the applicable investor/insurer. Any amount above such requirements or guidelines must be approved by Servicer prior to billing of such amount by the Firm.

7.2 FLAT FEE MATTERS. Unless otherwise specifically agreed to in advance in writing in relation to a specific matter, all foreclosure, bankruptcy and eviction matters shall be billed by the Firm on a "flat fee" or "lump sum" basis, in accordance with applicable investor and/or FHA/VA requirements. The parties acknowledge that such flat fees may change over time, and shall be as set by HUD, FHA, VA, Fannie Mae, Freddie Mac or other applicable investor, or as mutually agreed to by the Firm and Servicer. To the extent that the applicable investor has not communicated such a flat fee schedule to Servicer or Firm, Firm shall follow the Fannie Mae guidelines.

7.3 HOURLY FEE MATTERS. For litigated matters or issues (including foreclosure or bankruptcy referrals that become litigated matters) or other matters assigned to Firm outside of foreclosure, bankruptcy or evictions, Firm will charge Servicer at the lesser of Firm's normal hourly billing rate for the personnel performing the Services, or an hourly rate of $175.00/hour.

7.4 EXPENSES. Subject to the following sentence, any expenses Firm intends to pass through to Servicer must be approved in advance by Servicer in order to be reimbursed. Firm's costs for phone calls, postage, copying, courier or similar "overhead" items will not be subject to reimbursement by Servicer.

7.5 CHARGES TO BORROWER. Firm shall not quote to or charge the mortgage loan borrower (including debtors in bankruptcy), in any context, including but not limited to the time of reinstatement or payoff, a higher rate or fee than billed to Servicer, and shall promptly reimburse to the borrower, or Servicer as the case may be, any fees or costs which have been miscalculated, over-estimated or which have not been actually incurred.

7.6 INVOICE TIMING. All invoices shall be submitted to Servicer (via Servicer's bill presentment program) for payment in accordance with the procedures set forth herein:

(A) Foreclosure: Invoices for Services must be submitted to Servicer no more than twice during the period from the initiation of foreclosure proceedings to the completion of the matter: first, upon filing of the complaint (where applicable); and second, within five (5) business days of completion of sale/disposition of the subject property or when the foreclosure action is

9

BDFTW016670

1-11

otherwise terminated, such as by withdrawal of the matter, reinstatement, interruption by a bankruptcy, etc. All amounts due must be invoiced within thirty (30) days of final completion of the matter. Servicer shall not be obligated to pay any amounts not invoiced within thirty (30) days of completion of the matter.

(B) <u>Bankruptcy</u>: Invoices for Services in connection with routine bankruptcy matters must be submitted to Servicer no more than three times during the period from the initiation of bankruptcy proceedings to the completion of the matter: first, upon filing of the proof of claim (if applicable); second, upon filing of the motion for relief from stay (if applicable), and third, within thirty (30) days of dismissal, discharge, confirmation of plan, or other completion of the matter. All amounts due must be invoiced within thirty (30) days of final completion of the matter. Servicer shall not be obligated to pay any amounts not invoiced within thirty (30) days of completion of the matter.

(C) <u>Litigation or other hourly billed matters</u>: Invoices for Services shall be submitted on a monthly basis.

7.7 INVOICE REQUIREMENTS. A "Flat Fee" or "Lump Sum" bill is allowed only on foreclosure, bankruptcy or eviction matters. Such billing of total charges and fees is not acceptable in litigation or contested matters. Firm must itemize fees and itemize disbursements for all litigated or contested matters or other matters billed on an hourly basis. Invoices for matters billed on an hourly basis must show the task performed, the person performing the task, break down of time to increments of 1/10 of an hour, hourly rate charge for the person(s) providing the service and an itemization of approved expenses incurred in connection with the work performed on behalf of Servicer.

7.8 FEE COMPLIANCE. All charges, costs and fees submitted by Firm must comply with all applicable federal, state, and local laws and court rules, as well as any ethical requirements regarding legal fees to which the Firm or its personnel are subject.

7.9 TIME FOR PAYMENT. Servicer agrees to remit payment to Firm within 30 days of receipt of Firm's invoice.

7.10 PAYMENT DELAY. If Firm fails to follow the procedures for billing set forth herein or if Firm has not provided Servicer with a certified IRS W-9 and Federal Tax ID#, Servicer may withold payment until Firm has materially complied with these provisions.

## ARTICLE VIII. CONFIDENTIALITY

8.1 CONFIDENTIAL INFORMATION. Servicer (including its affiliates) and Firm may from time to time disclose to each other (both orally and in writing and in any form or medium) in connection with the Services provided hereunder Confidential Information. As used herein "Confidential Information" shall mean any and all information furnished or disclosed, in whatever form or medium, concerning a disclosing party, unless excluded as hereinafter set forth. Confidential Information, includes, without limitation, such disclosing party's intellectual property, clients, borrowers, customer lists, business contacts, business plans, policies,

10

BDFTW016671

procedures, techniques, know-how, standards, products, source or object code, product or service specifications, manuals, agreements, economic and financial information, marketing plans, data, reports, analyses, compilations, statistics, summaries, studies, and any other materials or information, or any materials based thereon, whether written or oral, furnished directly or indirectly by a disclosing party or any of such disclosing party's directors, officers, employees, agents, attorneys, accountants, advisors and other representatives. For purposes herein, any technical or business information of a third person furnished or disclosed by one party to the other shall be deemed "Confidential Information" of the disclosing party and subject to the terms of this Section 8. Servicer's Confidential Information also shall include any proprietary and/or confidential information related to PHH's affiliates, sales representatives, and/or customers.

8.2 NON-DISCLOSURE. The receiving party agrees to treat all Confidential Information provided by the disclosing party pursuant to this Agreement as proprietary and confidential to the disclosing party, and the receiving party shall not (without the prior written consent of the disclosing party) disclose or permit disclosure of such Confidential Information to any third party, provided that the receiving party may disclose, on a need-to-know basis, such Confidential Information to its third party subcontractors who have signed non-disclosure agreements with the receiving party which contains confidentiality and non-disclosure obligations that are at least as protective of the disclosing party's Confidential Information as set forth herein, and/or to its current employees, officers, or directors, or legal or financial representatives, for which the receiving party shall be responsible under this Agreement. The receiving party agrees to safeguard all Confidential Information of the disclosing party with at least the same degree of care (which in no event shall be less than reasonable care) as the receiving party uses to protect its own Confidential Information. The receiving party shall use the disclosing party's Confidential Information solely for the purpose of fulfilling its obligations under this Agreement. The receiving party further agrees not to use or disclose the disclosing party's Confidential Information for its own benefit or for the benefit of others, except as otherwise authorized by this Agreement, or the disclosing party in writing.

8.3 PERSONALLY IDENTIFIABLE INFORMATION. In addition to the foregoing, in the event that Servicer's Confidential Information contains any personally identifiable information of Servicer's (and/or its Affiliates') employees, or customers (including mortgage loan borrowers) (hereinafter "Personally Identifiable Information"), Firm agrees to comply at all times with (and maintain and safeguard such Personally Identifiable Information in accordance with) (i) Servicer's then-current privacy policies and procedures, to the extent so requested by Servicer and made available to Firm, and (ii) any and all applicable privacy laws, regulations, statutes, and guidelines.

8.4 EXCEPTIONS. Notwithstanding the foregoing, the Parties agree that the following information (except if such information constitutes Personally Identifiable Information) shall not be deemed Confidential Information, and the receiving party shall have no obligation with respect to any such information:

    (i)    Information which is independently developed by the receiving party without use of the disclosing party's Confidential Information;

BDFTW016672

1-13

(ii)   Information which is or becomes in the public domain by no fault or wrongful act of the receiving party;

(iii)   Information which is known by the receiving party prior to disclosure by the disclosing party;

(iv)   Information which is disclosed to the receiving party by third party who was not under a similar restriction or obligation of confidentiality to the disclosing party, and without breach of this Agreement;

(v)   Information which is approved for release by written authorization of the disclosing party and/or the third party owner of the disclosed information; or

(vi)   Information which is disclosed pursuant to the lawful requirement or order of a court or governmental agency, provided that, upon the receiving party's request for such a disclosure, the receiving party gives prompt notice thereof to the disclosing party (unless such notice is not possible under the circumstances) so that the disclosing party may have the opportunity to intervene and contest such disclosure and/or seek a protective order or other appropriate remedy.   In the event that such protective order or other remedy is not possible under the circumstances, the receiving party shall furnish only that portion of the Confidential Information which is legally required and the receiving party shall exercise its reasonable best efforts to obtain reasonable assurance that confidential treatment will be accorded the Confidential Information.

8.5  All Confidential Information transmitted or disclosed hereunder will be and remain the property of the disclosing party, and the receiving party shall (at the disclosing party's election) promptly destroy or return to the disclosing party any and all copies thereof upon termination or expiration of this Agreement, or upon the written request of the disclosing party. Upon the request of the disclosing party, any such destruction shall be certified in writing by the receiving party.

8.6 Subject to the provisions specifically set forth herein, nothing in this Agreement shall be construed to limit or prohibit the receiving party from independently creating or developing (or having created or developed for it), or from acquiring from third parties, any information, products, concepts, systems, or techniques that are similar to or compete with the information products, concepts, systems, or techniques contemplated by or embodied in the disclosing party's Confidential Information, provided that (in connection with such creation, development, or acquisition) the receiving party does not violate any of its obligations under this Agreement. Notwithstanding the foregoing, the receiving party shall not, nor assist others to, disassemble, decompile, reverse engineer, or otherwise attempt to recreate, the disclosing party's Confidential Information.

8.7 Firm shall not tamper with, compromise, or attempt to circumvent any physical or electronic security or audit measures employed by Servicer or its affiliates in the course of Servicer's or its affiliates' business operations. Firm shall not, without Servicer's prior express written consent, or as otherwise provided in this Agreement, and without complying with

12

1-14

BDFTW016673

Servicer's security policies and procedures, (i) access any Confidential Information or computer systems of Servicer or its affiliates, or (ii) remove from Servicer's premises any Confidential Information, or any other property, whether tangible or intangible, of Servicer or its affiliates.

8.8 The Parties acknowledge and agree that, given the unique and proprietary nature of the Confidential Information, monetary damages may not be calculable or a sufficient remedy for any breach of this Section 8 by the receiving party, and that the disclosing party may suffer great and irreparable injury as a consequence of such breach. Accordingly, each party agrees that, in the event of such a breach or threatened breach, the disclosing party shall be entitled to seek equitable relief (including, but not limited to, injunction and specific performance) in order to remedy such breach or threatened breach. Such remedies shall not be deemed to be exclusive remedies for a breach by the receiving party but shall be in addition to any and all other remedies provided hereunder or available at law or equity to the disclosing party and the receiving party further agrees to waive any requirement for the securing or posting of any bond in connection with such remedy.

8.9 The Parties acknowledge and agree that, due to the attorney – client relationship that exists between the Parties, communications and other information exchanged between the Parties in connection with this Agreement may be subject to the attorney – client privilege and/or the attorney work product doctrine. Servicer reserves all rights available to it in connection with attorney – client privileged communications and/or the attorney work product doctrine. Firm's confidentiality obligations set forth in this Article 8 are in addition to and not in lieu of Firm's legal and ethical obligations to preserve client confidential information and communications, including attorney – client privileged communications and attorney work product.

## ARTICLE IX. INFORMATION PROTECTION

9.1 INFORMATION PROTECTION.  Firm shall have in place on the Effective Date, and shall maintain throughout the term of this Agreement, commercially reasonable technical and security measures intended to prevent destruction, alteration, disclosure or access, in each case to the extent unauthorized, or loss of, Servicer data, borrower or loan data, or Confidential Information, including Personally Identifiable Information. Such measures shall be reviewed regularly and revised as needed to address ongoing threats and risks. The following requirements of this Article IX are minimum standards and Servicer does not represent that they are adequate to meet the Firm's needs. The Firm acknowledges that it is the Firm's sole obligation to (i) implement appropriate measures to secure its systems and data, including Servicer Confidential Information, against internal and external threats and risks; and (ii) continuously review and revise those measures to address ongoing threats and risks.

9.2 REMOVABLE MEDIA. Firm shall institute strict physical and logical security controls to prevent transfer of Servicer Confidential Information, including Personally Identifiable Information, via any form of Removable Media.  For purposes of this section, "Removable Media" means portable or removable hard disks, USB memory drives, CDs, DVDs, memory cards, and all other removable data storage media. Firm hereby agrees that in any exception situations to the foregoing involving Servicer Confidential Information or Personally

1-15

BDFTW016674

Identifiable Information, that are specifically approved by Servicer in writing, such data will be encrypted using commercially recognized encryption technology, and Firm will provide decryption keys or codes to only the authorized representatives of the recipients via secure out-of-band communications only.

9.3 ENCRYPTION, ETC. Servicer Confidential Information, including Personally Identifiable Information (i) may only be made available and accessible to those parties explicitly authorized under this Agreement or otherwise expressly authorized by Servicer in writing; (ii) if transferred across the Internet, any wireless network, or other public or shared networks, must be encrypted using commercially recognized encryption technology, and (iii) if transferred using Removable Media (if so permitted) must be sent via a bonded courier and encrypted using commercially recognized encryption technology.

9.4 FACILITIES. Firm facilities that process Servicer Confidential Information, including Personally Identifiable Information, will contain secure areas to house such information and be protected by perimeter security such as access controls (e.g., the use of guards and/or entry badges) that provide a physically secure environment from unauthorized access, damage, and interference.

9.5 SYSTEM SECURITY. Firm shall implement formal procedures to control access to its systems, services, and data, including, but not limited to, user account management procedures and the following controls:

- Network access to both internal and external networked services shall be controlled, including, but not limited to, the use of properly configured firewalls;

- Operating systems will be used to enforce access controls to computer resources including, but not limited to, authentication, authorization, and event logging;

- Applications will include access control to limit user access to information and application system functions; and

- All systems will be monitored to detect deviation from access control policies and identify suspicious activity.

Firm will promptly notify (but in no event more than twenty-four (24) hours after confirmation of the occurrence) the Servicer of any suspected and potential or actual security attacks or incidents, whether directed from internally or externally, involving Servicer Confidential Information or Personally Identifiable Information. The notice shall include the approximate date and time of the occurrence and a summary of the relevant facts, including a description of measures being taken to address the occurrence. Firm will notify PHH of each and every security incident involving PHH's Confidential Information, including Personally Identifiable Information.

1-16

BDFTW016675

9.6 The Firm will certify to Servicer on an annual basis that Firm has complied with the requirements of this Article IX.

## ARTICLE X. DISASTER RECOVERY/BUSINESS CONTINUITY

10.1 Firm shall have implemented and will administer a Business Continuity Plan ("BCP") covering the Services. The BCP shall be designed to permit Firm to recover critical Services provided under this Agreement. The BCP shall cover contingency strategies for coping with the prolonged unavailability of critical business processes, equipment, communications services, employees, buildings and access to buildings, and shall enable the recovery of the provision of the Services following any disruption or outage that impacts the Services within twenty four (24) hours of the disruption or outage. The BCP shall list the resources that are required to recover the Services, and must detail the Firm's process for communicating the interruption internally and externally. Firm shall provide to Servicer a then most current copy of its BCP (or summary thereof) upon request.

10.2 The Firm shall formally exercise the BCP at least once every twelve (12) months during the term of this Agreement, using realistic simulations to demonstrate whether the Services can be resumed within recovery timeframes established pursuant to Section 10.1 above. Firm shall be responsible for coordinating and executing these exercises, and for conducting an assessment of each exercise analyzing the recovery capability of the component part of the BCP exercised to ensure that all critical processes and services tested are adequately protected by Firm's BCP. Any remedial actions and recommendations resulting from Firm's exercising the BCP shall be completed and closed by Firm within a commercially reasonable time after identification of such remedial action. If remedial actions cannot be implemented within such time period, Firm shall notify Servicer and provide a written corrective action plan specifying a timeline for completing implementation of the corrective actions.

10.3 Firm shall, at least every twelve (12) months during the term of this Agreement, review and update (if necessary) the BCP then in effect, to include any changes in facilities, systems and Firm personnel providing the Services.

10.4 If an event occurs resulting in a disruption of the Services, Firm shall (i) promptly provide Servicer with notice of the same, and ongoing status updates, and (ii) promptly implement the BCP upon the occurrence of any such event which adversely affects the provision of the Services to Servicer. If the occurrence of such an event affecting Firm's provision of the Services to Servicer causes Firm to allocate limited resources between or among Firm's clients, Servicer shall receive at least the same priority in respect of such allocation as Firm's other clients.

10.5 The Firm shall, within thirty (30) days after the occurrence of any event described in Section 10.4 above, provide to Servicer a reasonably detailed account of the event, any identified BCP deficiencies, recommendations, action plan(s) and associated activity timelines. Any such actions or recommendations relating to the Firm's ability to implement the BCP and reinstate the Services in accordance with the BCP shall be undertaken and closed by the Firm within a commercially reasonable time after the restoration of the Services. If remedial actions cannot be implemented within such time period, the Firm shall notify Servicer and submit a written

BDFTW016676

P-17

corrective action plan specifying a timeline for completing implementation of the corrective actions.

10.6 The Firm will certify to Servicer on an annual basis that Firm has complied with the requirements of this Article X.

## ARTICLE XI. TERM AND TERMINATION

11.1 TERM. This Agreement shall commence on the Effective Date and shall continue in force and effect unless and until terminated as provided herein. The Parties agree that this Agreement shall apply to all pending matters where Firm is providing Services or otherwise representing Servicer's interest on the Effective Date, as well as to new matters referred to Firm on or after the Effective Date.

11.2 TERMINATION BY SERVICER. Servicer may terminate this Agreement, in whole or in part, at any time, by providing written notice to Firm specifying the date such termination shall be effective. For the avoidance of doubt, the Parties acknowledge and agree that the Servicer may specify that termination shall be effective immediately. If Servicer terminates this Agreement only as to certain matters being handled by the Firm, Servicer shall specify the matter(s) regarding which Servicer intends to transfer to other counsel.

11.3 TERMINATION BY FIRM. Subject to (a) any legal requirements or ethical obligations relating to withdrawal or substitution of counsel that the Firm may be subject to in the jurisdictions where the Firm provides the Services, and (b) Firm's obligation to provide Services and/or assistance during the Transition Period set forth below, Firm may terminate this Agreement, in whole or in part, at any time, by providing not less than thirty (30) days advance written notice to Servicer specifying the date such termination shall be effective. If Firm terminates this Agreement only as to certain matters being handled by the Firm, Firm shall specify the matter(s) regarding which Firm no longer intends to represent Servicer.

11.4 PAYMENTS AFTER TERMINATION. In the event of termination, Firm shall be paid the amounts due and owing for Services accrued to the Termination Date within 30 days following the Termination Date, in accordance with the provisions of Article VII hereof.

11.5 SERVICER'S RIGHTS AFTER TERMINATION. Upon termination, the Servicer shall have full power and authority to take possession of all files and records, assume any and all information and documentation that the Servicer selects, and prosecute the matters being handled by Firm to completion.

11.6 FIRM"S RESPONSIBILITIES FOLLOWING TERMINATION. Upon any termination of this Agreement, Firm shall immediately proceed in accordance with any specific instructions from Servicer, protect and maintain the Services, and make reasonable and diligent efforts to mitigate costs associated with the termination. In the event of termination, Firm will provide Servicer as promptly as possible, but in no event later than five (5) days after the effective date of termination, with the following:

1-18

BDFTW016677

(a) a current and updated report detailing all matters being handled and their status, including any critical upcoming dates such as court hearings or depositions;

(b) a current and updated report of all original mortgage loan documents that were provided to the Firm, including the location of each such document;

(c) all funds held on behalf of Servicer and all active files being handled by Firm;

(d) all bills for each active matter and all outstanding invoices. These bills and invoices should be submitted in accordance with the billing procedures contained in Article VII; and

(e) the assistance during the Transition Period described below.11.7 TRANSITION ASSISTANCE. Following the effective date of termination of this Agreement in whole or in part for any reason (whether terminated by Servicer or Firm), Firm shall continue to provide the Services to the extent necessary to protect the Servicer's interests, and otherwise fully cooperate with Servicer in transitioning the Services to new counsel, for a reasonable period of time as requested by Servicer, not to exceed one hundred eighty (180) days following the effective date of termination (the "Transition Period"). During the Transition Period, the Firm shall continue to provide any Services needed before new counsel formally assumes responsibility for the matters being transitioned, including appearing at any pending court hearings, depositions, or similar matters, and filing all documents with pending deadlines (or obtaining extensions if so doing will not prejudice Servicer). During the Transition Period the Firm will also execute all substitutions of counsel requested by Servicer or Servicer's new counsel. The Servicer will pay the Firm for all Services provided during the Transition Period in the amounts and through the invoicing process set forth in this Agreement. The foregoing obligations of the Firm to provide transition assistance are in addition to and not in lieu of any legal requirements or ethical obligations relating to withdrawal or substitution of counsel that the Firm may be subject to in the jurisdictions where the Firm provided the Services.

11.7 COSTS. If either (a) Servicer terminates this Agreement in whole or in part for cause, or (b) Firm terminates this Agreement in whole or in part without cause, then Firm shall be liable for the reasonable out of pocket costs incurred by Servicer to transition the matters handled by Firm to new counsel, including costs of copying and shipping files, and the reasonable fees of new counsel to familiarize themselves with the status of the transferred matter. For purposes of this Section 11.8, "for cause" in case of Servicer's termination of this Agreement shall mean the Firm's material breach of any of its obligations hereunder, and "without cause" in case of Firm's termination of this Agreement shall mean termination of this Agreement by Firm for any reason other than (i) Servicer's failure to pay the amounts due for Services to the Firm, or (2) Servicer's failure to reasonably cooperate with Firm in connection with Firm's provision of the Services.

17

1-19

BDFTW016678

## ARTICLE XII. MISCELLANEOUS PROVISIONS

12.1 GOVERNING LAW. This Agreement shall be deemed to be made in and in all respects shall be interpreted, construed and governed by and in accordance with the internal laws of the State of New Jersey.

12.2 ENTIRE AGREEMENT. This Agreement embodies the entire understanding and agreement between the Parties with respect to its subject matter and supersedes any and all prior agreements, arrangements and understandings, whether oral or written, with respect to its subject matter.

12.3 NO THIRD PARTY BENEFICIARIES. There shall be no third party beneficiaries of this Agreement. The obligations undertaken by Firm or Servicer in this Agreement (i) shall be for their respective sole benefit, (ii) shall not be for the benefit of any third party, and (iii) and may not be enforced by any person other than Firm or Servicer.

12.4 AMENDMENT. No amendment or modification of this Agreement shall be effective unless it is in writing and signed by both Parties.

12.5 CAPTIONS. The captions of the paragraphs of this Agreement are for reference purposes only and shall not be considered in construing this Agreement.

12.6 COUNTERPARTS. This Agreement may be executed in counterparts, all of which together shall constitute one Agreement, binding on the Parties, notwithstanding that the Parties have not executed the original or the same counterpart.

12.7 SEVERABILITY. If any one or more of the provisions contained herein shall for any reason be held to be unenforceable in any respect under law, such unenforceability shall not affect any other provision of this Agreement, but this Agreement shall be construed as if such unenforceable provision or provisions had never been contained herein, provided that the removal of such offending term or provision does not materially alter the burdens or benefits of either of the parties under this Agreement

12.8 SURVIVAL. In addition to any provision that by its express terms survives termination, the following provisions shall survive termination of this Agreement: Article V (Indemnification); Section 6.2 (Availability of Records/Audits); Article VIII (Confidentiality); Section 11.7 (Firm's Responsibilities Following Termination); Section 11.8 (Transition Assistance); and Article XII (Miscellaneous Provisions).

IN WITNESS WHEREOF, Firm and Servicer have executed this Agreement as of the day and year first above written.

**"Servicer"**
PHH Mortgage Corporation

By: _____

18

BDFTW016679

/ - 20

Its: <u>Senior Vice President</u>

"Firm"

<u>Barrett Daffin Frappier Treder & Weiss, LLP</u>

By: _____  Jay Frappier

Its: _____  MANAGING PARTNER

\* Subject to comments on cover letter dated
9/7/11 and as noted herein

19

EXHIBIT A
SERVICES

Statewide foreclosure, bankruptcy, eviction, title, closing and prosecution of related litigation for the state(s) of _CA , NV_ . To be completed in accordance with state law, investor and insurer guidelines.

Perform foreclosure prevention outreach to borrowers as directed by Servicer and in accordance with applicable law, investor and insurer guidelines.

In connection with the foregoing, Servicer authorizes and/or directs the Firm to take the following actions:

*    Order loan documents if not received within seven (7) business days of receipt of the referral at a cost of $10.00 per document up to maximum cost of $80.00.

*    Send out breach letters to any record owners revealed through a property search that did not execute the mortgage. Breach any mortgagors not listed in the referral and for which Firm did not receive a NOI (the servicing system utilized by PHH only captures two mortgagors so if there are three or more, they may be missed during the breach process).   All necessary breach letters sent out in this regard regardless of the number of breach letters that need to be sent will be billed at $50.

*    File and manage all routine title claims at a legal fee of no more than $125.00.  In the event a Satisfaction/Release of Mortgage needs to be recorded, PHH will also pay the actual recording cost.

*    Order all VA appraisals.

*    Send out all HUD occupancy letters.

*    Prepare any necessary Assignments of Mortgage at a legal fee of $35.00 per assignment plus filing costs if such assignments are not received by Firm within seven (7) business days of request.

*    Complete an SCRA check for all foreclosure borrowers utilizing the Department of Defense SCRA check website (currently: www.dmdc.osd.mil/appj/scra/scraHome.do) prior to foreclosure judgment and five (5) days prior to scheduled foreclosure sale date. A copy of the SCRA verification is to be retained in foreclosure file and uploaded to the Systems.

*    Complete an SCRA check for all bankruptcy borrowers utilizing the Department of Defense SCRA check website (currently: www.dmdc.osd.mil/appj/scra/scraHome.do) prior to filing a Motion for Relief from the Automatic Stay. A copy of the SCRA verification is to be retained in the bankruptcy file and uploaded to the Systems.

20

BDFTW016681

1-22

\*    Order a property search report on all bankruptcy loans that were not previously in foreclosure, prior to filing a bankruptcy Proof of Claim or newly filed delinquent Chapter 7 Motion for Relief, to determine current title prior to filing with the bankruptcy court.

\*    Send a post-referral foreclosure alternative solicitation letter on all Fannie Mae and Freddie Mac invested loans within five (5) business days following foreclosure referral but no later than the one hundred twenty fifth (125th) day of delinquency or immediately upon receipt from Servicer if the loan is greater than one hundred twenty five (125) days delinquent. The letter content will be in conformance with Fannie Mae and Freddie Mac requirements. Sample letter for Fannie Mae invested loans can be found at eFanniemae.com. Sample letter for Freddie Mac invested loans can be found in the Freddie Mac Guide, Exhibit 94.

\*    Prior to canceling any scheduled foreclosure sale for a Fannie Mae or Freddie Mac invested loan due to non receipt of the written certification required by Fannie Mae and Freddie Mac, Firm will notify Servicer that the written certification is needed within two (2) business days prior to the date the written certification is due to the Firm.

1-23

BDFTW016682

EXHIBIT B
PERFORMANCE STANDARDS

**Performance Standard #1:  Foreclosure Timelines**

**Metric**
Foreclosure Timeline is the timeframe required by the Investor, Insurer and state legal requirements to complete the foreclosure process measured from referral to sale.

**Monitoring and Reporting**
The Foreclosure Timeline is determined by calculating the number of days starting from foreclosure referral to foreclosure sale.

**Timing**
The Foreclosure Timeline will be calculated monthly on each file that has completed foreclosure sale.

**Required Level of Service**
Foreclosure Timelines must be met on 95% of all loans completing foreclosure sale each month.

**Liabilities**
Firm will reimburse Servicer for any loss or fees assessed including but not limited to compensatory fees assessed by Fannie Mae or Freddie Mac associated with not achieving the indicated Required Level of Service on any foreclosure file.  First occurrence on having not achieved the Required Level of Service will require Firm to submit a corrective action plan to Servicer.  More than one occurrence within a twelve month period may result in termination.

22

BDFTW016683

1-24

**Performance Standard #2:  Legal Documents**

**Metric**
Legal Documents refer to all documents related to the Services required to be prepared and executed in accordance with Investor, Insurer, State guidelines and applicable law.

**Timing**
Legal Document adequacy and accuracy will be based upon a monthly sample audit of documents completed each month.

**Required Level of Service**
Legal Documents must be 100% accurate relative to adequacy, content, execution and notarization.  Zero tolerance for any changes made to documents post execution.

**Liabilities**
First occurrence on having not achieved the indicated Required Level of Service may result in termination.

BDFTW016684

1-25

**Performance Level #3:  FHA First Legal Timeframes**

### Metric
FHA First Legal Timeframe is the timeframe required by HUD to complete the first legal action in regards to foreclosure processing on HUD insured loans.

### Monitoring and Reporting
FHA First Legal Timeframe is determined by calculating the number of days from first date of default to the day the first legal action is completed.

### Timing
FHA First Legal Timeframe will be calculated monthly on all HUD insured files that completed the first legal action.

### Required Level of Service
FHA First Legal Timeframe must be met on 98% of all HUD insured files that complete a first legal action each month.

### Liabilities
Firm to reimburse Servicer for any loss including but not limited to HUD claim curtailments or penalties associated with not achieving the indicated Required Level of Service on any FHA foreclosure file.  First occurrence on having not achieved the Required Level of Service will require Firm to submit a corrective action plan to Servicer.  More than one occurrence within a twelve month period may result in termination.

BDFTW016685

1-26

**Performance Level #4: Response to Written Inquiry Timeframe**

**Metric**
Response to Written Inquiry Timeframe is required by Servicer in accordance with Section 1.2(A).

**Monitoring and Reporting**
Response to Written Inquiry Timeframe is determined by calculating the number of days from Firm's receipt of a written inquiry to the day a response is provided to Servicer.

**Timing**
Response to Written Inquiry must be met on 100% of all written inquiries submitted by Servicer each month.

**Liabilities**
First occurrence on having not achieved the indicated Required Level of Service may result in termination.

1-27

BDFTW016686

### Performance Level #5: Fees Assessed by Firm

**Metric**

Fees Assessed by Firm are those fees permitted in accordance with Investor, Insurer, State requirements, applicable law and this Agreement.

**Timing**

Fees assessed by Firm in compliance with Investor, Insurer, State requirements, applicable law and this Agreement will be based upon a monthly sample audit of fees assessed each month.

**Required Level of Service**

Fees assessed by Firm must be 100% in compliance with Investor, Insurer, State requirements, applicable law and this Agreement.

**Liabilities**

Firm will immediately reimburse Servicer the amount of any fee assessed in excess of Investor, Insurer, State requirements, applicable law and this Agreement. First occurrence on having not achieved the indicated Required Level of Service may result in termination.

26

1-28

BDFTW016687